UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
JANICE LANG,                            )
       Plaintiff,                       )
                                        )
v.                                      )  Docket No. 05-10052-WGY
                                        )
JOHN E. POTTER, POSTMASTER GENERAL,)
UNITED STATES POSTAL SERVICE,           )
       Defendant.                       )
_____)
```

**DEFENDANT'S *REVISED* MEMORANDUM IN SUPPORT OF
HIS MOTION FOR SUMMARY JUDGMENT**

Defendant, John E. Potter, Postmaster General for the United
States Postal Service, by his attorney, Michael J. Sullivan, the
United States Attorney for the District of Massachusetts, hereby
submits this revised Memorandum of Law in Support of Defendant's
Motion for Summary Judgment dismissing Plaintiff Janice Lang's
Complaint in its entirety.

**I.    INTRODUCTION**

Plaintiff, a sixty-four year old woman, claims that the
United States Postal Service ("USPS") discriminated against her,
in violation of the Age Discrimination in Employment Act ("ADEA")
and Title VII of the 1964 Civil Rights Act ("Title VII"), on the
basis of her sex and age by not selecting her to fill a vacant
Labor Relations Specialist position in 2003.  She argues that her
background and qualifications are clearly superior to Ralph
Divasta, the forty-one year old man USPS hired for the position.
The record evidence, however, does not support Plaintiff's

claims.  As an initial matter, Plaintiff cannot establish a prima facie case of age or gender discrimination.  Moreover, the USPS selected Mr. Divasta for non-discriminatory reasons and Plaintiff cannot produce any evidence demonstrating that these reasons are pretext for discrimination.  As such, the Court should grant Defendant's motion for summary judgment.

## II.   STATEMENT OF FACTS

The government respectfully refers the Court to its Statement of Facts (Docket No. 14), filed March 27, 2006, and incorporates that document herein.

## III.  ARGUMENT

### A.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND PLAINTIFF HAS FAILED TO ADDUCE ADMISSIBLE EVIDENCE TO SUPPORT HER CLAIMS

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Barbour v. Dynamics Research Corporation, 63 F.3d 32, 36-37 (1st Cir. 1995)(quoting Fed. R. Civ. P. 56).  In this respect, a "genuine" issue means that "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational fact finder to

resolve the issue in favor or either side." <u>National Amusements,</u>
<u>Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995).
Likewise, "'material' means that a contested issue of fact has
the potential to alter the outcome of the suit under the
governing law if the dispute over it is resolved favorably to the
nonmovant." <u>Smith v. F.W. Morse & Company, Inc.</u>, 76 F.3d 413,
428 (1st Cir. 1996).

        Once the moving party makes a proper showing as to the
"'absence of evidence to support the non-moving party's case,'
the burden of production shifts to the non-movant." <u>Dow v.</u>
<u>United Brotherhood of Carpenters</u>, 1 F.3d 56, 58 (1st Cir.
1993)(citation omitted).  "As to issues on which the summary
judgment target bears the ultimate burden of proof, [he] cannot
rely on an absence of competent evidence, but must affirmatively
point to specific facts that demonstrate the existence of an
authentic dispute." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56
F.3d 313, 315 (1st Cir. 1995).  Moreover, a plaintiff cannot
defeat a summary judgment motion through conclusory statements,
mere speculation or conjecture.  <u>J. Geils Band Employee Benefit</u>
<u>Plan v. Smith Barney Shearson, Inc.</u>, 76 F.3d 1245, 1251 (1st Cir.
1996); <u>see also</u> <u>Horta v. Sullivan</u> 4 F.3d 2, 11 (1st Cir. 1993).
Even in employment discrimination cases, summary judgment is
appropriate where the non-movant relies "upon conclusory
allegations, improbable inferences, and unsupported speculation."

See <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).  Because Plaintiff cannot meet that burden with respect to her claims, the Court must grant summary judgment, dismissing the Complaint in its entirety.

**A.   PLAINTIFF'S CLAIMS OF AGE AND GENDER DISCRIMINATION FAIL AS A MATTER OF LAW**

Because Plaintiff cannot produce any direct evidence of gender or age discrimination in the USPS's decision not to hire her for the Labor Relations Specialist position, her claims are subject to the <u>McDonnell Douglas</u> burden shifting analysis.[1]  <u>See Colburn v. Parker Hannifin/Nichols Portland Div.</u>, 429 F.3d 325, 335-336 (1st Cir. 2005).  Plaintiff's claims fail under this analysis as she cannot prove a prima facie case of age or gender discrimination, nor can she establish that the USPS's legitimate, non-discriminatory reason for its employment decision was a pretext for discrimination.

---

[1]   "Under [the <u>McDonnell Douglas</u>] framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of . . . retaliation.  If he does so, then the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the [adverse employment action],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. . . . If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the adverse employment action] was in fact a pretext for retaliating against him for having [engaged in protected activity]."  <u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151, 160-61 (1st Cir. 1998) (citations omitted) (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).

### 1.  Plaintiff Fails To Establish A Prima Facie Case Of Gender And/Or Age Discrimination

In this failure to promote case, Plaintiff must first establish each of the elements of her prima facie case of age and/or gender discrimination: that she is a member of the protected group, that she was qualified for an open position for which she applied, but the USPS rejected her in favor of someone possessing similar qualifications.  See, e.g., Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004).  Plaintiff cannot establish that she possessed similar qualifications to Mr. DiVasta and, thus, her claims fails.  Indeed, the record evidence demonstrates that Mr. DiVasta scored higher than Plaintiff on the interview questions, and that Plaintiff did not possess the experience in dealing with labor and employment issues that Mr. DiVasta possessed.  See Exhibits 12-17; Persson Dep., p. 76-77, 90.  Indeed, even the Plaintiff admits that she performed poorly on some of the interview questions.  Lang Dep., p. 82, 115, 135-137, 139.  Accordingly, she fails to establish a prima facie case of age and/or gender discrimination as a matter of law.

   **2.    Plaintiff Cannot Establish That The USPS's
           Legitimate, Non-Discriminatory Reason For Its
           Employment Decision Is A Pretext For
           Discrimination**

Assuming *arguendo* that the Court concludes that Plaintiff
establishes a prima facie case of employment discrimination,
summary judgment in favor of the USPS is still appropriate
because she cannot show that the postal service's legitimate,
non-discriminatory reason for its employment decision is a
pretext for discrimination.  The record is clear that the USPS's
reason for hiring Mr. Divasta over the Plaintiff is that Mr.
Persson, after interviewing all of the candidates (wherein Mr.
DiVasta received the highest scores on the interview questions),
found Mr. DiVasta to be more qualified for the position.  Persson
Dep., p. 76-77, 90.

Plaintiff points to her "superior qualifications" as
evidence that the USPS's reason for selecting Mr. DiVasta over is
a pretext for discrimination.  In particular, Plaintiff cites to
her law degree and the fact that a Review Board selected her
twice for an interview with the selecting official, whereas, the
Board selected Mr. DiVasta only once, as evidence that she was
more qualified for the position than Mr. DiVasta.  <u>See</u> Lang Dep.,
p. 141-42.  A law degree was not a requirement for the position,
however.  Exhibits 9 and 11.  Indeed, Mr. Persson also rejected
Mr. Krinsky, who has been a lawyer for over 20 years.  <u>See</u>
Persson Dep., p. 32, 35.  Also, the first Review Board did not

- 6 -

select Mr. DiVasta because he completed his Form-991 improperly,
not because it found him to be unqualified.  See LoPreste Dep.,
p. 25-26, 46-48, 58-60; DiVasta Dep., 58.

Plaintiff fails to cite any objective evidence that proves
she was more qualified for the Labor Relations Specialist
position than Mr. DiVasta.  This failure is fatal to her claims.
Indeed, "in the absence of strong objective evidence (e.g., test
scores), proof of competing qualifications will seldom, in and of
itself, be sufficient to create a triable issue of fact."
Rathbun, 361 F.3d at 74 (citing Millbrook v. IBP, Inc., 280 F.3d
1169, 1178-79 (7th Cir.), cert. denied, 537 U.S. 884 (2002); and
Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d
277, 280-82 (5th Cir. 1999)).[2]  A plaintiff's personal opinion

---

[2]     The Fifth Circuit's approach in Deines, 164 F.3d at
280-82, adopted by the First Circuit in Rathbun, 361 F.3d at 74,
has also been adopted by the Second, Seventh, and Eleventh
Circuits. See Byrnie v. Cromwell Bd. of Educ. 243 F.3d 93, 103
(2d Cir. 2001) ("Where a plaintiff seeks to prevent summary
judgment on the strength of a discrepancy in qualifications . . .
the plaintiff's credentials would have to be so superior to the
credentials of the person selected for the job that 'no
reasonable person, in the exercise of impartial judgment, could
have chosen the candidate selected over the plaintiff . . . .'");
Cichon v. Exelon Generation Co., L.L.C., 401 F.3d 803, 813 (7th
Cir. 2006); Wilson v. B/E Aerospace, 376 F.3d 1079, 1090 (11th
Cir. 2004) ("[plaintiff] must . . .  adduce evidence that the
disparity in qualifications was 'so apparent as virtually to jump
off the page and slap you in the face'").  The Tenth and D.C.
Circuits have followed the Fifth Circuit's lead as well.  See
Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance
Abuse Services, 165 F.3d 1321, 1330 (10th Cir. 1999) ("When two
candidates are equally qualified in that they both possess the
objective qualifications for the position and neither is clearly
better qualified, 'it is within the employer's discretion to

regarding her own job qualifications is "not sufficiently probative on the issue of pretext." Shorette v. Rite Aid, 155 F.3d 8, 15 (1st Cir. 1998).

This exceedingly high burden placed on the plaintiff is the result of the business judgment rule. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions"); see also Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990). Thus, where a plaintiff seeks to prevent summary judgment solely by showing a discrepancy in qualifications, more must be shown than that the employer made a mistake in corporate judgment in its decision not to hire the disappointed applicant. A plaintiff must show that the difference in qualifications is "so stark as to support an inference of pretext." Rathbun, 361 F.3d at 74. The plaintiff's qualifications must be "so obviously superior to those of the successful . . . applicant[] as to undermine the legitimacy of the selection process." Id. In other words, disparities in qualifications must be "so apparent as virtually to jump of the page and slap you in the face." Hernandez Marrero v. Crowley Am.

_____

choose among them . . . ."); Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (if the employer made an error [in not hiring plaintiff] too obvious to be unintentional, perhaps it had an unlawful motive for doing so).

Transp. Inc., 206 F.Supp.2d 279, 287 (D.P.R. 2002)(quoting
Deines, 164 F.3d at 280).  Plaintiff cannot meet this burden,
and, accordingly, her claims fail as a matter of law.

     Further, Plaintiff has failed to provide any evidence, for
example, that (1) the USPS held other employees outside of her
protected class, who are similarly situated in all respects, to a
different standard; (2) the USPS subjected other employees in her
protected class to adverse employment actions; or (3) instances
of poor treatment toward her occurred.  See, e.g., McDonnell
Douglas, 411 U.S. at 804; Mesnick, 950 F.2d at 824.

     Plaintiff alleges that all of the Labor Relations Specialist
positions are held by males.  While true, that fact is not due to
discrimination but rather small turnover in the lean-staffed
Labor Relations unit and few women applicants for the positions
when they become available.  Couture Dep., p. 101-102; LaVecchio
Dep., p. 74-75.  The undisputed record demonstrates, however,
that the USPS actively has tried to recruit and hire women to
these positions.  Couture Dep., p. 103-104; Persson Dep., p. 152;
LaVecchio Dep., p. 71-74; LoPreste Dep., p. 76.

     The only "negative" comment Plaintiff can recall hearing
from a management employee concerning members of her protected
class purportedly came from Mr. Couture when he mentioned to
Plaintiff in 2003 that she, as was he, was eligible for
retirement.  Lang Dep., p. 69-74; Couture Dep., p. 90-91.  Even

if socially inappropriate, Mr. Couture's isolated, innocuous comment hardly indicates that he harbored any animus toward Plaintiff's age group.  See e.g., Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996) (isolated or ambiguous remarks tending to suggest animus based on a protected class are insufficient, standing alone, to prove pretext) (citing Price-Waterhouse v. Hopkins, 490 U.S. 228, 251-52 (1989)); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st Cir. 1996) (holding that isolated remarks are insufficient to prove discriminatory intent).  Moreover, Mr. Couture was not the decision maker with regard to the selection of Mr. DiVasta for the Labor Relations Specialist position.  Ayala-Gerena, 95 F.3d at 96.

Therefore, in the absence of any "evidence from which a reasonable jury could infer, without the most tenuous insinuation," that the USPS's legitimate, non-discriminatory reasons for its employment decisions were pretexts for discrimination, the USPS is entitled to summary judgment on Plaintiff's retaliation claims.  See Mesnick, 950 F.2d at 826.

- 10 -

**IV.    CONCLUSION**

For the foregoing reasons, this Court should enter summary judgment for the Defendants dismissing Plaintiff's Complaint in its entirety.

                                    Respectfully submitted,

                                    Michael J. Sullivan
                                    United States Attorney

                        BY:    /s/ Damian W. Wilmot
                               DAMIAN W. WILMOT
                               Assistant U.S. Attorney
                               Moakley Federal Courthouse
                               One Courthouse Way, Suite 9200
                               Boston, MA 02110
Dated: March 28, 2006          (617) 748-3398


<u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing Memorandum in Support of Summary Judgment to be served on Plaintiff's attorney, Gary Goldberg, 120 Main Street, Worcester, MA 01608, by first class mail, postage pre-paid.

                               /s/ Damian W. Wilmot
                               DAMIAN W. WILMOT

# EXHIBIT 1

```
 1                        Volume I
                        Pages 1 - 83
 2

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
     JANICE E. LANG,                      )
 5                    Plaintiff           )
                                          )
 6        VS.                             )  05-10052-WGY
                                          )
 7   JOHN E. POTTER, Postmaster General   )
     United States Postal Service,        )
 8             Agency                      )
```

**COPY**

```
 9

10

11        DEPOSITION OF ROBERT LOPRESTE, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   11, 2005, commencing at 10:27 a.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.
```

```
21   _____
                    FOR THE RECORD
22              COURT REPORTING SERVICES
                   11 FISKE STREET
23          SHREWSBURY, MASSACHUSETTS   01545
                    (508) 845-1096
24
```

1  were there at that time?

2       A.     At that time, I believe there were

3  three.

4       Q.     Do you have a recollection as to who

5  they were?

6       A.     Dave Papa and Joseph McClusky and I

7  believe Mark Persson, I believe, was there at that

8  time.  I think those were the three.

9       Q.     Now, we know from Mr. Persson's

10 testimony that he assumed your old position as

11 manager of labor relations back in 2003?

12      A.     Okay.

13      Q.     Is that correct?

14      A.     Yeah, that sounds about the time frame.

15      Q.     Okay.

16      A.     That's when I took the assignment in the

17 Northeast area.

18      Q.     I have also heard some testimony that

19 Dave Papa holds the position of EEO manager?

20      A.     Yes, manager EEO compliance or EEO

21 complaints processing or something to that effect.

22      Q.     When he left his job as labor relations

23 specialist, who assumed that position?

24      A.     I believe in replacement of Dave Papa I

1   honestly can't recall whether it was -- for which

2   selection it was for or if it was both.  It might

3   have been for both selections.  I don't recall.

4       Q.     What would have been the reason why

5   Mr. Couture would have been involved in either one or

6   both of those interview processes at the time?

7       A.     I guess there were two reasons.  While I

8   was the selecting official, the process required his

9   concurrence then the concurrence of the district

10  manager.  So him participating in the interview

11  process helped, I believe, helped him make his

12  decision and concurrence and I think the second

13  reason is we just thought it would be more efficient

14  for us both to be there at the same time and evaluate

15  and consult in deciding to make the selection.

16      Q.     Did Mr. Couture ever disagree with any

17  of your recommendations for the labor relations

18  specialist position?

19      A.     I don't know.  I don't recall.

20      Q.     Did you ever ask any of your

21  subordinates, whether it be Dave Papa, Joe McClusky,

22  Mark Persson or Stephen Meier to assist you in the

23  interviewing process?

24      A.     Ever or in these instances?

1    up to the criteria, the skills one would expect to

2    have in order to be successful in the assignment.

3              So, generally, what I do do in reviewing

4    the 991 is I look -- well, you know, you first look

5    at the background.  The first page of the 991 tells

6    you about their education, about the other types of

7    assignments that they have had.

8              That may be important because there may

9    be some experience that they have that you think

10   would help them in whatever assignment they are

11   looking or seeking to be placed into.  And then you

12   look at the responses to these questions to see how

13   they kind of tie in their experiences to these

14   skills.

15             One of the things that I know that I'm

16   pretty picky on is to see that they follow the

17   instructions.  There is something called a star

18   format that you're suppose to follow, situation,

19   task, activity, result.

20             It's asked in answering those questions

21   that you kind of respond in that format.  You sort of

22   state what the situation is, what the task is to

23   accomplish, how you did it and what the final result

24   was.

1          It kind of helps to show that you can
2   sort of perform this function even though it might
3   have been in some other avenue, some other function,
4   some other company for that matter, you know, some
5   other experiences other than your employment
6   experiences.
7          I'm kind of picky about making sure that
8   they do that because I think that if you can't kind
9   of follow instructions, there is some question as to
10  how well you're going to perform in the function,
11  especially in the labor relations function because I
12  think there is a lot of technicalities in the labor
13  relations function.
14          So I would look at the background.  I
15  would look at the format of their response.  I would
16  look at the meat of their response then evaluate how
17  well I think they did generally, and generally you
18  evaluate for each of the responses for these, for
19  lack of a better word, questions.
20     Q.     Is there some kind of a note taking or
21  grid that you as a member of a board would generally
22  keep?
23     A.     Keep?  I don't know about keeping but I
24  often would get -- I'm looking at -- I'm not sure if

1    posting which was Exhibit No. 1, is it your testimony

2    that prior to March of '03, you added six through

3    nine under level 17 as additional requirements in a

4    prior posting?

5         A.    I guess what I'm saying is that I recall

6    adding similar type of requirements.  I can't

7    honestly say this is verbatim the requirements that I

8    added back several years before but it appears to be.

9         Q.    And what was the reasoning that you

10   added six through nine or similar type of wording and

11   I'm not simply asking you to say, well, that's what

12   you believe to be more important but why specifically

13   six through nine were those requirements added?

14        A.    Well, as a labor relations specialist,

15   part of their function is to guide operations

16   supervisors, managers, in a whole lot of areas,

17   contract, collective bargaining issues, discipline

18   matters, but one of the issues that was becoming more

19   and more prominent were issues of discrimination,

20   having some understanding of the rehab act and the

21   disabilities act, being able to kind of address some

22   of those issues to operations managers.

23             I thought that they needed some baseline

24   knowledge.  It was becoming more on more a part of

1   the responsibility of a labor relations specialist
2   using computer systems to analyze data.
3                One of the things that we were doing
4   back then, and I think they still do now, is do
5   research on contract matters through different
6   computer programs and I have found one of the things
7   that we do is we present cases at arbitration and I
8   found that creating charts and graphs, things of that
9   nature, for the purposes of the prepping for use in
10  front of an arbitrator, were beneficial.  So I wanted
11  them to have those skills.
12               We were data processing.  We had to do
13  more and more of our own typing, filing, those types
14  of things so, you know, that was a requirement that I
15  believe someone really needed to have in order to be
16  successful.
17               Reasonable accommodation is sort of the
18  same.  Again, issues that were becoming more and more
19  prominent and the labor relations function somehow
20  started to absorb, in an advisory role, those issues.
21  So I thought it was important to have our specialists
22  have an understanding of at least what they were.
23       Q.    Where were the specialists at the time
24  of the interview stage supposed to get that level of

1   Persson deposition, please?  These are the agency's

2   answers to Ms. Lang's first set of interrogatories.

3   Can you turn to the second page, just read the

4   question and response to number three?

5        A.     I have read it.

6        Q.     Does the identification of Mr. Kender,

7   Mr. Krinsky and Ms. Lang, refresh your memory at all

8   as to the individuals that you recommended for

9   interview by the selecting official?

10             MR. WILMOT:  Objection.  You can answer.

11       A.     Not much more.  You know, Mr. Krinsky, I

12  can't even remember who he is quite frankly.  I don't

13  question that I did but I don't have a vivid

14  recollection of having reached these individuals.

15  Mr. Kender, I recall.  I don't even remember who

16  Mr. Krinsky is.  Ms. Lang, obviously, I know.

17       Q.     Do you have any recollection whatsoever

18  of any concerns that you or any of the other board

19  members had regarding Mr. DiVasta's 991?

20       A.     I have a vague recollection that there

21  was some concerns.  I don't remember -- I believe now

22  that you mention it, we had some concerns about how

23  he completed his 991 and I believe the concerns were

24  shared by -- I know, I believe I had some concerns.

1    Mr. Papa, I'm just trying to remember.

2                Ms. Legro had some concerns as well.  I

3    don't remember what it was but I recall being

4    disappointed, so to speak, you know, not -- I didn't

5    think the 991 was put together as well as it should

6    have been.

7        Q.      You had indicated before that in some

8    instances the board member's experience with the

9    candidate could assist the candidate's 991 even if

10   some of the answers to the 991s were either not

11   complete or not to the full satisfaction of the

12   board; is that correct?

13       A.      That's correct.

14       Q.      Do you recall whether or not that your

15   knowledge or Mr. Papa's knowledge of Mr. DiVasta's

16   performance played a role in your decision not to

17   recommend him out of the review board?

18                MR. WILMOT:  Objection.  You can answer.

19       A.      I can't speak for Mr. Papa, I don't

20   recall, but it didn't for me because I think if it

21   had, it probably would have been in reverse because

22   my experience with Mr. DiVasta had been good and the

23   work that I had seen that he had performed I thought

24   was good, but like I said early on, I'm maybe

```
 1    different than some others but I'm pretty picky about

 2    the 991 process and I can't -- my recollection is he

 3    didn't do his 991 as good of a job as he should have

 4    in applying for the position.

 5         Q.    Are there any other documents that you

 6    have at your disposal besides the 991s and attached

 7    questions and answers as a member of the review

 8    board?

 9         A.    I don't recall having anything other

10    than the 991s.

11         Q.    When you are in the capacity as a

12    selecting official, are the 991s returned to you as

13    part of your selection process?

14         A.    I believe I have always taken the 991s.

15    I don't know that everybody does but my practice is

16    to look at the 991s as well.

17         Q.    In addition to the interview?

18         A.    In addition to the interview but I think

19    everybody is different but that's what I do.

20         Q.    Why do you do that?

21         A.    Well, like I said before, one of the

22    things you look at in the 991 is some experiences and

23    sometimes that's helpful to understand and to help

24    evaluate the responses that they give in interviews
```

1    that.  So from a personal perspective, she had some

2    pluses but she also had some serious -- I had some

3    serious concerns about it.

4        Q.    The issue about the operational

5    managerial experiences, did you share that concern

6    with either Mr. Couture or Mr. Persson?

7            I'm specifically referring back to the

8    time period associated with this interview process.

9        A.    I think not.  Generally speaking, if

10   you're a member of the board, you know, you kind of

11   refrain from having really in-depth conversations

12   about the candidates.  I just don't think that's

13   really appropriate.

14       Q.    Why?

15       A.    Well, not that anybody would but I

16   suppose there is an opportunity for someone to try

17   and influence you in some way.  Actually, it's never

18   happened to me but I just feel, I don't know, maybe I

19   was told way back, you know, in the early years,

20   maybe I was told you shouldn't do that but that's

21   kind of been my practice.

22       Q.    The labor relations specialists, who are

23   the individuals that they primarily service?

24       A.    Primarily, supervisors, managers,

1    postmasters, we refer to as operational, operations

2    folks, people who as Mr. Runner used to say, touch

3    the mail, move the mail.

4        Q.    That would be people in your district?

5        A.    Yes.  Sorry.  Well, each district has a

6    labor relations staff.  That staff supports the

7    members of that district.

8        Q.    At some point in time, did the districts

9    merge with Springfield?

10       A.    Yes, that happened after I left the

11   position of manager.

12       Q.    Prior to the merger but while you were

13   still there?

14       A.    You know, I say that.  I'm just trying

15   to think back.  The time frame is pretty close.  So

16   it possibly could have started when I was still there

17   and then, but for all practical purposes, it happened

18   when Mr. Persson got there.

19       Q.    Assuming for the sake it happened right

20   around the time, predominantly after you left, when

21   you were there as the manager, do you have a general

22   recollection of the breakdown of the genders of the

23   supervisors, managers and postmasters that were in

24   your district?

1  follow-up question is going to be, I'm going to ask

2  you if by reviewing the exhibit, whether or not that

3  assists you in recalling what part of Mr. DiVasta's

4  991 may have been viewed by you or other members of

5  the board as being deficient in some capacity?

6        A.      Okay.

7              MR. GOLDBERG:  Off the record while he's

8  reviewing that.

9              THE WITNESS:  Could I see the posting

10 for this?

11             MR. WILMOT:  I think it's Exhibit No. 1.

12             THE WITNESS:  This was the posting that

13 resulted in this.  I have looked at it.

14       Q.      Are you able to answer the pending

15 question?

16       A.      Not specifically.  I can say that on the

17 sixth of ten pages, that's my handwriting and I

18 believe the cross-offs and changes in the numbers are

19 mine and I don't remember the details but there was

20 some problem with, you know, how he put the

21 application together for a 17 and 19 and I was just

22 looking here to see if there was more specific

23 directions, but my recollection is this wasn't the

24 way -- I mean, I crossed out, looks like I crossed

1    out advanced, which is the 19 requirement but that's

2    the only distinction between the two and juxtaposed

3    some of these responses and without recalling the

4    details of it, there is no question in my mind that

5    was something that raised some concern of mine.  I

6    just can't recall what it was beyond -- it seems as

7    if he didn't process this in the way it was supposed

8    to be processed.

9            I mean, I can look at the other

10   applications, see how, if they were done differently,

11   but that's the best of my recollection that jumps out

12   as to, you know, one of the reasons why he wouldn't

13   have been recommended.

14       Q.    The page that you have open, which you

15   described as page six of ten, I believe?

16       A.    Yes.

17       Q.    What is the word that appears to be

18   crossed out?

19       A.    I don't know.

20       Q.    Below that, what is the words which are

21   written?

22       A.    It's ranked on 17 KSA.

23       Q.    What does that refer to?

24       A.    If you look at Exhibit No. 1, EAS 17

```
 1   requirements and EAS 19 requirements.  So,
 2   presumably, this question is question number five:
 3   Ability to communicate orally and in writing.  So
 4   there is a distinction in the -- apparently, what I
 5   had done was I used his response as a response to the
 6   17 KSA even though it was written as the 19 KSA and
 7   that's sort of the example of what appears to be the
 8   problem.
 9             He didn't separate these things
10   properly.  So if he was applying for both, so to
11   speak, he should have identified specifically the 17
12   and the 19 and he was applying, if I'm not mistaken,
13   he was kind of vague but he put a slash, 17/19.
14             I know in some instances people realize
15   in all likelihood they're not going to get the 19 and
16   just write 17.  He wrote 17/19 but didn't really say
17   here are my requirements for the 17 and some of them
18   might have been duplicate or just, you know, change a
19   little bit but this, I mean, I'm picky.
20             This is the type of thing that would
21   aggravate me and say that's not the way I expected
22   the application to be processed.
23        Q.    So just so I can summarize just one
24   second, when Mr. DiVasta applied for the labor
```

```
 1          A.      2003?
 2          Q.      Yes.
 3          A.      No, I don't.  I do a lot of
 4   arbitrations.  They kind of go...
 5          Q.      In Exhibit No. 20 from Mr. Persson's
 6   deposition, I think it's the second to the last page
 7   of the document, Mr. DiVasta writes in his revised
 8   991 for the reposting that he recently sat in on an
 9   arbitration case as an observer and has requested and
10   will be given training as an arbitration advocate in
11   the near future?
12          A.      Where does he say that?
13          Q.      Sorry, first paragraph, last line.
14          A.      Okay.
15          Q.      Does that assist you at all in recalling
16   whether or not that it was yourself he was referring
17   to in the arbitration matter?
18                  MR. WILMOT:  Objection.  You can answer.
19          A.      No.
20          Q.      Do you have any recollection today of
21   Mr. DiVasta coming to you, subsequent to his
22   rejection and not getting an interview from the
23   review board or from the selecting official in the
24   initial posting and asking you, specifically, for
```

```
 1   advice and guidance as to how to improve his chances
 2   or opportunities?
 3                MR. WILMOT:  Objection.  You can answer.
 4        A.    I think that he did contact me.  I can't
 5   remember if he came in person or on the phone, to
 6   discuss it to some extent.
 7        Q.    What is your recollection of that
 8   discussion?
 9        A.    I really can't.  I don't have any
10   specifics that I can recall, unfortunately.
11   Mr. Walcott had done the same, if I'm not mistaken.
12        Q.    I'm sorry please?
13        A.    Miles Walcott, I think he did the same.
14   I think they both approached me and asked, you know,
15   why they weren't recommended.  Was Walcott
16   recommended?  I forget the order of it but I know
17   they both at some point approached me.
18        Q.    Well, there is documentation to support
19   the fact Mr. Walcott did apply for the first posting
20   and was not given an interview .
21        A.    Okay, so it could have been the same
22   time frame that they approached me, not together but
23   individually.
24        Q.    And would such a conversation or meeting
```

```
1    for the position?
2              MR. GOLDBERG:  Objection.
3         A.      Yes, I'm trying to recall how many
4    applicants there were.  I don't really recall many
5    applicants but there was one applicant, Ann Marie
6    Stoica, who I actually selected for the assignment.
7              I can't recall whether it was the one
8    Mr. Venti got or the one Mr. Meier got, and she
9    declined.  She ultimately declined the assignment.
10   We didn't get a lot of women applicants that I can
11   recall.
12        Q.      So you don't remember getting a lot of
13   female applicants but you have a memory of offering a
14   labor relations specialist position to, did you say
15   Ann Marie Stoica?
16        A.      Yes, I offered her -- again, I just
17   can't recall which of the assignments but in one of
18   the selections, I had selected her.  I offered her
19   the assignment and she declined.
20        Q.      Now, we have talked a lot about Exhibit
21   1 which was identified in a previous deposition as
22   the first posting that the plaintiff, Ms. Lang,
23   applied for.
24              Were you the decision maker with regards
```

# EXHIBIT 2

1

1        Volume I
         Pages 1 - 159
2

3        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
4

JANICE E. LANG,                    )
5              Plaintiff           )
                                   )
6        VS.                       ) NO. 05-10052-WGY
                                   )
7  JOHN E. POTTER, Postmaster      )
   General, United States Postal   )
8  Service,                        )     **COPY**
              Agency               )
9

10

11        DEPOSITION OF MARK D. PERSON, taken at the

12  request of the Plaintiff, pursuant to the applicable

13  provisions of the Federal Rules of Civil Procedure,

14  before Karen G. Farragher, RPR and Notary Public in

15  and for the Commonwealth of Massachusetts, on August

16  9, 2005, commencing at 10:11 a.m., having been

17  identified by the Notary Public through satisfactory

18  evidence of identity per Executive Order No. 455

19  (03-13) at the offices of Gary H. Goldberg, Esq., 120

20  Main Street, Worcester, Massachusetts.

21  _____
                FOR THE RECORD
22        COURT REPORTING SERVICES
                11 FISKE STREET
23      SHREWSBURY, MASSACHUSETTS  01545
                (508) 845-1096
24

```
 1                    P R O C E E D I N G S

 2                        STIPULATION

 3        The parties stipulate that the sealing,

 4   certification and filing of the deposition are

 5   waived, and that all objections except as to the

 6   form of the question and all motions to strike are

 7   reserved until the time of trial.

 8                    MARK D. PERSSON, SWORN

 9   EXAMINATION BY MR. GOLDBERG:

10        Q.       Please state your first and last name,

11   spell your last name, please?

12        A.       It's Mark, M A R K.  Last name is

13   Persson, P as in Paul, E R S S O N.

14        Q.       What is your current employment?

15        A.       I'm the manager of labor relations with

16   the United States Postal Service.

17        Q.       Have you ever been to a deposition

18   before?

19        A.       Yes, I have.

20        Q.       I'm going to be asking you a series of

21   questions today.  I'm going to ask you to answer them

22   to the best of your ability.  If you do not

23   understand a question that I'm asking you, please ask

24   me to repeat it or to rephrase it.  I will be happy
```

1  to do that.

2          I will wait for you to answer my

3  question and I would also ask you to wait for me to

4  finish my question before you respond.  Try to avoid

5  all nonverbal responses so the stenographer can take

6  down your response.

7          Your counsel may object to questions.

8  You still have an obligation to answer those

9  questions unless he instructs you not to do so.  If

10  there is a question pending, I'm going to ask that

11  you answer the question to the best of your ability

12  prior to requesting any type of a break, unless the

13  answer itself involves some type of attorney-client

14  privilege; okay?

15      A.    Yes.

16      Q.    Do you have any questions before we

17  begin?

18      A.    No, I don't.

19      Q.    How long have you held the position as

20  manager of labor relations?

21      A.    Approximately, two years.

22      Q.    Sometime in 2003?

23      A.    I think it was April of 2003, yes.

24      Q.    What were you before you were manager of

```
 1    labor relations?

 2         A.      I was a labor relations specialist.

 3         Q.      How long?

 4         A.      Ten years.

 5         Q.      What is your total tenure with the U.S.

 6    Postal Service?

 7         A.      I started in 1977, February of 1977, so

 8    28 years.

 9         Q.      How old are you?

10         A.      I'm 50.

11         Q.      When you were a labor relations

12    specialist, did you have to apply to become manager

13    of labor relations?

14         A.      Yes, I did.

15         Q.      And who were you reporting to when you

16    were the labor relations specialist, right before you

17    became the manager?

18         A.      Bob LoPreste.

19         Q.      Is that L O capital P R E S T E?

20         A.      Yes.

21         Q.      Was it his position that you assumed?

22         A.      Yes, it was.

23         Q.      What happened to Mr. LoPreste?  Where

24    did he go after that?
```

```
 1         A.       He took a labor relations specialist

 2    position in the area which is domiciled in North

 3    Reading, however, he reports directly to the area

 4    office instead of to the district office now.

 5         Q.       That's something that was higher than

 6    the labor relations manager?

 7         A.       Yes.

 8         Q.       When you began the recruitment process

 9    that led us here today in terms of the position that

10    Janice applied for, for labor relations specialist,

11    was that the first position that you, as manager, had

12    interviewed for?

13                  MR. WILMOT:  Objection.  You can answer.

14                  THE WITNESS:  You want the answer?

15                  MR. WILMOT:  Yes.

16         A.       I believe so.  I believe that was the

17    first position, yes.

18         Q.       What process were you advised to do in

19    order to begin to fill the labor relations position

20    that you ultimately had advertised for in March of

21    2003?

22                  MR. WILMOT:  Objection.  You can answer.

23         A.       Basically, I was talking with the

24    manager of human resources about the need to fill the
```

9

```
 1   position that became open.
 2               It was actually my position that became
 3   open as I filled my boss' position who left for the
 4   area position and so there was a need to fill that
 5   position and I asked him what process do we go
 6   through now basically.
 7        Q.      Who were you speaking with?
 8        A.      Dave Couture.
 9        Q.      Is Dave your boss?
10        A.      He was at the time.
11        Q.      And what did Mr. Couture advise you as
12   to the process to follow?
13        A.      That he would go through personnel and
14   personnel would post the position.  I believe it had
15   to also get area approval, if I'm not mistaken.
16               MR. GOLDBERG:  Mark this, please.
17               (Persson Deposition Exhibit No. 1
18   marked.)
19        Q.      Can you identify Exhibit No. 1, please?
20        A.      As soon as I get my glasses I will.
21   This looks like the first posting.
22        Q.      By first posting, you mean for the labor
23   relations specialist; is that correct?
24        A.      Yes, I do.
```

1      Q.     Anybody else?

2      A.     Not that I can recall, no.

3      Q.     What detail was she assigned to?

4      A.     Labor relations specialist.

5      Q.     How long had she been on that at the

6 time?

7      A.     I'm unsure as to when she started.  It

8 may have been approximately a year at that time.

9 I'm really not sure.

10     Q.     After the job was posted, what was your

11 knowledge of the next step in this selection process?

12     A.     What happens is the interested

13 applicants submit their PS form 991s to personnel and

14 it usually goes into the shared services department

15 of personnel where they hold them until the closing

16 date arrives.

17     Q.     Is there any action performed by

18 personnel besides simply gathering the 991s?

19     A.     No, I believe they just collect them and

20 then when the closing date comes, depending upon how

21 many people apply for them, then they decide what

22 process as far as if there is going to be a review

23 board necessary or not.

24     Q.     So if there is a review board, who makes

1    that determination?

2         A.    I think if it's greater -- if it's, you

3    know, a number of employees that are more than three

4    or four, that a review board is automatically put

5    into place but I'm really not one hundred percent

6    with that answer.

7         Q.    Do you know if there was a review board

8    in place for the initial posting in this matter?

9         A.    Yes, there was.

10        Q.    Who was on the review board?

11        A.    I know, let me see, Bob LoPreste was on

12   that review board.  Dave Papa was on that review

13   board.  I believe there was a third person.  It may

14   have been Donna Legro.  I'm not certain about that

15   but I'm almost positive Donna Legro was on that.

16        Q.    Donna's last name is spelled how,

17   please?

18        A.    L E G R O.

19        Q.    I believe at that time you mentioned

20   that Mr. LoPreste had assumed this different position

21   in labor relations?

22        A.    Yes, I did.

23        Q.    Okay.  Dave Papa, that's P A P A?

24        A.    Yes.

18

1      Q.      What was his position at the time?

2      A.      I believe the actual title was manager

3   of EEO.

4      Q.      And how about Donna Legro?

5      A.      Let's see, she was the postmaster at the

6   time of Reading, Massachusetts.  She's been on

7   several details but I'm sure she was -- her title was

8   postmaster of Reading at the time.

9      Q.      Do you know what the responsibilities

10  were of this review board?

11     A.      What they do is they go through the

12  991s, which are similar to a resume, and they try to

13  determine or narrow down the field, if you will, and

14  then determine if they are going to actually conduct

15  an interview of the remaining applicants that they

16  have narrowed down.

17     Q.      Do you have any authority to direct them

18  to interview or not to interview?

19     A.      No, I do not.

20     Q.      Who had the authority to do that, to

21  tell them that?

22     A.      I don't believe anybody has the

23  authority over the review board to tell them whether

24  or not to interview.  That's their decision as far as

     1          A.     I believe it's personnel.

     2          Q.     Fair to say this would list all of the

     3     individuals who had applied for that position?

     4          A.     Yes.

     5          Q.     Did the review board, in this first

     6     posting, narrow down the field for you?

     7          A.     Yes, they do.

     8          Q.     Who did they recommend to you for

     9     interviews?

    10          A.     Let's see, I believe it was Roger

    11     Kender, Richard Krinsky, and Janice Lang.  I believe

    12     those were the three.

    13          Q.     Were you aware whether or not that the

    14     review board conducted any interviews themselves as

    15     part of their narrowing down process?

    16          A.     I don't believe they conducted

    17     interviews on this first posting.

    18          Q.     Did they submit to you any written

    19     document that would indicate the names of these three

    20     people that were selected?

    21          A.     I believe they sent out letters.  Hold

    22     on, let me think for a second.  I believe they sent

    23     out letters stating that these three people -- to

    24     each of the three people, that they would be having

1   asked at that time.  They usually are.

2        Q.    Were there written questions that you

3   utilized in your interview?

4        A.    I thought there were and I have looked

5   for them and I cannot find them but my memory tells

6   me that there were.

7        Q.    Did Mr. Couture participate in the

8   interview?

9        A.    Yes, he did.

10        Q.    Did he ask any of the questions during

11   the interview?

12        A.    Yes, he did.

13        Q.    Was it a 50-50 type of sharing of the

14   questions?

15        A.    I believe it was.  I believe I asked a

16   question, then Dave would ask a question and so on.

17        Q.    Did Mr. Couture, to the best of your

18   knowledge have a copy of the questions that you

19   believe existed at the time?

20        A.    I do believe he had a copy of the

21   questions.  I'm almost positive.  I cannot find them

22   and my only guess is the reason I didn't keep them

23   was because nobody was selected.  I usually don't

24   keep stuff like that.

1        Q.       Why was Mr. Couture involved in the
2    interview itself?
3        A.       I think it was, primarily, because I was
4    a new manager coming into the job and I don't know if
5    it was at his suggestion even.  It could have been at
6    my suggestion that we do it together.
7                 It's not unusual.  When I was
8    interviewed, I was interviewed by three people in the
9    selection process.  So it wasn't something that was
10   unusual and I don't know actually who suggested it or
11   I think it was basically done because I was new to
12   the position and wanted to make sure I was getting
13   the right applicants for the job.
14       Q.       Do you recall any statement made by
15   Mr. Couture at the beginning of the interview of
16   Ms. Lang to the effect that if we don't find the
17   right candidate during these sets of interviews, then
18   we're going to repost it nationwide?
19                MR. WILMOT:  Objection.  You can answer.
20       A.       No, I don't know.  He may have said it
21   but I don't recall him saying that.
22       Q.       Do you have a recollection of your
23   general impression as to how that interview went with
24   Ms. Lang?

32

```
 1         A.      I don't think -- it was unremarkable, I
 2    guess is my general impression.
 3         Q.      What do you mean by that, please?
 4         A.      I don't think there is anything that
 5    really stood out or stands out in my mind regarding
 6    that first interview.  I guess if anything stood out
 7    in my mind, it probably was with Mr. Krinsky more
 8    than anybody.
 9         Q.      Why is that?
10         A.      Because I thought, based upon his 991,
11    his experience as a practicing attorney, that he
12    would have been more prepared for the interview and
13    he wasn't and I was very surprised by that.
14         Q.      To your recollection, was Ms. Lang
15    prepared for the interview?
16         A.      She was prepared.  You could tell she
17    had spent some time preparing herself, yes.
18         Q.      Is there anything that you recall today
19    besides your phrase that this was an unremarkable
20    interview, that you felt that Janice was lacking or
21    did not do well during the interview?
22         A.      It wasn't that she didn't do well.  It
23    was the lack of experience was clearly obvious.  Her
24    experience in the field, as it pertains to labor
```

1  relations issues, was clearly lacking.

2      Q.      Are you able to give me any examples or

3  instances as to why you reached that conclusion or

4  formed that opinion?

5      A.      It was based pretty much on the answers

6  that she gave, the way she answered them.  Again,

7  nobody was really selected from that applicant list,

8  so it really was -- we decided to move on and post it

9  nationally.

10     Q.      Just to follow up, when you say about

11 the way that she gave her answers and the answers

12 themselves, are you recalling anything at all with

13 any specificity that would assist me in explaining

14 how you reached your conclusion?

15     A.      I would say when you conduct -- when

16 you're in an interview, you have to promote yourself

17 and to show that you're qualified for the position.

18 That did not come across during that interview.  It

19 was clear that her lack of experience in the field

20 was not what I was looking for to fill that position

21 at that time.

22     Q.      Had you made up your mind prior to the

23 interview itself that she was not going to be the

24 selected candidate?

1        A.      Absolutely not.

2        Q.      So what was it exactly during the

3    interview that led you to form the opinion that her

4    lack of experience in the field, by way of her

5    answers or the answers themselves, led you to the

6    opinion that she was not going to be the selected

7    candidate?

8        A.      Well, I think it was a matter of our

9    opinions, both Dave's and mine, that probably out of

10   the three candidates, Krinsky probably had more

11   experience as far as an advocate would go.

12            Kender was somebody that I was looking

13   at more than Krinsky and Janice was third on the

14   list, as far as what my memory recalls.  I know I was

15   looking towards Kender in trying to rationalize with

16   maybe selecting him but we decided not to go that

17   way.

18       Q.      And this was before or after the

19   interviews were taking place that you had these --

20       A.      After the interviews.

21       Q.      Is there anything that you can recall

22   today during the interview process itself with any

23   specificity as to why you formed the opinion that

24   Ms. Lang was third on that scale?

1    A.    I believe the other two people that were

2    interviewed that day, I believe it was only three

3    people that were interviewed that day, that they were

4    more experienced, that their answers were clearer,

5    and I really don't have any specifics as far as what

6    those questions or the answers to those questions

7    were.

8              I do recall that Roger and Mr. Krinsky,

9    Roger Kender that is and Mr. Krinsky, were definitely

10   more experienced and more qualified than Janice was

11   at that time.

12    Q.    You do recall testifying before though

13   that you believe that Mr. Krinsky was not prepared

14   for his interview?

15    A.    Yes, I would say his -- he had some

16   skills.  I think it was more of his attitude, which I

17   thought was cavalier in a way.  It was not something

18   that I was interested in.

19    Q.    Who made the decision to repost?

20    A.    That was a mutual decision by

21   Mr. Couture and myself.

22    Q.    Did you have any discussion with

23   Ms. Lang yesterday in reference to her case?

24    A.    Yes.

37

1    and that's basically where it ended there.  Didn't

2    really get into any discussion about Mr. Couture.

3              She said something about, Ms. Lang,

4    talking about how Mr. Edmonds who she worked for, had

5    mentioned some things about Dave Couture, and it

6    was -- it was more in tuned to Dave Couture, not to

7    me, but we didn't get into any real specifics.

8         Q.    When the decision was made to repost,

9    how did it come about that the reposting took a

10   different form?

11             MR. WILMOT:  Objection.  You can answer.

12        A.    I believe it was because we were trying

13   to open up the position to a broader spectrum to

14   hopefully attract more applicants.

15        Q.    What role did you play in that decision

16   making process?

17        A.    I don't believe I really played any

18   active role in that.  It may have been discussed with

19   Dave Couture, but I think Dave was probably the

20   person who made that decision.  I may have agreed

21   with him but really didn't have any authority one way

22   or the other.

23        Q.    Were you aware that the criteria had

24   changed from the first posting down to the second?

53

1                    (Persson Deposition Exhibit No. 9

2       marked.)

3            Q.    Take a moment, please, to review Exhibit

4       No. 9.  When you're finished, please identify it for

5       me.

6            A.    I know what it is.  It is the questions

7       that were asked Ralph DiVasta on the second interview

8       occurring on October 8, 2003, and it looks like

9       this -- yeah, it is the one.  This is my sheet that I

10      used.

11           Q.    Refer back to the last page, do you see

12      where it says closing comments at the top?

13           A.    Yes.

14           Q.    In the middle of the page, it says:  Has

15      improved 991 to increase his chances.  Spoke with

16      people, Bob, Dave, Mark and Steve.  Attended hearing

17      with Bob LoPreste.  Do you see that?

18           A.    Yes.

19           Q.    Do you know who Bob, Dave, Mark and

20      Steve is referring to in that comment?

21           A.    I would say Bob LoPreste, Dave Papa,

22      myself, I guess, and Steve Meier, I would assume.

23           Q.    Do you know what each one of them spoke

24      to Mr. DiVasta about in reference to improving his

```
 1   991?
 2              MR. WILMOT:  Objection.  You can answer.
 3        A.    Specifically, no.  Like I said, it's
 4   common for people to do that.  A lot of people do it.
 5   Where did I go wrong?  They go by a star format.
 6   Where did I -- you know, how can I improve that?  Did
 7   I explain myself not sufficiently enough or whatever.
 8   Depends.  I don't recall what he spoke to me about.
 9        Q.    Yourself and Steve Meier were two of the
10   individuals who were on the final panel with the
11   second posting?
12        A.    Yes.
13        Q.    Do you know what hearing that he
14   attended with Bob LoPreste?
15        A.    I do not.
16        Q.    Do you know how it came to be that he
17   attended a hearing with Bob LoPreste?
18        A.    Well, many times we have people who are
19   interested in labor relations, attend hearings as an
20   observer.  Again, not unusual for people.  Which
21   specific one, I have no idea.
22        Q.    Do you know if any of the individuals
23   identified, Bob, Dave, yourself or Steve, assisted
24   Mr. DiVasta in either preparing or reviewing his 911?
```

1          A.      I can only speak for myself.  I don't

2     know what the others did or if they reviewed anything

3     or not.    And, again, I don't recall looking at his

4     991 and I cannot recall any specific conversations

5     that I had with him.   I give advice to people like

6     this all the time who are interested in labor

7     relations.

8          Q.      The people who applied for the first

9     posting, were they required to apply again for the

10    second posting?

11         A.      I believe the application said that they

12    were not required.   I don't believe there was an

13    obligation for them to have to submit a new 991.   If

14    they wanted to submit an improved 991, they could do

15    that.

16              MR. GOLDBERG:   Can I have that marked,

17    please.

18              (Persson Deposition Exhibit No. 10

19    marked.)

20              MR. GOLDBERG:   Off the record for a

21    minute, please.

22              (Recess held.)

23         Q.      Can you identify Exhibit No. 10, please?

24         A.      It appears to be an e-mail from Melinda

1   you want to add to it or change it, it's your

2   prerogative.  I don't know if I'm answering the

3   question.

4        Q.     Did you ever advise Mr. DiVasta to

5   complete a new 991 form for the second posting?

6        A.     I don't recall advising him that.

7        Q.     Do you know if any of your staff,

8   specifically, Mr. Attridge or Mr. Meier ever advised

9   him to do that?

10        A.     I wouldn't know that.  I don't know

11   that, no.

12        Q.     Okay.  Can you describe for me, the best

13   of your recollection, the selection process for the

14   reposting?

15        A.     Again, a review board was convened and

16   the review board selected.  They narrowed down their

17   own applicants and they decided, apparently, to

18   interview people and then narrow it down again from

19   that process to give the interviwees to me and to my

20   board.

21        Q.     Who was the review board on the second

22   posting?

23        A.     It was Larry McDonough, Carl Augostinho

24   and Pam Boudreau.

```
 1        Q.      What are each of their positions,
 2   please?
 3        A.      Larry McDonough is a labor relations
 4   specialist, northeast area, domiciled in Boston.
 5                Carl Augostinho is the workplace
 6   intervention analyst, commonly referred to as WEIA, W
 7   E I A, for the Massachusetts district.  He is
 8   domiciled in Worcester.  He may have been domiciled
 9   in North Reading at the time.
10                Pam Boudreau is a postmaster.  I believe
11   at the time she was postmaster of Ayer, Mass.
12        Q.      Do you know who selected this review
13   board?
14        A.      I think they were asked if they would
15   like to participate on the review board and I'm not
16   sure if I asked or somebody asked.  Maybe Melinda.  I
17   think maybe Melinda asked who would be some good
18   names and they were asked.  I honestly don't know or
19   can't remember how they were formulated.
20        Q.      And did you ask them to conduct any
21   interviews?
22                MR. WILMOT:  Objection.  You can answer.
23        A.      I didn't ask them to do it, no, no.
24        Q.      You were the selecting official?
```

1    posting interviewed five candidates?

2                    MR. WILMOT:  Objection.  You can answer.

3         A.       Repeat the question.

4         Q.       Either based upon review of Exhibit 11

5    or your own personal knowledge, do you believe that

6    the review board for the second posting interviewed

7    five candidates?

8                    MR. WILMOT:  Objection.  You can answer

9    that.  It looks like -- it's hard to say.  Screened

10   down to five whom we interviewed, okay, yes, I would

11   agree to that.

12                   MR. GOLDBERG:  Can I have that marked,

13   please.

14                   (Persson Deposition Exhibit No. 12

15   marked.)

16        Q.       Can you identify Exhibit No. 12?

17        A.       This is a, looks like a recommendation

18   submitted by the people who were on the review board,

19   submitting a list of names to be interviewed; Ralph

20   DiVasta, Janice Lang, Miles Walcott.

21        Q.       To your knowledge, is the review board

22   required, as part of the selection process, to

23   actually deliver to you or to human resources,

24   correspondence similar to Exhibit 12 where they

```
 1          A.      Yes.
 2          Q.      Is there anything else about Exhibit No.
 3   13 that you do not believe is accurate as you sit
 4   here today?
 5          A.      Everything else looks like it's
 6   accurate.
 7          Q.      I'd ask you to pull out of your packet
 8   in front of you, Exhibit No. 9.  Following the review
 9   board's work where they recommended three candidates
10   for interviewing, what was your next step in the
11   process to prepare yourself for the interview?
12          A.      Pretty much getting some questions
13   formulated to ask the applicants during the
14   interview.
15          Q.      And how did you go about doing that?
16          A.      Well, I have some questions that are
17   just on the top of my head.  I believe I formulated
18   probably all of the questions.  I think I submitted
19   these to Peter Attridge and to Steve Meier for them
20   to look over.
21                  They may have put one or two in, I'm not
22   sure or suggested a change to one or two of them, I'm
23   not sure.  I've been on other boards for labor
24   relations positions like in Boston where we have
```

1    asked questions similar to these.  So it's just a

2    compilation of things that are from my experience in

3    the past.

4        Q.     Do you have an earlier draft of these

5    questions that were prior to any potential changes

6    that may have been suggested by Mr. Attridge or

7    Mr. Meier?

8        A.     No, I don't.

9        Q.     Is there a particular reason why

10   Mr. Meier, Mr. Attridge were asked to be on this

11   interviewing board?

12       A.     I don't think there was any real

13   particular reason.  I believed -- well, there may

14   have been, I guess, underlying reasons, that they

15   were the two individuals working there at the time

16   and I wanted them to be stakeholders and have been

17   part of the process of who they were going to be

18   working with, so I wanted their input.

19              As I said earlier, when I was

20   interviewed, I was interviewed by the three people in

21   labor relations when I came, so I thought it would be

22   a good idea to do it the same way.

23       Q.     Did you receive any particular

24   permission from human resources to have this type of

```
 1    that exists today that would say a five would include
 2    the following responses?
 3           A.      That's correct, there was no document.
 4           Q.      And there was no even discussion about
 5    that prior to the interviews?
 6           A.      That's correct.
 7           Q.      Can you describe for me to the best of
 8    your recollection, what your impression was of
 9    Ms. Lang during this interview process for the second
10    posting?
11           A.      Well, again, I think she was prepared as
12    best she could, for a lot of the questions.  Some of
13    the same questions as a matter of fact were from the
14    first interview.
15                   So there was an advantage there for
16    those being interviewed the second time, that I
17    recall there were Metz questions.  There were Douglas
18    questions, FMLA questions.  So she did pretty good on
19    those, I believe.
20                   This particular interview she appeared
21    to be very nervous, anxious, basically told her, you
22    know, relax, you know, we understand everybody is
23    nervous when you get to these interviews.
24                   We've all been through them so we know,
```

1    you know, what it feels like but she was very nervous
2    and, again, I think her inexperience in some of the
3    questions, it came out, were obvious.  Some of the
4    field experience she lacks came out during the
5    interview but, nonetheless, she didn't do poorly.
6              She did pretty good during the interview
7    with the exception of her being nervous but I think
8    she overcame that.
9         Q.    What do you believe led you to conclude
10   that she was, as you described, nervous during the
11   interview?
12        A.    Well, for one thing, she told us she
13   was.  She explained she was getting, you know,
14   blotchy in her face, you know, she gets red, things
15   like that she basically told us.
16             We just told her to relax, you know.  We
17   all know her.  She knows us, except I don't think she
18   knew Peter really at the time so but I've known
19   Janice for a long time.  Told her to relax and just
20   answer the questions.  That's all.
21        Q.    What was your experience dealing with
22   Janice prior to this interview process whether it be
23   March or October?
24        A.    Well, you know, we work in the same

1   pick up and learn relatively quickly.  So I think

2   she -- if I had to say she did better at any of

3   those, I would say the technical questions she did

4   pretty good at.

5        Q.      What was your overall impression of

6   Mr. DiVasta's interview?

7        A.      Ralph was nervous, too, and he -- I

8   think he started out really nervous.  I don't know

9   if, you know -- no, I actually have his here.

10              Yeah, he couldn't remember.  He was

11  getting a little flustered there at the beginning but

12  then he came out of it and he did a pretty good job.

13  I mean, his experience did show.

14              I mean the fact that he's worked with

15  the unions and he's -- he knows how to handle those

16  situations, a lot of hypotheticals, because he's been

17  involved with them, so I think his experience came

18  through.

19              He definitely prepared, too, for the

20  interview, which was good.  I mean, you don't know

21  what questions are going to be asked.  It's --

22  sometimes it's a guessing game, which you spend a lot

23  of time working at but at least he showed that he was

24  interested enough to spend some time preparing.

1          Q.        What was his overall score that you gave

2    him?

3          A.        According to this Exhibit No. 9, a 52.

4          Q.        And do you recall the overall score you

5    gave to Ms. Lang?

6          A.        I think it was somewhere in the mid 40s.

7    I'm not sure.  I don't recall.

8          Q.        What was the basis of your decision that

9    you ultimately selected Mr. DiVasta for the position?

10         A.        Well, it was really, you know, well, the

11   questions, obviously, he scored higher than Janice

12   did on the questions, but it was no secret it was the

13   experience, you know, the experience did show.

14                   And I was confident that he would be

15   able to step into the position at that time, take

16   over step 2s, write discipline, things like that

17   immediately, without me having to spend an awful lot

18   of time with him.  So along with him scoring the

19   highest of the three applicants, compiled with his

20   working knowledge, that's what probably gave him the

21   edge.

22         Q.        How about the 991 form?

23         A.        The 991 form was something that got him

24   into the interview process.  We'd look at it but

1          Q.      Well, in reference to the ultimate

2    vacancy announcement, Exhibit No. 7, as relates back

3    to level 17, would it be fair to say that you were

4    looking for an individual who could best meet the

5    knowledge, skills and abilities of the requirements

6    as identified in Exhibit 7?

7                  MR. WILMOT:  Objection.  You can answer.

8          A.      I'd say a lot of these things come into

9    play.  I don't go over these and overly analyze, you

10   know, each one of these qualifications.  That's

11   basically -- a lot of it has to do with the review

12   board to make sure that they're going to get a

13   qualified candidate but what I'm looking at is

14   knowledge of labor relations programs, policies,

15   procedures, sufficient enough -- at a level

16   sufficient enough to advise local managers, to train

17   supervisors.

18                 There is a lot there and a lot of that

19   comes from experience, field experience being in that

20   arena and I don't believe Janice was experienced in

21   those areas at that time.

22         Q.      Now, as far as I understand, she was the

23   only candidate in both of the postings to make it to

24   the final stage; is that correct?

```
 1    over a year.  Again, based upon that knowledge that

 2    she's been here for over a year now, in fact, I have

 3    even less doubt in the decision to select Ralph now

 4    than I did then.

 5         Q.    Why is that?

 6         A.    It's obvious, clearly obvious, Ralph was

 7    more experienced at that time than she is even right

 8    now.

 9         Q.    What facts do you have to support that

10    opinion?

11         A.    Observations, direct observations of me

12    and her.  What I -- Janice sends a lot of letters

13    that she writes to me or she's drafting discipline or

14    drafting responses to things and although she has

15    pretty decent writing skills, it's clear that areas

16    she lacks is from experience in different situations

17    so...

18         Q.    Can you give me a specific incident

19    where, which factually supports your opinion that

20    your decision that you made back then to promote

21    Mr. DiVasta and not Ms. Lang is based upon that

22    experience factor as demonstrated during her detail

23    assignment?

24         A.    Well, you know, I don't keep a list of
```

```
 1   period, was anything associated with supervision
 2   required listed?
 3        A.    No, I think, you know, that's not
 4   listed.  I can pretty much say that's a fair
 5   statement to make.
 6        Q.    Were you involved in the selection
 7   process for Peter Attridge?
 8        A.    I don't think I was.  I think Bob
 9   LoPreste was the sole selecting official there.
10            MR. GOLDBERG:  Let me confer with my
11   client.  I will be right back.
12            MR. WILMOT:  Okay.
13            (Recess held.)
14            MR. GOLDBERG:  I am done with my
15   questioning.
16            MR. WILMOT:  I just have maybe six
17   questions or so.  It will be very quick.
18   EXAMINATION BY MR. WILMOT:
19        Q.    Mr. Persson, hypothetically speaking, if
20   Ms. Lang had come to you and asked how she could
21   enhance her candidacy for the labor relations
22   specialist position while the second posting was
23   pending, would you have given her advice if you had
24   any?
```

```
 1                    MR. GOLDBERG:  Objection.
 2                    THE WITNESS:  Can I answer?
 3                    MR. GOLDBERG:  Sure.
 4                    MR. WILMOT:  Absolutely.
 5          A.       Yes, I would have.
 6                    MR, WILMOT:  We are objecting as to
 7     form; is that right?  Is that what we reserved, all
 8     objections except as to form?
 9                    MR. GOLDBERG:  Yup.
10                    MR. WILMOT:  A hypothetical question,
11     you're objecting to?
12                    MR. GOLDBERG:  Yes.
13                    MR. WILMOT:  All right.
14          Q.       Before making your decision to hire
15     Mr. DiVasta for the labor relations specialist
16     position, did you make any inquiries of his previous
17     supervisors to determine his abilities to determine
18     the functions of that position?
19          A.       No.
20          Q.       Prior to making your decision to hire
21     Mr. DiVasta for the labor relations specialist
22     position, did you make any inquiries of Mr. Walcott's
23     previous supervisors to make any determination as to
24     his abilities to perform the functions of the labor
```

149

```
 1          A.      Lisa, I'm not sure exactly what her age
 2    is.  She's over 40 though.
 3          Q.      Now, you testified earlier that Ms. Lang
 4    has been working in a detail position in your
 5    department?
 6          A.      Yes.
 7          Q.      And that was a detail for a labor
 8    relations specialist?
 9          A.      Yes.
10          Q.      Have you received any complaints
11    regarding her performance in that detail?
12          A.      Complaints, no.
13          Q.      Okay.  Have you received any negative
14    feedback from anyone that she's interacted with while
15    performing the functions of that detail?
16          A.      I have received, I don't want to say
17    complaints.  I have received some comments that they
18    would prefer dealing with someone else on occasion.
19    I have taken a lot of calls on my own, a lot of cases
20    and to be fair with Janice, it's not because she
21    can't do it, she's not capable of doing it.
22                  In all honesty it goes back to someone
23    just not having that type of experience with maybe a
24    particular case.
```

```
 1        Q.     You were saying that some individuals
 2   have said they didn't want to work with Ms. Lang.
 3   Did they give a reason as to why they did not?
 4        A.     I'm trying to think, specifically.
 5   There's been -- there's been some -- there's been
 6   occasions where Janice has given various types of
 7   advice and then they would check.  I hate when they
 8   do this but they shop around, get different advice
 9   and it's the advice they suspected that they should
10   have gotten in the first place.  So now they question
11   all the advice.
12        Q.     Who made that comment to you?
13        A.     Who, in particular?
14        Q.     Yeah.
15        A.     I can think of actually one.  Donna
16   Legro was one.
17        Q.     Who is Donna Legro?
18        A.     Postmaster of Wakefield now, I believe.
19        Q.     Anyone else?
20        A.     There's been some others but I can't
21   really recall the names right off the top of my head.
22        Q.     Okay.
23        A.     Again, it's -- these are not, you know,
24   complaints that other advocates don't get from time
```

1    to time either.

2              I will stand by what I said earlier that

3    Janice is doing a good job in the position that she's

4    doing.  She's a hard worker.  She's very diligent.

5    Tries all the time to improve herself and the

6    improvements are always shown, so I have no regret

7    having her on my staff and appreciate everything she

8    does on my staff.  She's a good worker.

9         Q.     Did you play any role in the review

10   board's decision to recommend Ralph DiVasta for an

11   interview by the selection board?

12        A.     No.

13        Q.     Who made the decision to hire Ralph

14   DiVasta for the labor relations specialist in 2003?

15        A.     I did.

16        Q.     What role did David Couture play in your

17   decision to hire Ralph DiVasta for the labor

18   relations specialist position in 2003?

19        A.     He, basically, just concurred with my

20   selection.

21        Q.     Did you meet with Mr. Couture to discuss

22   your decision to hire Mr. DiVasta before submitting

23   the selection form?

24        A.     If I did, it was very briefly.  I may

152

1    have just brought the sheet down said, you know,

2    Dave, this is who I want to select.  I don't think it

3    was an in-depth meeting.

4                Probably did discuss it at some length

5    but very briefly, very brief discussion.  He knew who

6    I wanted.  He knew I was in need of getting someone

7    in the position and, therefore, he concurred with me.

8        Q.    So you made your decision to hire

9    Mr. DiVasta before meeting with Mr. Couture?

10       A.    Yes, it was my -- it was my

11   determination that that is who I wanted and I knew I

12   had to get it by Dave Couture then by the district

13   manager as well and he does not rubber stamp these

14   things.

15       Q.    Was Ms. Lang's age a factor in your

16   decision not to hire her for the labor relations

17   specialist position in 2003?

18       A.    It was not, no, absolutely not.

19       Q.    Was Ms. Lang's sex or gender a factor in

20   your decision not to hire her for the labor relations

21   specialist position in 2003?

22       A.    No.

23       Q.    Was Mr. DiVasta's age a factor in your

24   decision to hire him for a labor relations specialist

```
1    position in 2003?

2         A.     No, it was not.

3         Q.     Was Mr. DiVasta's sex or gender a factor

4    in your decision to hire him for labor relations

5    specialist position in 2003?

6         A.     Not at all.

7                MR. WILMOT:  That's all I have.

8                MR. GOLDBERG:  I will be right back.

9                (Recess held.)

10               MR. GOLDBERG:  Can I have that marked,

11   please.

12               (Persson Deposition Exhibit No. 27

13   marked.)

14   FURTHER EXAMINATION BY MR. GOLDBERG:

15        Q.     Can you identify Exhibit No. 27, please?

16        A.     This is a 991 from Lisa Andreasson for

17   the position of labor relations specialist vacancy

18   number 08120.

19        Q.     This was the person that you had

20   expressed a question or two to the review board as to

21   why she didn't make it out of the committee?

22        A.     Yeah.

23        Q.     Is this the person that had the labor

24   relations specialist detail experience?
```

# EXHIBIT 3

```
 1                              Volume I

 2                            Pages 1 - 79

 3

 4               UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 5
    JANICE E. LANG,                          )
 6                    Plaintiff              )
                                             )
 7        VS.                                )  05-10052-WGY
                                             )
 8   JOHN E. POTTER, Postmaster General      )
     United States Postal Service,           )
 9                 Agency                     )  COPY

10

11        DEPOSITION OF STEPHEN MEIER, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   11, 2005, commencing at 10:05 a.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21                _____
                       FOR THE RECORD
22                 COURT REPORTING SERVICES
                      11 FISKE STREET
23              SHREWSBURY, MASSACHUSETTS   01545
                       (508) 845-1096
24
```

1    questions.  I'm going to ask you to give me answers

2    to the best of your ability.

3              Some general rules in terms of the

4    deposition:  One of us should only be speaking at a

5    time.  So I would ask that you wait to give your

6    answer until I finish my question.  I, in turn, will

7    wait for you to finish your answer before I have any

8    follow-up questions.

9              Your attorney may object to a question

10   that I ask.  Unless he advises you not to answer the

11   question, you are still under an obligation to answer

12   the question to the best of your ability.

13             If you need a break, feel free to ask me

14   for a break.  I will be happy to accommodate you.

15   The only proviso in regard to the request for a break

16   is if there is a question pending when you ask for a

17   break, I would ask that you answer the question

18   before you break unless it involves attorney-client

19   privilege, then you may take a break at that point in

20   time.  Any questions before we begin?

21        A.    No.

22        Q.    Tell me what your current position and

23   who your employer is.

24        A.    Labor relations specialist for the

1    United States Postal Service.

2        Q.      How long have you been employed with the

3    postal service in that capacity?

4        A.      Five years, approximately.

5        Q.      Five years?

6        A.      (The witness shook his head indicating

7    yes.)

8        Q.      Is that a yes?

9        A.      Yes.

10       Q.      One of my instructions that I failed to

11   mention is to avoid nonverbal responses.

12       A.      Okay.

13       Q.      What were your responsibilities before

14   you became a labor relations specialist?

15       A.      I was supervisor of customer services.

16       Q.      For how many years?

17       A.      Approximately, ten years.

18       Q.      And when did you first join the postal

19   service?

20       A.      1987.

21       Q.      Were there any additional permanent

22   assignments that you had besides the labor relations

23   specialist and supervisor of customer services?

24       A.      Letter carrier.

```
 1        Q.      Was that at the beginning of your
 2   career?
 3        A.      Yes.
 4        Q.      When you applied for the labor relations
 5   specialist position, I'm going to assume it was
 6   around 1999 or 2000?
 7        A.      Yes.
 8        Q.      Is that correct?
 9        A.      Yes.
10        Q.      Who was the manager at the time?
11        A.      Robert LoPreste.
12        Q.      And when you had applied, was that the
13   first time that you had applied for that position?
14        A.      Permanently, yes.  For the permanent
15   position, yes.
16        Q.      Was there a point in time when you had
17   applied for something on a temporary basis?
18        A.      Yes.
19        Q.      When was that?
20        A.      I would say about 1998 or 1999.
21        Q.      And what was the nature of the temporary
22   position at that time when you applied for it?
23        A.      A detail in labor relations, temporary
24   detail.
```

```
 1          Q.      Is there any detail that you're aware of
 2    that would be permanent?
 3          A.      Not that I'm aware of.
 4          Q.      So in theory, a detail is a temporary
 5    assignment?
 6          A.      As far as I know.
 7          Q.      Did you get that detail in labor
 8    relations in either 1998 or 1999?
 9          A.      Yes.
10          Q.      How long did you stay in that capacity?
11          A.      Approximately, a year.
12          Q.      Did Mr. LoPreste appoint you to that?
13          A.      No.
14          Q.      Who did?
15          A.      David Papa.
16          Q.      What was Mr. Papa's position at the time
17    when you made that appointment?
18          A.      Acting labor relations manager.
19          Q.      Where was Mr. LoPreste at the time, if
20    you know?
21          A.      I don't know.
22          Q.      When you interviewed for the permanent
23    labor relations position in either 1999 or 2000, do
24    you recall the interviewing process that you went
```

1    Mr. Persson or Mr. Attridge as to what would

2    constitute a full and complete answer?

3        A.      I don't recall.

4        Q.      How would you know, based upon the

5    question itself, as to how much of a grade that you

6    would assign to it, either a one, two, three, four or

7    five or possibly zero?

8        A.      Basically, if they answered the whole

9    question and hit all the points.  Most of the

10   questions, if I remember correctly, had more than one

11   point that we would be looking for.

12       Q.      That's my follow-up question.  How did

13   each one of you know what points you were looking for

14   if you didn't discuss the content of the answer in

15   advance?

16       A.      I don't know that we did each know what

17   each person was going to grade or how Peter was going

18   to grade compared to what I was going to grade.

19       Q.      Did you participate in the interview

20   process with all three candidates?

21       A.      Yes, I did.

22       Q.      Did you take notes of that process?

23       A.      I had a score sheet in front of me.  I

24   did take limited notes.

1          Q.       Have you reviewed that score sheet
2     recently?
3          A.       No.
4          Q.       Do you recall when the interview was
5     going on, were you writing notes at that time or was
6     it at a later time?
7          A.       It was while the interview was going on.
8          Q.       All right.  When did you grade the
9     person for each of the questions?
10         A.       It would have been either immediately
11    after they left the room or while they were speaking,
12    while they were answering the questions.
13         Q.       Do you know which one it was?
14         A.       It was probably a combination of both.
15         Q.       When did you compare your answers to
16    that of the other two members of the team?
17                  MR. WILMOT:  Objection.  You can answer.
18         A.       I don't know that we did compare
19    answers.  Actually, we did.  I'm not sure when.  I
20    think it was shortly after, either right after all
21    three candidates or shortly thereafter.
22         Q.       Do you recall what your discussion was?
23         A.       I just recall comparing scores and
24    seeing if we were close and if we were off, we

1  discussed, well, why do you have this person at that

2  number?  How did you come up with that number or why

3  did I come up with the number that I did?  It was

4  brief because my recollection is we were all fairly

5  close.

6          Q.      Who was your ultimate selection?

7          A.      I believe it was Ralph DiVasta.

8          Q.      Were you aware that this was a reposting

9  of a labor relations position that had been posted a

10 few months before?

11         A.      Yes.

12         Q.      How did you come to learn of that?

13         A.      Just by being in the department, knowing

14 that the job was posted and that for whatever reason,

15 I forget why, it was reposted.

16         Q.      Had you come to learn that Mr. DiVasta

17 had sent in a 991 for the first posting?

18         A.      Yes.

19         Q.      How did you come to learn of that?

20         A.      Probably from Mr. -- it was from

21 Mr. DiVasta himself.

22         Q.      Do you recall what he said to you to

23 inform you of that?

24         A.      No, just through normal conversation.

```
 1                    (Recess held.)

 2               MR. GOLDBERG:  Let's go back on.

 3          Q.      Following the interview that you had

 4    that we have been talking about involving Ms. Lang

 5    and Mr. Walcott and Mr. DiVasta, can you explain to

 6    me what occurred between you and the other members of

 7    the committee in reference to your notes and making a

 8    decision regarding who your selection was?

 9          A.      What I recall is we added up the points.

10    We looked to see who had the higher number of points.

11    I honestly don't recall a whole bunch of discussion.

12    I remember Mark coming in and asking if we -- there

13    was some discussion on the repost and I remember

14    feeling that the job should be reposted.

15               There was some brief discussion, at

16    least that I was involved in, it had already been

17    reposted once, I believe, and I personally felt

18    saying that, you know, maybe we should consider

19    reposting it again.

20               Other than that, I don't recall a whole

21    lot.  I don't recall a lot of discussion.

22          Q.      Did Mr. Persson indicate to you that he

23    was opposed to reposting again?

24          A.      Yes.
```

# EXHIBIT 4

1                             Volume I
                          Pages 1 - 74

2

3          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS

4

5  JANICE E. LANG               )
           Plaintiff      )

6                           )
    VS.                  ) NO. 05-10052-WGY

7                           )
  JOHN E. POTTER, Postmaster General)

8  United States Postal Service,    )
           Agency         )

**COPY**

9

10

11     DEPOSITION OF PETER ATTRIDGE, taken at the

12  request of the Plaintiff, pursuant to the applicable

13  provisions of the Federal Rules of Civil Procedure,

14  before Karen G. Farragher, RPR and Notary Public in

15  and for the Commonwealth of Massachusetts, on August

16  11, 2005, commencing at 1:22 p.m., having been

17  identified by the Notary Public through satisfactory

18  evidence of identity per Executive Order No. 455

19  (03-13) at the offices of Gary H. Goldberg, Esq., 120

20  Main Street, Worcester, Massachusetts.

21                  FOR THE RECORD

22           COURT REPORTING SERVICES
             11 FISKE STREET

23       SHREWSBURY, MASSACHUSETTS  01545
             (508) 845-1096

24

```
 1   privilege; okay?

 2        A.      Uh-huh.

 3        Q.      Do you have any questions before we

 4   begin?

 5        A.      No.

 6        Q.      How long have you been employed by the

 7   postal service?

 8        A.      Just over 20 years.

 9        Q.      From 1985 or so?

10        A.      April 27, 1985.

11        Q.      How long have you been in the labor

12   relations specialist position?

13        A.      Since March of 2003.

14        Q.      When you filled that position, who had

15   filled that job before you?

16        A.      The guy, he's actually still on the job.

17   Eventually, I took Dick Venti's job.

18        Q.      Dick Venti retire?

19        A.      He had retired.  He was in the process

20   of retiring when I was taking the place of him.

21        Q.      Prior to going into the labor relations

22   specialist position in March of '03, what were your

23   positions with the postal service?

24        A.      My position of record was manager
```

```
 1   customer services West Newton, Boston district.
 2        Q.     How long were you in that capacity?
 3        A.     Since, approximately, 1997.
 4        Q.     Before that what was your position with
 5   the postal service?
 6        A.     I was a supervisor customer services.
 7        Q.     For how long?
 8        A.     From '88, 1988 on.
 9        Q.     And had you held any detail positions in
10   labor relations?
11        A.     Yes.
12        Q.     Would that have been prior to March of
13   '03?
14        A.     Yes.
15        Q.     When did you hold those positions?
16        A.     From 1998 up through 2002.
17        Q.     Was that one continuous detail?
18        A.     No.
19        Q.     Who assigned you to those details?
20        A.     One was Ron Freddie and the other was
21   Dennis Shea.
22        Q.     Were they your supervisors at the time?
23        A.     No.
24        Q.     Who was Ron Freddie?
```

# EXHIBIT 5

1                                    Volume I
                                Pages 1 - 117
2

3                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
4

JANICE E. LANG,                              )
5                     Plaintiff              )
                                             )
6       VS.                                  )  05-10052-WGY
                                             )
7   JOHN E. POTTER, Postmaster General       )
    United States Postal Service,            )
8              Agency                         )

9                                    **COPY**

10

11        DEPOSITION OF DAVID COUTURE, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   12, 2005, commencing at 1:53 p.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21

22                       FOR THE RECORD
                    COURT REPORTING SERVICES
23                     11 FISKE STREET
                 SHREWSBURY, MASSACHUSETTS  01545
24                     (508) 845-1096

1        A.      Yes.

2        Q.      My name is Gary Goldberg and I represent

3   Janice Lang in a matter currently pending in U.S.

4   District Court.  I'm going to be asking you a series

5   of questions this afternoon.  I'd ask you to answer

6   to the best of your ability.

7               There are some general ground rules.

8   One of which is that we can only talk, one of us can

9   only talk at the same time.  So I will avoid talking

10  while you're answering my question and I will ask you

11  to avoid talking while I'm asking the questions.

12              Try to avoid any nonverbal responses so

13  the court reporter can take it down.  There may be

14  objections from your counsel.  You are still under an

15  obligation to answer the question unless he instructs

16  you not to answer.

17              Finally, if you need a break, just let

18  me know.  I will be happy to oblige.  If in fact a

19  question is pending and you ask for a break at that

20  time, I'm going to ask that you answer the question

21  first unless the question involves some form of

22  attorney-client privilege; okay?

23       A.      Okay.

24       Q.      Are you currently employed?

```
 1           A.      No, I'm retired.  I retired on January
 2   1st of this year.
 3           Q.      And you retired from the postal service?
 4           A.      Yes.
 5           Q.      Did you make any preparations to prepare
 6   for this deposition?
 7           A.      Only speaking to my own counselor.
 8           Q.      Referring back to your own counselor,
 9   are you talking about the attorney present?
10           A.      Yes.
11           Q.      Did you review any documents or papers?
12           A.      No.
13           Q.      Did you talk to any of the employees at
14   the postal service --
15           A.      No.
16           Q.      Let me just finish my question.
17   Regarding their depositions or in preparation for
18   your deposition?
19           A.      No.
20                   MR. GOLDBERG:  Off the record for one
21   second.
22                   (Discussion held off the record.)
23           Q.      Can you tell me your dates of employment
24   with the postal service and if you can, the
```

1    appropriate positions that you have held at different

2    times?

3        A.      I started in the postal service in 1973.

4    My first position was termed part time flexible mail

5    handler.  I was employed here in Worcester.  At that

6    time it was called the management sectional center.

7            I then converted to a distribution clerk

8    position, approximately, two years after that, so

9    sometime around 1975.  Approximately, four years

10   after that, so say 1979, I was promoted to my first

11   management position.  That was associate training and

12   development specialist.

13           Approximately a year and a half, two

14   years after that, I would have then been promoted to

15   the manager of training.  At that time, it was called

16   manager of PEDC, postal employee development center.

17   I was in that position for I'd say, approximately,

18   seven to eight years.

19           There was a restructuring that occurred.

20   My next position then was as the manager of safety

21   and health, still staying in the Worcester MSC.  I

22   was in that position for, approximately, two years,

23   then was promoted to the, what was called the

24   management sectional center director of employee and

1   labor relations.

2          I was in that position for,

3   approximately, two years and there was another

4   restructuring and then I became the position that I

5   retired from, which was district manager of human

6   resources at the Middlesex Essex district.

7          There was a minor little restructuring,

8   approximately, two years ago where our district

9   changed in that we encompassed also the Springfield

10  district.  So our position titles changed to director

11  of human resources for the Massachusetts district

12  but, primarily, the same position.

13     Q.    In your capacity as the manager of human

14  resources, can you tell me what your responsibilities

15  were, and if they changed throughout the years, I'm

16  more concerned about what your responsibilities were

17  say, for example, from 2000 to the time you retired

18  in January 2005?

19     A.    As I mentioned, other than the scope of

20  the size of the district, my responsibilities stayed

21  basically the same.

22          As manager of human resources, I was

23  responsible for the different functional areas that

24  fell under human resources so that there was labor

```
 1   relations, personnel, safety, injury compensation,

 2   training and development, EEO and EAP and all those

 3   functional areas had a manager who actually was the

 4   head of each one of those functional areas, and those

 5   managers reported to me and in all we had,

 6   approximately, 64, 65 employees working in human

 7   resources.

 8        Q.    In 2003, who did you report to?

 9        A.    Well, there was a change in the district

10   manager sometime in '73.  So originally it was Joanna

11   Corker, who was the district manager, then she had

12   left and the new manager came in, Mike Powers.  So I

13   actually retired under Mike Powers.

14        Q.    Do you have a recollection today as to,

15   approximately, when Mike Powers took over?

16        A.    No, I don't.  Two years ago.

17        Q.    Right, I'm saying in 2003, do you

18   remember?

19        A.    It would have been sometime in 2003, I

20   believe.

21        Q.    Was there a party for him when he or an

22   announcement when he became the new district manager?

23        A.    I do recall he brought everybody

24   together.  We did numbers of groups of people because
```

1    along the way.

2         A.    Yes.

3         Q.    Do you have knowledge of the recruitment

4    process for positions under your general authority?

5         A.    Yes, I do.

6         Q.    Once a position, and we will use as a

7    for instance, labor relations specialist but I'm

8    talking in general now, not in specific to any

9    particular job; okay?

10        A.    Okay.

11        Q.    Once a position like the labor relations

12   specialist became vacant or available, can you walk

13   me through what the process would be as to how that

14   job gets either approved for posting, gets posted and

15   subsequently gets filled, please?

16        A.    Depending upon the position title, I

17   will give you an example.  The postmaster position,

18   all postmaster positions when they become vacant

19   would have to first be submitted to the northeast

20   area for approval to even post the position, to fill

21   the position.

22             That same restructure was on certain

23   management positions, that we would first have to

24   request through the district permission to post the

1   position.   Other positions, called initial level

2   positions, supervisory positions, at different times

3   throughout the years we would have to go to the

4   district for that approval and at different times

5   throughout the years the area had relinquished that

6   back to the district so we could just post those

7   without getting approval.   So depending upon the time

8   frames that we are talking about...

9        Q.      Talking about, specifically, a labor

10  relations specialist position so it would be a level

11  17 or 19.   First of all, would that have to go

12  outside your district for approval?

13       A.      We would first have to request

14  permission to post that from the Northeast area.

15       Q.      Is there a certain form that you use or

16  how does that get accomplished?

17       A.      It was usually done just through a CC

18  mail, an e-mail from personnel through the area,

19  permission to be granted back to the shared services

20  center that I spoke about in Woburn that Melinda

21  LaVecchio was managing.

22       Q.      This was identified in Mr. Persson's

23  deposition as Exhibit No. 16.   You mention a CC or

24  e-mail that was going back and forth to get the

```
 1    authority to post a particular position?
 2         A.     That's correct.
 3         Q.     Would that document that I'm showing
 4    you, especially toward the bottom, would that
 5    encompass that approval process?
 6         A.     Yes, this e-mail, CC mail was the
 7    internal name.  That is the process that I spoke
 8    about where we would send this request to the
 9    northeast area.
10              The northeast area would funnel it
11    through the different functional areas.  By that I
12    mean a position in labor relations would have fallen
13    under human resources, so it would have ended up with
14    the area manager of human resources with their
15    initial approval.
16              If it was a position in operations, it
17    would end up in the operations manager's area for
18    their approval.  So you can see different positions
19    listed here.
20              Depending whether it was operations,
21    whether it was human resources, whether it was a
22    finance position, it would have been funneled through
23    those functional areas at the area for their approval
24    then this kind of format would come back to us.
```

1       Q.     Who was the area labor relations manager

2   back in March of '03?

3       A.     Labor relations would have been Scott

4   Morgan.  So he might have had input into it, but as I

5   say, it would have been the manager of human

6   resources at the area level, which would have been

7   Kathy Dial.

8       Q.     So on the very top where it says Dave,

9   we can post immediately, Mike?

10       A.     Yes, that was from Mike Powers himself

11   because as the district manager, usually, and I only

12   say usually, usually the information coming from the

13   area would be funneled through the district manager

14   before we would receive it but oftentimes there would

15   be a blind copy of this, even though it was addressed

16   to Mike Powers, a blind copy of this would have come

17   directly to Charlie Wilkinson as manager of

18   personnel.

19       Q.     So after we get the approval and which

20   you have indicated so said, so done, what then would

21   you do to get this process moving?

22       A.     Unless it was a direct report position

23   to myself, so as an example that you had given

24   earlier, the labor relations specialist, then it

1    would be up to the manager of that functional area,

2    labor relations in that instance, to contact the

3    shared services center to request that the position

4    be posted or sometimes Charlie Wilkinson, acting on

5    behalf of that manager, Charlie Wilkinson, as the

6    manager of personnel, might contact the shared

7    services center.

8        Q.    Who prepares the actual vacancy

9    announcement that gets posted?

10       A.    My understanding of the process,

11   especially, with the shared services center, is that

12   it is automated.  So that by position title, Melinda

13   LaVecchio, as acting manager, would input that in the

14   national computer data system and a posting then

15   would be developed and printed in her office.  So

16   it's a canned, boilerplate posting on the national

17   level.

18       Q.    After that occurs, after she or he gets

19   the posting, it gets posted for a period of time?

20       A.    That's correct.

21       Q.    And it gets posted either nationwide

22   depending upon whether they are making I guess it

23   known to those people who may be eligible or to a

24   restricted area?

1    that individual.

2        Q.        And in terms of the interview itself by

3    the selecting official, who are they allowed to bring

4    in with them to that interview process?

5        A.        There is no restriction that I'm aware

6    of.  I will give the example of the postmaster

7    position that I spoke of.

8                  You have the postmaster's immediate

9    manager is the post office operations manager but I

10   know, factually, that almost every single interview,

11   the district manager sits in on those.

12                 Another example is myself in human

13   resources.  As manager of human resources, whenever

14   my scheduling permitted, I attempted to sit in on as

15   many of the interviews as I could in my functional

16   area.

17       Q.        What would your role be?

18       A.        My own personal role is that I would

19   actually interact with the candidates and ask

20   specific questions also.

21       Q.        How about in terms of a decision making

22   role?

23       A.        I only concur with the decision made by

24   the immediate manager, the selecting official.

36

```
 1          Q.     So you didn't offer your --
 2          A.     Oh, yes, yes, I will offer an opinion
 3   but it is the selecting official's responsibility to
 4   select the individual.
 5          Q.     You, in some cases, would be the
 6   selecting official's superior; right?
 7          A.     That's correct.
 8          Q.     So are you suggesting that if you
 9   offered an opinion that a person should or should not
10   be selected, that that selecting manager has the
11   right to either agree or disagree with you?
12          A.     That's correct, but I can state for the
13   record that in all of my years as manager of human
14   resources, I never countered a manager.
15          Q.     Never what?
16          A.     Never countered a manager.  So whoever
17   they selected, I concurred with.
18          Q.     How many instances have you been
19   involved where jobs were not filled the first time
20   around but they were reposted?
21          A.     It would be speculative but numbers of
22   them.
23          Q.     Say it again?
24          A.     It would be speculative as to the number
```

1   recall my part of the conversation.

2        Q.     Let me show you what was marked as

3   Exhibit No. 4 in the Persson deposition.   Have you

4   seen that document before?

5        A.     Again, I would have.   My assumption is

6   it would have been part of the promotion package.

7        Q.     Do you know whose handwriting that is

8   going across the document?

9        A.     No, I do not.

10       Q.     It does say reposted though; correct?

11              MR. WILMOT:   Objection.

12       A.     Correct.

13       Q.     Can you tell me if you recall, when the

14   decision was made to have the job reposted and the

15   reasons for that?

16       A.     I can't recall the time frame.   The

17   reasons for the reposting is because Mark was of the

18   opinion that of the three candidates that we

19   interviewed, none of them were the best qualified

20   candidate for the position and I concurred with him,

21   but I can't recall the time frame.

22              Again, as I say, this would have then

23   had to have been discussed with the district manager

24   for wider posting.

63

```
 1         Q.      Was there any person Mr. Persson
 2    indicated to you that he would have liked to have
 3    applied or interviewed but did not?
 4         A.      I don't recall him saying that,
 5    specifically, no.
 6         Q.      But specifically to Ms. Lang, you're not
 7    recalling today anything in particular that
 8    Mr. Persson had said to you which would indicate to
 9    you that she was not the most qualified candidate for
10    the position?
11         A.      Could you clarify?
12         Q.      I'm looking for any comments that you
13    had between yourself and Mr. Persson which would
14    indicate to me that Mr. Persson stated that Ms. Lang
15    was not the most qualified candidate for the
16    position?
17         A.      As I stated, we would have had a
18    discussion regarding the three candidates whether or
19    not he was of the opinion whether, and I concurred,
20    whether any of those three candidates were the best
21    qualified for that particular position.
22             Note, I don't mean best qualified within
23    the three candidates.  That's not a requirement of
24    the selecting official.  It is their responsibility
```

1    to select the best candidate for the position, not

2    the best candidate within the numbers of people who

3    are being submitted to him or her.

4         Q.    That's why I asked you if he had

5    expressed any indication as to whether or not there

6    was other people that he wanted to have apply for or

7    be interviewed for the position.  Was there?

8         A.    Not that I recall specifically.  There

9    was one individual who he was surprised had not

10   applied for the position.  I can't recall his name

11   right now.  He had worked on a detail in labor

12   relations earlier.

13        Q.    Were you or Mr. Persson surprised that

14   Mr. DiVasta did not get interviewed?

15        A.    I can't recall that specifically but

16   from looking at the list, I would have been

17   surprised, my assumption.

18        Q.    Did you or Mr. Persson make any attempt

19   to contact members of the review board to find out

20   why Mr. DiVasta did not make it out of the review

21   board?

22        A.    I can't recall that specifically.

23        Q.    Okay.  Did you ever make your own

24   independent assessment of Mr. DiVasta's 991 as to

1    this instance.

2        Q.     When Mr. Persson wanted to repost and

3    indicated that he did not feel that he had the best

4    qualified candidate for the position, did he indicate

5    to you what he felt was missing in any of the

6    candidates' qualifications?

7        A.     There were two specific things.  That we

8    discussed posting it, as I had mentioned, as either

9    career ladder 17 or as a 19 and we truly wanted to

10   expand nationwide, to see if we could actually

11   attract an existing labor relations specialist, an

12   existing 19 from somewhere across the county to apply

13   for the position, be the successful candidate, come

14   right in, be prepared to do the job.

15             That was the best scenario.  That was

16   the primary consideration.  Second consideration was

17   that he felt out of the three candidates, he was

18   looking for somebody with operational experience.

19             By that, that meant somebody who had day

20   to day dealings with the union, had day to day

21   experience in dealing with grievances at the step one

22   level, dealing personally with some of the issues

23   that they were being faced with in labor relations,

24   which was the American Disabilities Act, the Family

1  Medical Leave Act, those things that impacted on

2  operations.

3       Q.    Do you know as you sit here today

4  whether or not Ms. Lang had experience with the ADA,

5  the rehab act, FMLA grievances, step one or

6  operations experience?

7       A.    Personal experience, I knew Janice for

8  at least twelve years at that point.  I knew she had

9  worked in training for twelve years.  So I had that

10  personal knowledge.  Prior to the twelve years, I

11  can't specifically state.

12       Q.    Show you her 991 which was number 18

13  from the Persson deposition.  Were you aware that she

14  had graduated from law school?

15       A.    Yes, I was.

16       Q.    Were you also aware that she had taken

17  various courses in labor relations outside of law

18  school?

19       A.    Not specifically.

20       Q.    Were you aware of her certification in

21  mediation?

22       A.    Not specifically.

23       Q.    See on the bottom of the first page

24  where it refers back to postal positions?

```
 1         A.     No, I don't know that.  I do know and
 2  for the record, that's not my handwriting.
 3         Q.     In terms of the 10/8/03 you mean?
 4         A.     The date.
 5         Q.     Do you know whose handwriting it is?
 6         A.     No, I do not.
 7         Q.     Back in 2003, do you recall any
 8  conversation you had with Ms. Lang regarding her
 9  interest or desire for retirement?
10         A.     Please give that time frame again.
11         Q.     2003.
12         A.     Not specifically.
13         Q.     Did you ever indicate to her, to the
14  best of your recollection, whether or not she's ever
15  considered retiring?
16         A.     I can't recall specifically but it would
17  be common conversation within the postal service if I
18  did that.
19         Q.     Why would it be a common conversation in
20  the postal service?
21         A.     Government employment, those of us who
22  have been in there a number of years, that's common,
23  common conversation that we comment, when can you
24  retire?  We joke about it by saying how much more
```

1    time do you have on your sentence?

2                    I can't recall specifically having that

3    with Janice.  I do know during that time frame that I

4    already made my decision that I would be retiring as

5    manager of the department.  Dave Edmonds might have

6    already retired but if not, certainly made note that

7    he was retiring.  That's common conversation.

8            Q.    Do you recall having any conversation

9    with Janice regarding her financial ability to

10   retire?

11           A.    Not specifically, no.

12           Q.    Did you have any discussions with Janice

13   on a personal level regarding her career or her

14   family life, anything of that nature?

15           A.    I can't recall any specific conversation

16   but I am a friendly type person.  I was a manager who

17   walked around every day, said hi to everybody and

18   those people that, you know, would talk back with me,

19   I'd stop and have conversations with them.  So I

20   can't recall anything specifically but it certainly

21   is plausible.

22           Q.    During the time period that you were the

23   manager of human resources, I think you have given me

24   that time period from at least 1992 to 2005, January

```
 1   those conversations?
 2        A.    No, not specifically but I certainly was
 3   interested in promoting females into the positions,
 4   into all the positions in human resources, any
 5   minorities.
 6        Q.    Are you familiar with, within the
 7   district, the percentages of females versus males at
 8   the time that you retired?
 9        A.    It was as high as 42, 43 percent female
10   versus male but that's the entire population so by
11   that, that's craft employees, managers, postmasters,
12   supervisors.
13        Q.    So 42 percent for female and,
14   approximately, 58 percent for the males, give or
15   take?
16        A.    Correct.
17        Q.    Was there a different percentage for
18   managers in general?
19        A.    Yes.
20        Q.    What was the percentage?
21        A.    I don't recall specifically.
22        Q.    Higher or lower for females?
23        A.    Much lower for females in management.
24   Interestingly enough, in human resources we had more
```

```
 1   did not agree with the selecting official's selection
 2   but concurred anyway?
 3        A.    Little strongly worded there.  I
 4   questioned -- all I can recall, one time I questioned
 5   the selection by the manager but we acquiesced and
 6   concurred with his selection.
 7        Q.    Do you remember what that occasion was?
 8        A.    Selection for safety position.
 9        Q.    Have you ever had the occasion where you
10   have convinced a manager to change their selection?
11        A.    No.
12        Q.    In the period of time that you have
13   served as district manager for human resources, how
14   many times was there a vacancy in the labor relations
15   specialist position?
16        A.    Including these two times that we are
17   speaking about here, I think five times.
18        Q.    Five times, not including the two
19   postings that we have discussed here, the two
20   vacancies we have discussed here today and the other
21   three occasions that a position was vacant in labor
22   relations specialist position, how many times did a
23   woman apply for that position?
24        A.    While I can't recall a specific number,
```

```
 1    I know for a fact one time there was one female
 2    candidate from Boston.
 3           Q.     Okay.
 4           A.     But I can't recall any others.
 5           Q.     You can only think of one?
 6           A.     Yes.
 7           Q.     I don't think we got this before, how
 8    many EAS employees reported to you in 2003?
 9           A.     Well, I mentioned the number before, 64,
10    65.  It's a little bit in flux but out of that 64,
11    65, probably 62, 63 of them are EAS employees,
12    supervisor employees.  We only had two craft
13    employees, bargaining unit employees that worked.
14           Q.     How many of those employees were female?
15           A.     Can't give you the exact number but I
16    know more than half.
17           Q.     Okay.  Do you remember who hired Pete
18    Attridge in 2003 for the labor relations specialist
19    position?
20           A.     My recollection would have been Bob
21    LoPreste.  I think he was prior to Mark.
22           Q.     Did you concur with that decision?
23           A.     I would have.
24           Q.     At any time after or before your
```

 1    interview of Ms. Lang with Mr. Persson in 2003, did

 2    you have any discussion with Mr. Persson about

 3    Ms. Lang's age?

 4        A.    Not that I can recall.

 5        Q.    After or before your interview of

 6    Ms. Lang with Mr. Persson 2003, did you have any

 7    discussion with Mr. Persson about Ms. Lang's sex or

 8    gender?

 9        A.    Well, obviously, she's a female.  We

10    would have had those types of discussions.

11        Q.    What do you mean by that?

12        A.    Just in speaking about the candidates.

13    I had mentioned earlier that one of my desires was to

14    try to have more females in human resources in

15    specific functional areas.

16              So I know at times we had conversation

17    about the fact of a lack of people that were in there

18    and the lack of qualified candidates applying for the

19    job.  So we would have had that type of conversations

20    about Janice's sex.

21        Q.    So fair to say your conversation about

22    Ms. Lang being a female candidate was positive for

23    Ms. Lang's candidacy?

24        A.    Yes, yes, my desire to have women in the

```
 1   office.
 2        Q.      Was Ms. Lang's age a factor in your
 3   recommendation to repost the labor relations
 4   specialist position in 2003?
 5        A.      No.
 6        Q.      Was Ms. Lang's sex or gender a factor in
 7   your recommendation to repost the labor relations
 8   specialist position in 2003?
 9        A.      No.
10        Q.      Did you play any role in the second
11   review board's decision to recommend Ralph DiVasta by
12   the selecting official?
13        A.      No, not that I can recall.  In fact, as
14   I testified earlier, that whole process for the
15   second posting, the second position, I had minimal
16   involvement.
17             We were in the middle of this
18   restructuring with Springfield, assumption of all of
19   those employees, all those people and, in fact, in
20   retrospect, that's probably why I agreed to allow the
21   other labor relations specialists to sit in on the
22   interviews rather than do it myself as an example.  I
23   was just busy with other things.
24        Q.      Who made the decision to hire Ralph
```

# EXHIBIT 6

1

1                              Volume I
                               Pages 1 - 87
2

3                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
4
JANICE E. LANG,                              )
5                        Plaintiff           )
                                             )
6        VS.                                 )   05-10052-WGY
                                             )
7    JOHN E. POTTER, Postmaster General      )
     United States Postal Service,           )
8              Agency                        )  **COPY**

9

10

11        DEPOSITION OF MELINDA LAVECCHIO, taken at the

12    request of the Plaintiff, pursuant to the applicable

13    provisions of the Federal Rules of Civil Procedure,

14    before Karen G. Farragher, RPR and Notary Public in

15    and for the Commonwealth of Massachusetts, on August

16    17, 2005, commencing at 1:07 p.m., having been

17    identified by the Notary Public through satisfactory

18    evidence of identity per Executive Order No. 455

19    (03-13) at the offices of Gary H. Goldberg, Esq., 120

20    Main Street, Worcester, Massachusetts.

21    _____
                        FOR THE RECORD
22                 COURT REPORTING SERVICES
                        11 FISKE STREET
23         SHREWSBURY, MASSACHUSETTS   01545
                        (508) 845-1096
24

1   employees, the interviewing of new employees.

2              So that as HR specialist, we didn't

3   really specialize.  Everything, all employment from

4   the beginning to the promotions to retirement is what

5   we handle and what I had to handle at certain points.

6        Q.      But in terms of just dealing with the

7   promotional piece, besides any assistance you

8   provided in the processing of the vacancy

9   announcement, which we will get into in more detail

10  shortly, what other role did you play in that

11  promotional process?

12       A.      The applications most times actually

13  came to me.  They were addressed to me and I prepared

14  the promotion packages for the selecting officials.

15       Q.      By applications, you are referring back

16  to the 991 form?

17       A.      Yes.

18       Q.      Who would select the -- what role do you

19  have in selecting the review board if one is going to

20  be used in the promotional process?

21       A.      That wasn't my role.

22       Q.      Whose role to your knowledge is it?

23       A.      The selecting official.

24       Q.      Is it your role to make sure that the

1   review board has all the appropriate 991 applications

2   to do their processing?

3        A.    Yes.

4        Q.    And do you provide them with anything

5   other than the 991s?

6        A.    I would provide them with a listing of

7   everybody who applied, a sheet, so they could look at

8   it, see these are the people who applied.  To

9   facilitate the evaluations, there was a sheet that we

10  used to supply with their names, also with the

11  requirements listed on top or at least the number and

12  we called it a matrix form.

13             So during the review, when they rated

14  people between, actually, numerically, from one to

15  five, they could use it as an evaluation sheet.

16  They were supplied with the entire package which had

17  the job description, the qualification standards and,

18  of course, the posting with all the applications.

19       Q.    And once they completed their job and

20  did whatever reviews they had to do, what did they

21  send back to you for the next step of the process?

22       A.    Normally, the selecting official has the

23  package.  They need a review board.  If there is five

24  or more applicants, a review board is needed.

```
 1              The selecting official at that point
 2    gives it to the review board.  The review board has a
 3    responsibility of reviewing the applications,
 4    interviewing if needed, and then send it back to the
 5    selecting official, then the selecting official would
 6    interview and send out letters to the applicants,
 7    selected, non-selected, interviewing.
 8         Q.    What did you do as part of that process
 9    between when the review board completes their work
10    and prior to the interviews by a selecting official?
11    Do you play a role in any intervening process?
12         A.    No, not a formal role.  There are times
13    that a selecting official would call me, ask me for
14    copies of letters to send but no, no formal role, no.
15         Q.    Who gets a copy of the matrix that is
16    completed by the review board?
17         A.    The matrix are considered their personal
18    documents and I always advise the review panel, after
19    they have done their review, to shred the matrix
20    forms.
21         Q.    Why?
22         A.    Because it is their personal documents.
23    The review, the chairperson of the review board would
24    have the responsibility to speak to any non-selected
```

1          A.        It should be, yes.

2          Q.        Is there a rule of thumb in reference to

3    whether a review board interviews or doesn't

4    interview as part of their decision making process?

5          A.        The rule is, the regulations state that

6    a review board can interview or not interview.  If

7    the review board does not interview, then the

8    selecting official has to interview.

9          Q.        Is there a certain rule of thumb in

10   terms of when the review board, as it deals with a

11   certain number of applicants, must interview or has

12   the option to interview?

13         A.        No, no mandates on interviews by the

14   review committee.

15         Q.        So whether or not someone has for

16   example 10 or 15 applicants, there is no, as far as

17   you know, from the postal service, there is no

18   requirement that says that they should or should not

19   interview any one of those 10 to 15?

20         A.        Correct.

21         Q.        Has there been any kind of practice that

22   you're aware of as to what review boards generally

23   do?

24         A.        No.

1      Q.      Did you have involvement in the

2    recruiting and selection for the labor relations

3    specialist position that Ms. Lang had applied for in

4    2003?

5      A.      I posted the position.

6      Q.      And how did you go about posting the

7    job?

8      A.      When a position becomes vacant, the

9    selecting official normally would have notified me.

10   I will pull the job description and qualification

11   standards for the position.

12              If it was a position that I had posted

13   in the past, I would get a copy of the position, the

14   posted position, prior.  The vacancy announcements

15   are all typed.  Unfortunately, we don't have an

16   automated system at this point, like you type in occ

17   codes and it gives you everything.

18              So this is all typed in.  So I would

19   prepare the vacancy announcement and then have it

20   reviewed by the selecting official before it was

21   posted.

22     Q.      Is that what occurred in this matter?

23     A.      Yes.

24     Q.      I know that you have been touching

```
 1    Exhibit No. 1 --
 2         A.      Sorry.
 3         Q.      -- in the Persson deposition.  I'm not
 4    sure if that was by nerves or intent.  So I will have
 5    to ask the question.  Do you recognize Exhibit No. 1
 6    in the Persson deposition as the vacancy announcement
 7    for the labor relations specialist job in March of
 8    '03?
 9         A.      Yes.
10         Q.      And is that a document that you created?
11         A.      Yes.
12         Q.      How did you go about creating the
13    document?
14         A.      The document is actually a template.  So
15    I have a template and I would put in the -- the
16    position number is based upon the number of positions
17    that we have posted.  So we go numerically.  We use
18    the year then how many we posted.
19         Q.      You're referring back to the 03-020?
20         A.      Right.
21         Q.      So in 2003, it was the 20th position
22    posted?
23         A.      Yes.
24         Q.      Okay.
```

1      A.      We have an issue date and closing date.

2   It had to be open for at least 15 days, two weeks.

3   We put the information that is here on the left is on

4   every single vacancy announcement.  It is the

5   information that is mandated we put in.

6            We find out the persons eligible to

7   apply.  The selecting official determines if they

8   want to go district-wide, area-wide, service-wide.

9   If they want career employees or EAS employees only,

10  that's a selecting official's decision.

11           The functional purpose, I get it from

12  the position description.  The requirements I get

13  from the qualification standards.   Mail to, I notice

14  it had my initials.  That's what this is, who it was

15  sent to and then how to apply is basically the same

16  thing on every application.

17     Q.      When you use the word template, what

18  information from Exhibit 1 appears on that template?

19     A.      The postal service logo, position number

20  issue date, closing date, location, title, grade,

21  FLSA designation, occupation code, non-scheduled

22  days, hours, salary range, finance number, persons

23  eligible to apply, functional purpose, requirements,

24  mail to, and how to apply.

```
 1        Q.      But where you have the word
 2   requirements, is there in the template one through
 3   nine, one through ten, or is that blank?
 4        A.      That's all blank.
 5        Q.      Okay.  So is that part of what you would
 6   do by typing it in?
 7        A.      Yes.
 8        Q.      Do you type it in before or after you
 9   speak to the selecting official?
10        A.      I normally prepare it and then give it
11   to the selecting official for review.
12        Q.      In this particular situation, how did
13   you complete one through nine for under level 17 and
14   one through ten under level 19?
15        A.      I used a previous copy that was posted
16   prior to this posting.
17        Q.      Who had prepared that document?
18        A.      I had prepared it.
19        Q.      Under guidelines from Mr. LoPreste?
20                MR. WILMOT:  Objection.  You can answer.
21        A.      I -- Mr. LoPreste when it was posted
22   previously, did request additional requirements.
23        Q.      What particular requirements, if you
24   recall, did he request?
```

```
 1   copied those requirements and put them into Exhibit
 2   No. 1; is that a correct statement of your prior
 3   testimony?
 4       A.    Can you repeat it?
 5       Q.    Probably not exactly the way I just did
 6   but I'll give it a different shot.  Did you
 7   previously indicate that in preparing Exhibit No. 1
 8   that you had taken a prior posting that you and
 9   Mr. LoPreste had prepared and authorized and simply
10   copied those requirements into Exhibit No. 1?
11       A.    Yes.  I'm hoping that I understand what
12   you said.  I had a previous copy of this posting that
13   Bob LoPreste had gone over and I prepared it again
14   for this particular posting the same way.  Is that
15   what you said?
16       Q.    That's correct.
17       A.    Yes.
18       Q.    Did you know when you were doing it for
19   Exhibit No. 1, for the March 2003 posting, that the
20   requirements that were included now that you had
21   copied from a previous job posting were greater than
22   the requirements that were in the job description?
23            MR. WILMOT:  Objection.  You can answer.
24       A.    It's in the qual standards.  Qual
```

```
 1    showing him the prior one so he would see it.
 2         Q.    Is there a document which would indicate
 3    his written authorization?
 4         A.    No.
 5         Q.    Now, was there a discussion that you
 6    were involved with which indicated who was going to
 7    be an eligible employee to apply?
 8         A.    Yes, I must have been.
 9         Q.    Okay.  Why do you say there must have
10    been?
11         A.    Well, I'm reading this.  It says all
12    qualified career employees.  That is something that I
13    certainly would have discussed with the selecting
14    official before I wrote that.
15         Q.    It says all qualified career employees
16    within the Middlesex central performance cluster?
17         A.    Uh-huh.
18         Q.    What does that term, Middlesex central
19    performance cluster, mean?
20         A.    It is the offices within the cities and
21    towns that began with the zip code 014 to 019.
22         Q.    So they would all be within
23    Massachusetts?
24         A.    Well, Massachusetts is different now.
```

1   It's 010 to 019 but yes, 014 to 019 is all

2   Massachusetts cities and towns.  Sorry.

3        Q.     That's all right.  Was there a

4   discussion that you had with Mr. Persson that he

5   wanted to limit those eligible to apply to only those

6   qualified career employees within this particular

7   district?

8        A.     Yes.

9        Q.     Do you know why it was restricted to

10  just Middlesex central performance cluster and not

11  beyond that?

12       A.     I can't speak for him.

13       Q.     I'm just asking you if there was a

14  conversation that you had that would have discussed

15  that?

16       A.     I don't remember the specific

17  conversation.

18       Q.     What does the term qualified career

19  employees mean in reference to the job posting?

20       A.     Well, qualified means that people who

21  meet the requirements of the position.  Career

22  employees is any employee in the postal service who

23  is a career employee, not any of our temporaries, our

24  casuals, who actually hold a career position in the

```
 1    the functional purpose of the job is.
 2              So the functional purpose would have
 3    been the functional purpose for the target position
 4    which would be the labor relations position, the
 5    level 19.
 6         Q.    After you had the job posting in this
 7    particular matter, did you begin to receive 991s?
 8         A.    Yes.
 9         Q.    I think you testified before it's not
10    your responsibility to select the review board
11    panelists; is that correct?
12         A.    Correct.
13         Q.    Do you know who in this case selected
14    the members of the review board?
15         A.    No.
16         Q.    Do you know who the members of the
17    review board were?
18         A.    No.
19         Q.    Towards the bottom of your packet, go to
20    the next to the last page.  You don't have it?  I
21    show you my copy.
22              This is Exhibit 1 to Dave Couture's
23    deposition.  It refers back to a letter addressed to
24    Ralph DiVasta, April 29, 2003 from Mr. LoPreste and
```

33

1    your signature is above that?

2          A.      Uh-huh.

3          Q.      Is that correct?

4          A.      Yes.

5          Q.      Does that at all refresh your memory as

6    to at least one of the panelists on the review board

7    for the initial posting?

8          A.      It tells me that Bob LoPreste was the

9    chairperson.

10         Q.      Does that assist you at all in recalling

11   who else was a member of that board?

12         A.      No.

13         Q.      Do you know who selected Robert LoPreste

14   to be a member of the review board?

15         A.      No.

16         Q.      Whose responsibility is it to select the

17   review board members?

18         A.      The selecting official.

19         Q.      Once you obtain the 991s, would you then

20   transmit them to the review board?

21         A.      I would prepare the package and only

22   give it to the selecting official.

23         Q.      You give him just one --

24         A.      Yes.

34

1    Q.    -- set of 991s or you make multiple
2  copies?

3    A.    It could be either.

4    Q.    What knowledge do you have today as to
5  after you post the job and after the 991s were sent
6  to the selecting official, what specific knowledge do
7  you have today as to what took place next in this
8  selection process?

9    A.    I am not sure I can be specific on
10 anything at this point.

11   Q.    Do you have a recollection today that
12 the job was reposted?

13   A.    Yes.

14   Q.    What is your recollection in that
15 respect?

16   A.    That the job was reposted service-wide.

17   Q.    What does service-wide mean?

18   A.    Throughout the postal service.

19   Q.    Whose decision was that?

20   A.    The selecting official's.

21   Q.    Do you know who that was in this case?

22   A.    Mark Persson is the selecting official.

23   Q.    Anybody else?

24   A.    I don't know.

```
 1        Q.      When the review board had narrowed down
 2   the field to various candidates, how do they
 3   communicate their selection to either you or the
 4   selecting official?
 5        A.      They fill out this form, fill out this
 6   when they make a selection.  I'm sorry, is that what
 7   you said when the selecting official --
 8        Q.      No.
 9        A.      I'm sorry.
10        Q.      Review board, when the review board
11   narrows down their field to people they want to have
12   interviewed by the selecting official, I asked you
13   how do they communicate that selection to either you
14   or the selecting official?
15        A.      Normally, there is a form that is filled
16   out with the names of the people recommended, signed
17   by each review board member.
18        Q.      Where does that go to?
19        A.      It goes in the package to the selecting
20   official, the whole package.
21        Q.      Doesn't go to you?
22        A.      No.
23        Q.      Where is that document maintained
24   afterwards?
```

1  selection was made and the service center processed

2  it, it would be at the service center.

3      Q.      Wherever it is physically maintained

4  today, would the recommendation from the review board

5  as to who they wanted to have interviewed be a part

6  of that file?

7      A.      Should be.

8      Q.      When the decision is made to repost

9  which apparently was done in this particular case,

10 what is your responsibility in the reposting?

11     A.      When a position needs to be posted

12 service-wide, we have to notify our northeast area

13 office, the HR analyst at the northeast area, about

14 the position, vacancy, with all the pertinent

15 information and he forwards it to headquarters to

16 post in a service-wide booklet.

17     Q.      Who chooses the specific requirements

18 for level 17 and level 19?

19     A.      Headquarters has a vacancy automated

20 system so that when they put in an occ code, the

21 requirements come up automatically.

22     Q.      So if that occ code requirement were

23 different than what was used for the district

24 posting, does that difference get discussed with the

1        A.      Without knowing what was actually said,

2   we normally don't tell the names of the review board

3   to the applicants because we don't want the

4   applicants going to the review board.  So that the

5   review board's names aren't made public so that they

6   can't go and influence them in any way.

7               In our district, we have several people

8   who are considered experts in 991s and people may go

9   to them and ask them questions about it but I know

10  that we do encourage people, when they are applying

11  for a position, to talk to the people who know the

12  position, talk to the manager of the people so they

13  will find out about the position, but as far as

14  reviewing a 991, I don't -- I have never seen that

15  happen.

16       Q.      Two follow-up questions to that.  In one

17  of the documents that we saw was a letter of thanks

18  but no thanks to Ralph DiVasta from Mr. LoPreste that

19  you signed?

20       A.      Okay.

21       Q.      He indicates in that document that he

22  was the chairman of the review board?

23       A.      Right.

24       Q.      So if they are supposed to keep the

60

```
 1   identity of the review board confidential, why would
 2   he do that?
 3                MR. WILMOT:  Objection.  You can answer.
 4        A.      They keep it confidential until
 5   selections are made and non-selections are made.  So
 6   once the position is either filled or the position
 7   is -- it is determined who isn't going to get the
 8   position, then the applicants have the right to know
 9   who was on the review committee, so that way a person
10   like Mr. DiVasta could go back to the chairperson and
11   talk to him about the job and what his deficiencies
12   were.
13        Q.      So the level of confidentiality is only
14   up to a certain point in time?
15        A.      Yes, yes.
16        Q.      I just want to make sure my previous
17   question was in context.  The question of the undue
18   influence really is in the context of the fact that
19   the job was still currently being posted because it
20   wasn't filled the first time around.
21                Is that what your understanding was in
22   answering the question?
23        A.      Yes.
24        Q.      Have you been involved in any
```

```
1        Q.    But we know at least for the local level
2   there was several additional factors that were
3   included that were not in the job description as
4   well; isn't that true?
5        A.    Yes.
6        Q.    Couldn't the selecting official have
7   directed that that posting include, for instance,
8   operational experience for the district?
9        A.    The requirements, the special
10  requirements that we are able to add locally,
11  normally have something to do with the specific job
12  or the ones we normally have, computer skills,
13  traveling skills, things that, you know, knowledge of
14  word processing or oral communications, if it's not
15  included, those are the ones that are really
16  applicable to every single job.
17            Those are the ones that we can add
18  locally.  For something like operations, putting that
19  requirement would really change the, you know, the
20  job.
21       Q.    But if the selecting official really
22  wanted someone who could walk right into the job and
23  they needed to have this operations experience
24  background, why couldn't they then include that as
```

1          A.       No, I don't.

2          Q.       You made a comment before during your

3    earlier testimony about individuals who are deemed to

4    be experts in 991s.  Who would they be?

5          A.       In our district, there is certain people

6    that have been designated to give the training.

7    Right now, Dave Papa has been giving the training.

8    I know that Janice has even spent time giving people

9    training on 991s.

10         Q.       So besides Mr. Papa and Ms. Lang,

11   anybody else that when you were giving the answer

12   before about experts in 991s, anybody else that you

13   were thinking of?

14         A.       I know of several postmasters that if

15   people asked me, I try to steer them to those

16   postmasters.

17         Q.       For example?

18         A.       Donna Legro, postmaster of Wakefield.

19   She and Dave Papa are probably the only two that I

20   have recommended.

21         Q.       There was some testimony earlier today

22   that an employee by the name of Ann Marie Stoica was

23   offered a labor relations specialist position by

24   Mr. LoPreste.  Do you have any knowledge about that?

```
 1        A.      Yes.

 2        Q.      What is your knowledge?

 3        A.      That she applied for a labor relations

 4  specialist position.  She was postmaster of Sutton

 5  and she was very interested in the job but when push

 6  came to shove or when she was actually offered the

 7  job, she didn't want to commute to the district

 8  office every day.

 9        Q.      So from wherever she lives to --

10        A.      Sutton to North Reading.  Sutton, I

11  think it's around here.  Isn't it part of Worcester

12  someplace?  I don't know.  I've never been there but

13  I know that she just didn't want to commute the whole

14  way every day.

15        Q.      Do you remember when this offer was

16  made?

17        A.      I don't have the date.

18        Q.      Is Ms. Stoica still employed with the

19  postal service?

20        A.      No, she isn't.

21        Q.      Do you know how long it's been since

22  she's been employed?

23        A.      I'm guessing three years.

24        Q.      What position did she hold before she
```

```
 1   left, if you know?
 2        A.     I can't be sure.  She's one of these
 3   people that had all kinds of details but I believe
 4   she had a position at the northeast area.
 5        Q.     In labor relations?
 6        A.     In labor relations.
 7        Q.     And any idea as to how long she was in
 8   that position for before she left?
 9        A.     I'm guessing.  I know it was at least a
10   couple years.  When I was down there, she was down
11   there, too.  So at least a couple years.
12             MR. GOLDBERG:  Okay, I don't have any
13   further questions right now.
14             MR. WILMOT:  I just have a couple.
15   EXAMINATION BY MR. WILMOT:
16        Q.     You testified earlier that you never
17   applied for the labor relations specialist position.
18   Were you ever asked to?
19        A.     When positions came open, I was a
20   trained advocate so I used to help them out.  Every
21   month I'd get a listing and I used to do advocacy
22   work.
23             When positions became vacant, they
24   always said, Melinda, there's a position opening.
```

1   You should think about coming into labor relations.

2        Q.      Who would say that to you?

3        A.      Dave Couture and Bob LoPreste.

4        Q.      During the time that you were HR

5   specialist, are you aware how often a vacancy became

6   available for labor relations specialist positions?

7        A.      You know, I knew I was coming here

8   today.  I didn't do very much but I kept thinking

9   about it all night.  I got to thinking about the

10  staff in labor relations.  In 1993 there was Bob

11  LoPreste, Mark Persson, Dave Papa.  I posted at least

12  two or three prior to this one.

13       Q.      This one being what?

14       A.      The one that was posted 03-020 then

15  service-wide.

16       Q.      So prior to what's been marked as

17  Persson Exhibit No. 1 and then the reposting of that

18  position, and Persson No. 17, your memory is that you

19  posted maybe three?

20       A.      Yes.

21       Q.      Okay.  For those vacancies, other than

22  the two that we have been talking about today, which

23  is marked as Plaintiff's Exhibit No. 1 and

24  Plaintiff's Exhibit No. 17, other than Ms. Stoica,

1    are you aware of any other female applicants for

2    those vacant labor relations specialist positions?

3         A.    Not that I can remember.

4         Q.    You testified earlier that it is a

5    selecting official's responsibilities to choose the

6    members of a review board.  Although it is the

7    selecting official's responsibility to do that, were

8    there times where you had to choose the review board

9    members?

10        A.    I never was the actual chooser.  I have

11   had, as I said, my role is so different from job

12   vacancy to job vacancy.  I have had selecting

13   officials, postmasters, ask me who was trained and

14   who was on review boards and I would give them

15   recommendations, but I never made the sole selection.

16        Q.    Do you remember if you made any

17   recommendations for the two review boards that we

18   spoke about today?

19        A.    No, I didn't.

20        Q.    You did not make any recommendations?

21        A.    I did not make any recommendations.

22        Q.    It's my last question and it's a long

23   one.  I will try and make sense of it.  If it

24   doesn't, please ask me to repeat it.

1              Based on U.S. Postal Service policy, to

2     the best of your understanding, is there anything

3     improper about a former review board chairperson or

4     member giving advice to an applicant that was not

5     selected by the review board that that chairperson

6     member served on after that review board made its

7     decision, you know, made its decisions, generally,

8     therefore completed its responsibilities as a review

9     board and during a pending reposting of that same

10    position?

11         A.    If I understand your question --

12         Q.    I will repeat it, if I can.

13         A.    All right.

14         Q.    Based on your understanding of United

15    States Postal Service policy, is there anything

16    improper about a former review board chairperson or

17    member giving advice to an applicant who was not

18    selected by the review board that that chairperson or

19    member served on, after that review board completed

20    its responsibilities for that first posting but while

21    the reposting was pending?

22         A.    The purpose of a review board and having

23    a chairperson of the review board is to have someone

24    that the applicants can go back to to ask advice, to

1  find out where the discrepancies are.

2          So if your question is if I applied for

3  a job, didn't get it, I would definitely go to that

4  chairperson of the board after I found out I didn't

5  get it, for advice, for questions on how to fill out

6  my application or what I could have done better, how

7  my interview was wrong.  That is the chairperson's

8  role is to help counsel and speak to the applicants

9  if they are not selected.

10     Q.     Does your answer change if during that

11  time that the review board chairperson is giving the

12  advice if during that time the position that the

13  person was not selected for was reposted and is

14  pending?

15     A.     So long as that chairperson isn't the

16  chairperson of the new board, that is not something

17  that would be prohibited.

18          MR. WILMOT:  Nothing further from me.

19  FURTHER EXAMINATION BY MR. GOLDBERG:

20     Q.     Just to follow up on that last point --

21     A.     Yeah.

22     Q.     If in fact that the review board has

23  completed its initial task but the job has been

24  reposted, is there any guidelines that would indicate

**EXHIBIT 7**

1

1 - 207

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

JANICE LANG,                              )
                                          )
            Plaintiff,                    )
                                          )
-v-                                       )  CIVIL DOCKET NO.:
                                          )  05-10052-WGY
JOHN E. POTTER,                           )
Postmaster General,                       )
                                          )
            Defendant.                    )


            THE ORAL DEPOSITION OF JANICE LANG, held

pursuant to Notice, and the applicable provisions of the

Federal Rules of Civil Procedure, before Steven Kane, a

Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the office of the

United States Attorney, 1 Courthouse Way, Suite 9200,

Boston, Massachusetts, on Tuesday, August 4, 2005,

commencing at 11:00 a.m.



27

1        I believe one had to do with Roberts Rules of

2   Civil Procedure in running meetings.  And another one had to

3   do with negotiating skills.

4        Q    Any other courses that you took there?

5        A    There might have been one more.  And right at this

6   time I can't recall.

7        Q    After SHRM, what was your next education venture?

8        A    I attended Massachusetts School of Law in Andover.

9        Q    Did you attend full-time or--

10       A    I was a part-time student.

11       Q    What were the years of your attendance there?

12       A    I began in 1997 and I completed the program in

13   2000.

14       Q    At Mass. School of Law, did you take any courses

15   with regards to labor or employment relations?

16       A    Yes, I did.

17       Q    What did you take?

18       A    I took labor law; negotiating skills; mediation,

19   conciliation and arbitration; contract law.

20       Q    When you say contract law, was that other than

21   first year contract law?

22       A    Well, it's first year contract law.

23       Q    What else?

24       A    But we did enter into different types of cases

25   that involved some employment situations and so forth.

1   on my own, and I was working full-time, and taking classes

2   on a part-time basis.

3           MR. WILMOT:  Let's break for one second.

4           (Recess.)

5           MR. WILMOT:  We're back on the record.

6           BY MR. WILMOT:

7       Q   The courses that you described that you took at

8   Mass. School of Law, was there any clinical component to

9   those courses?

10      A   No.

11      Q   So, did you graduate from Mass. School of Law?

12      A   Yes, I did.

13      Q   Did you take the bar exam afterwards?

14      A   Yes, I did.

15      Q   Are you a member of the bar now?

16      A   Yes, I am.

17      Q   When did you pass the bar exam?

18      A   I think it was in 2002.

19      Q   How many times did you take the bar exam?

20      A   Three times.

21      Q   Are you currently employed?

22      A   I am.

23      Q   Where?

24      A   U.S. Postal Service.

25      Q   What division are you currently assigned to?

37

1    A    I began my employment with the U.S. Postal Service

2  May 12th, 1984.

3    Q    What position did you first start in?

4    A    I began as a mail handler.

5    Q    And how long did you perform that position?

6    A    I was a mail handler approximately one year and

7  three months.

8    Q    What was your next position?

9    A    The position I was appointed to was Personnel

10  Assistant and Injury Compensation.

11    Q    And what were your responsibilities in that

12  position?

13    A    Basically, my responsibilities as the Personnel

14  Assistant was to set up appointments for fit for duties;

15  work related and non-work related injuries; handle claims;

16  the processing of the Federal Employee Compensation Act

17  Forms, CA1s, CA2s, CA2As; make contacts with insurance

18  companies, attorneys settling third-party claims--

19    Q    I'm sorry?  You were settling third-party claims?

20    A    That's correct.

21    Q    Do you think you can elaborate on that?  What do

22  you mean by -- what was your role in settling third-party

23  claims?

24    A    When a Postal employee was injured in the line of

25  duty, and it was on someone's property, or due to the fault

1   of a non-Postal party, I would contact the party, see if

2   they had insurance.

3          If they didn't have insurance, I would deal

4   directly with the homeowner or the dog owner, or whatever

5   the situation entailed, and try to make a settlement in

6   terms of having the Post Office reimbursed for medical

7   expenses and the settlement according to the Federal

8   Employee Compensation Act.

9      Q    Would you then draft some type of settlement

10  agreement between--

11     A    That's correct.

12     Q    Let me just finish the question.

13         You would draft a settlement agreement between the

14  Post Office, the Postal Service and this homeowner, for

15  example?

16     A    That's correct.

17     Q    And who would sign off on the settlement

18  agreement?

19     A    If homeowner or the dog owner had insurance,

20  possibly I'd be working directly with the insurance company

21  and the agent.

22         If it was just the homeowner or the dog owner, I

23  would have them sign the paperwork and issue the check.

24     Q    Would you sign the agreement, as well?

25     A    I believe my name would be on it because I would

39

1   have been submitting the documentation and the paperwork and

2   making the negotiations with them.

3       Q    When you say your name would be on it, do you mean

4   that you are a signature to the agreement?

5       A    That's correct.

6       Q    Who was your supervisor at that time?

7       A    Michael Tierney, T-i-e-r-n-e-y.

8       Q    And how long did you work in that position?

9       A    I was a Personnel Assistant; I guess, 1985 to when

10  I was promoted officially.  I believe it was January 19 or

11  maybe December '91, January of 2002.  We had gone through a

12  restructuring.

13      Q    In what position -- what was our next position?

14      A    During that time I was doing details as Acting

15  Injury Comp Specialist.

16      Q    This was in 1991?

17      A    My details as Acting Injury Comp Specialist and

18  Injury comp Manager, extended from about 1986 to 1992.

19      Q    What was your next position within the Postal

20  Service?

21      A    My next position was Human Resource Specialist,

22  Training.

23      Q    And what were your responsibilities in that

24  position?

25      A    Let's see.  I did a lot of facilitating.

*APEX Reporting*
(617) 426-3077

40

1    Q    What do you mean by that?

2    A    Teaching classes, such as orientation for new

3    employees, diversity, work place violence, security, and

4    things along that line; highly affected people,

5    communications skills.  Various ones.

6    Q    Anything else other than that the training

7    component you just described?

8    A    Yes.  I organized meetings for the Postal

9    Quarterly, which are now part of Senior Management

10    Leadership meetings.

11    Q    Anything else?

12    A    I counseled people on their careers; worked on

13    their forms, interviewing techniques--

14    Q    What do you mean?  Can you back up a bit?

15        What do you mean that you counseled people on

16    their careers?

17    A    They would make an appointment to come to see me.

18    I would go over everything from A to Z in terms of applying

19    for a position, interviewing, looking.

20        I would advise them in terms of perhaps going back

21    to college or getting other things that they were interested

22    in so that they would have a well-rounded background.

23    Q    Any other responsibilities in that position?

24    A    Quite a bit.  Let's see.

25        I was in charge of organizing the training for --

1    like HAZMAT training for the whole district in terms of

2    making sure that they have the training, and that the

3    paperwork was resubmitted to our department for input into

4    the system, the training system for OSHA standards.

5              I made airplane reservations for people, and hotel

6    reservations.

7              I enrolled people in training in Windsor and in

8    Bolger Academy in Washington, D.C., Potomac.

9              I paid bills for training that they may have taken

10   on Postal courses.

11             I had contact with people in terms of some of the

12   new trainers, non-Postal trainers coming in.  When I went to

13   the airport, picked them up, brought them to their hotel,

14   brought them back, the whole bit.  Various jobs.

15             Another one would be ordering food, and making

16   sure food was available for different meetings or whatever

17   at times if I was asked to do that.

18             The list goes on and on, a lot of duty.

19   Q    Would you describe your duties as largely

20   administrative or--

21   A    Oh, yeah.

22   Q    Who did you report to at that time?

23   A    Now, which time are we talking about?  The whole

24   time of my training job?

25   Q    Well, if you want to go from 1992 forward.

42

1    A    Okay.  1992, was Jane McClelland.

2    Q    Jane?

3    A    Jane, J-a-n-e, McClelland, M-c-C-l-e-l-l-a-n-d.

4  Then we went to -- Jane was out quite a bit, she went on a

5  detail.  She had a pregnancy.  We had some people on details

6  there.

7         Then we went to Joseph D'Allocco,

8  D-'-A-l-l-o-c-c-o.

9    Q    Do remember when that was, when Mr. D'Allocco

10 became your, supervisor?

11   A    I believe that was around 1995-'96.

12   Q    And who was your next supervisor?

13   A    The next official one, I believe, was Dave

14 Edmonds, David Edmonds, E-d-m-o-n-d-s.

15   Q    And when was that?

16   A    I believe Dave got the job in 1999.

17   Q    Was he your supervisor for the remainder of your

18 time in that position?

19   A    He was my supervisor until his retirement, October

20 of 2004.

21   Q    So, from 1992 until you began the detail you are

22 in now, you were a HR Specialist/Trainer?

23   A    That's correct.

24   Q    If you could turn to Exhibit No. 1, which is your

25 Complaint, and just flip to paragraph eight for me, please.

53

1      Q     Do you know anything of Mr. Krinsky's educational

2    background?

3      A     I know he is a bar certified attorney, and other

4    than that, not really.

5      Q     Do you know how long Mr. Krinsky had been an

6    attorney prior to his application for this position?

7      A     I received some documents in terms of their

8    application, and their backgrounds and their experiences,

9    and so forth, how long he has been an attorney, I know he's

10   been 20 years as an attorney or so.

11     Q     Do you -- are you aware whether or not in his 20

12   plus years as an attorney, whether or not he was involved in

13   any labor relations law, what have you?

14     A     I believe he did a detail or so in labor

15   relations.

16     Q     Do you know whether Mr. Krinsky was a practicing

17   attorney?

18     A     I believe I heard that he did practice.  I don't

19   know if he was practicing at the time.  He was still working

20   for the Post Office.

21     Q     Do you know whether Mr. Krinsky practiced in the

22   area of labor law?

23     A     I do not know that.

24     Q     Do you have -- did you ever, prior to your

25   application, supervise any employees?

54

1       A    I have supervised.  Yes.

2       Q    You have?  When was that?

3       A    I have training techs within my office; training

4   techs, technicians within my office, and a secretary.  And I

5   held acting manager of details.

6            They are both in Massachusetts District and also

7   New Hampshire District.

8       Q    So, the training techs reported to you?

9       A    I found out afterwards that they -- my level of

10  supervision, they shouldn't be reporting to us.  But, at one

11  point they were directed to report to each of the

12  specialists.

13      Q    Let me ask you in another way.

14           Did you have any direct reports in your employment

15  history in USPS prior to your application?

16      A    Yes, I did.

17      Q    When did you have those reports?

18      A    When I was on detail as Acting Manager of

19  Training.

20      Q    What period of time was that?

21      A    As needed.  There were two or three different

22  times, and also when I was on a detail for four months in

23  the New Hampshire District.

24      Q    Can you give me those periods?

25      A    My detail in New Hampshire District started

55

1   September 10th, 2001 and ended January 11th or so, 2002.

2        Q    Was that the only period of time where you had a

3   direct report?

4        A    If I acted in the capacity of Injury Comp Manager,

5   the Specialist would report to me.  I would be held

6   responsible for the office.

7        Q    At what period time?

8        A    Again, as needed.  It might be a week here, two

9   weeks there.

10       Q    Now you were saying that, you know, you would have

11  been responsible for those direct reports.

12            Did you, during that time, ever have to, with

13  regard to the direct reports, have to hire or fire any

14  direct reports?

15       A    No.

16       Q    Did you ever have to make any employment decisions

17  with regards to the direct reports?

18       A    Yes, I did.

19       Q    What type of decisions?

20       A    Changing hours of employment, providing specific

21  assignments, taking discipline, if necessary.

22       Q    Do you know what the timeframes were when you had

23  to perform those actions?

24       A    They would be various because some of the details

25  were like for four months, some were for two weeks, some

56

1    were as needed.

2        Q    You mentioned that you had to discipline

3    employees, do you remember the context of that discipline?

4        A    Yes, I do.

5        Q    Can you describe it for me, please?

6        A    One was a driving instructor examiner who kept

7    canceling classes, saying that the roads were unsafe, and I

8    knew that if you give him a direct order to do his job,

9    which was to take people out and certify them as drivers.

10            Various times I needed to speak a union person

11   because he called the union -- he didn't like his

12   assignment, or something along that line.

13       Q    Is that the only employee you had to discipline?

14       A    I believe so.  Yes.

15       Q    Exhibit No. 9, is that your complete 991?

16       A    No, it isn't.

17       Q    What's missing from that?

18       A    I believe there's another.  This one stopped at 8.

19       Q    I'm sorry?

20       A    It stopped at Number 8--

21       Q    Okay.

22       A    --and I believe the requirement had nine

23   requirements:  word and data processing, including

24   spreadsheet software.

25       Q    So there should be one more question there?

*APEX Reporting*
(617) 426-3077

69

1            MR. GOLDBERG:  Objection.

2            THE WITNESS:  I don't know what he had.

3            BY MR. WILMOT:

4      Q    You don't know.  I'm saying was there anything you

5  perceived that would lead you to believe that perhaps he

6  harbored some animus towards persons over the age of 40.

7            MR. GOLDBERG: Objection.

8            THE WITNESS:  All I know is that he told me I was

9  eligible to retire so--

10           BY MR. WILMOT:

11     Q    Can you go into detail on that?

12           What do you mean by that?

13     A    I had occasion to interact with him.

14           Mike Powers had held a meeting which he introduced

15  himself to the staff as the new District Manager, and food

16  was served.

17           At the end of the meeting I helped to take the

18  food that was left over, put it in the cafeteria, and after

19  a while Dave Couture came down and spoke to me, and said,

20  "Hey, is there any orange juice left over?"

21           I said, "I put it in the cafeteria."  I went with

22  him into the cafeteria and as we were exiting our walking

23  down the corridor, he turned to me, out of the blue, and

24  said, "Do you know you're eligible to retire?"

25           And, believe me, as I said, my relationship with

70

1    him was strictly business professional.  I thought that was

2    rather personal.  I was stunned.  I was like, whoa!

3        Q    Did he say anything else other than that?

4        A    My reply to him was, "Oh, really"?

5            And then he went on to say how he had five people

6    in Human Resources who are eligible to retire, and he

7    started to name them off.

8        Q    Who did he name?

9        A    It would have been Fred Marshall, Patricia

10   Melanson, Richard Venti, himself -- no he wasn't eligible at

11   that time.

12           Let's see, Fred, Pat, Richard; oh, Charlie

13   Wilkinson.  No, I think he just began.  Whatever, and I was

14   the fifth.

15           My reply to him was, "Oh really?  Well, I may be

16   eligible to retire, but my mortgage isn't."

17           Then, he told me about he'd be leaving in a year

18   or so, December, or whatever.

19       Q    When you made the comment that your mortgage, what

20   was his response to that?

21       A    I can't right at this moment -- I cannot remember

22   what the exact response was.

23           He did say something else in terms--

24       Q    Did he talk about himself retiring in that

25   conversation?

71

1     A    He had made some reference to -- well he wouldn't

2  be there or something.

3     Q    What do you mean by that?

4     A    That he'd be retiring like in a year of time.

5          I mean I was just like, whoa!  That really upset

6  me.

7     Q    Well, I'm asking whether -- what he told you

8  specifically?

9          He mentioned his own intentions to retire?

10    A    He made some reference that he would be retiring.

11        To tell you, right at this precise moment I can't

12  tell you about exactly what his words were, because I was

13  like stunned that he would even bring the subject up to me

14  on my retirement.

15        I felt that if a Human Resource Manager was to

16  speak to a person; it should have been in his office in

17  private.

18     Q    Were there any witnesses around for that

19  conversation?

20     A    I don't believe so.

21     Q    It was just you two?

22     A    Yeah.

23     Q    Even though you can't remember the specifics of

24  what he said, is it your memory that he mentioned his own

25  interest in retiring?

72

1      A    There was something in terms of December, another

2   year, whatever.

3           But, again, I can't remember that, at that -- all

4   I know is I went in the office, and one of my co-workers

5   said, "What's wrong, Janice?  You look like you've seen a

6   ghost."  And I told them the story.

7      Q    Do you remember when this conversation occurred?

8      A    It was -- I don't remember the date.  It was the

9   day that Mike Powers reserved the conference room to

10  introduce himself to the whole district, as District

11  Manager.  So, it had to be somewhere in, I would say, maybe

12  January.

13     Q    Of what year?

14     A    January of 2003.

15     Q    Anything else you remember about what he said

16  during that conversation?

17     A    After he said it, and started naming off the

18  people, to tell you the truth, whatever -- it just took me

19  by total shock.

20          Number one, that he would be telling me other

21  people's personal business, and most importantly, that he

22  would even be speaking to me about my retirement.  I had no

23  intention of retiring.

24     Q    Did he make any derogatory remarks towards you or

25  the persons he mentioned?

73

1    A    No, I wouldn't say it was derogatory.  It was like

2  -- I took from that moment, like I go out the door -- shut

3  the door, and never come back.

4          And my work, everything I worked towards, and

5  worked for, had no value.  That I could just leave, goodbye,

6  you won't even be missed.  I was really pissed off that we

7  would even -- excuse my expression -- bring up my

8  retirement.

9          I am not a personal friend of his.  I don't have

10  personal conversations with him about my personal business,

11  and that meeting, if it needed to be done, should have been

12  held privately in his office, not in walking down the

13  corridor.

14    Q    I thought you said this took place in the

15  cafeteria.

16    A    As we were walking out of the cafeteria.  He had

17  his orange juice in the corridor, right outside the

18  cafeteria.

19    Q    Again, your memory is that he said, "Do you know

20  you're eligible to retire?"

21    A    That's correct.

22    Q    Anything else about that conversation that stands

23  out in your mind?

24    A    Not at this time.

25          No, all I know is that I went in my office and

74

1    someone asked me, "Janice, what's wrong?  You look like
2    you've seen a ghost."
3        Q    Were you eligible to retire?
4        A    I've been eligible to retire since I practically
5    got into the Postal Service.
6        Q    Anything else that you've perceived in your
7    interactions with Mr. Couture that would make you believe
8    that he harbors some type of animus towards persons over the
9    age of 40?
10            MR. GOLDBERG:  Objection.
11            THE WITNESS:  I went on a detail to the New
12    Hampshire District.  And I was returning, I was told that my
13    job had been eliminated.  That was in January of 2002.
14    I was told that by Dave Edmonds.
15            I went down to Dave Couture, and asked him, "Has
16    my job been eliminated?"  And, he confirmed that.
17        I went to an NAPS president, who was my Mike Tierney,
18    my former boss, told him that I'd been told my job's been
19    eliminated.
20            What is NAPS going to do about my job being
21    eliminated?  I am a dues paying member of NAPS, and this is
22    the first time I've heard my job is eliminated.
23            He went and spoke to Mr. Couture, Dave Couture,
24    came back telling me, "No, your job isn't eliminated," and
25    furthermore, I have bumping rights.

78

1  say.

2      Q    What did Dave say?

3      A    He sat in his seat.  I was over here.  Mark was
4  over there.

5      Q    Whether here or there isn't going to come up on
6  the transcript.  Can you better describe that?

7      A    Okay.  Mark sat on one side of the table.  Dave
8  sat on the other side of the table.  And I sat at the end of
9  the table.

10          Dave sat there with his arms folded, not even
11  looking at me.  And then, he turned and he said, "In spite
12  of the people, the three people that we're interviewing
13  today, if we don't find them qualified, anyone qualified,
14  we're posting the job nationwide.

15     Q    Okay.  And what did that mean to you?

16     A    That meant to me, decision is made, door shut,
17  just do your best, girl.  Do your best.

18     Q    "Decision is made."  What do you mean by the
19  decision is made?

20     A    That he had already made up his mind.

21     Q    As to what?

22     A    That is it was going to be posted elsewhere.

23     Q    Although he said--

24     A    I've been in several interviews, and never once,
25  has anyone started an interview with such a negative

79

1    connotation that, in spite of the people, the three people

2    who were interviewing the day, don't find them qualified--

3         Usually, if anything is said in terms of

4    additional postings, or that a decision would be delayed,

5    that's said at the end of the interview.

6         His role, sitting there, I don't know why he was

7    even there because Mark was the selecting official.  I've

8    often wondered why he was there, but in spite of that, any

9    of the people who are interviewing people, their main job is

10   to put people at ease, to welcome them; make them feel

11   comfortable, and so forth.

12        To be told, right up front, before you even were

13   asked a question, in spite of three people who were

14   interviewing today, "If we don't find them qualified, we're

15   going post the job nationwide."  I've never heard that in an

16   interview in my life.

17        Q    You say that was a poor way to start off?

18        A    Poor?  For a human resource manager, a former

19   Manager of Training?  I never heard of it in my life.

20        Q    Just to step back a bit, the comment that you said

21   Mr. Couture made in the corridor coming from the cafeteria

22   back in -- when was that?  January, 2003?

23        A    No, '02.

24        Q    2002?

25        A    Oh, wait.  2003, I believe, sorry.  Yeah, 2003.

80

1    That's when Mike came.

2        Q    Did you complain about that comment to anyone?

3        A    Do you mean did I file an EEO Complaint?  Did I

4    pursue a grievance or something?

5        Q    Well, let's take it in a different step.  Did you

6    complain to any member of management about that complaint --

7    that comment, sorry.

8        A    No, I didn't.  I spoke to some of my co-workers

9    who are close personal friends with me, and told them of my

10   displeasure, told them that my total shock, and that how I

11   felt like I could walk out that door and never come back.

12   And I -- everything I do had no value.

13       Q    Who did you speak to?

14       A    Ellen Fallon, Joyce Geiman, Peter Morse.  I might

15   have said something to few other people.

16            I was like -- I was stunned.

17       Q    What is Ellen Scanlon's position?

18       A    Ellen Fallon?

19       Q    Fallon.  I'm sorry.

20       A    Fallon, F-a-l-l-o-n.  She is a training

21   technician. ,

22       Q    And what is Joyce Morse's position?

23       A    Joyce Geiman, G-e-i-m-a-n.  She's an Injury Comp

24   Specialist.

25       Q    Peter Morse.  I get that one right?

81

1        What is his position?

2        A    Peter Morse had -- he worked in op support.  He's

3    now retired.

4        Q    Did you complain to any -- strike that.

5             Did you file any type of EEO Complaint concerning

6    Mr. Couture's comment?

7        A    No.  He'd deny saying it anyway, probably.

8        Q    So, after Mr. Couture made that comment in the

9    meeting, in the interview, what happened next?

10       A    They went on; Mark started asking questions, and

11   then Dave asked two questions.

12            I remember one of the questions Dave asked was on

13   METS Threat Assessment.  And to kind of break it up a little

14   bit in humor, I had never heard of that.  And so I said,

15   "Gee, the only METS I know of is the baseball team.  Mets

16   baseball team.  And no one laughed.  Okay.  It was like --

17   and they went on.

18            At the end of the interview, Mark jumps up.

19   "Great job, Janice."  Jumped right up out of his seat. Shook

20   my hand, and I go, "Wow.  I really did a good job," and I

21   really felt I had really socked it to them except for the--

22            There were two questions I didn't know.  One was

23   On METS Threat Assessment, and the other one, I don't recall

24   at the time what it was.  And how I remember METS Threat

25   Assessment is if I don't know something, I go, as soon as I

82

1   can immediately check it out so I know it again, if it's

2   ever asked of me.

3       Q    But your memory, is that there were two questions

4   you didn't have the answer to.

5       A    There was two -- two questions.

6       Q    Do you remember if they read the questions from

7   some prepared statement or something?

8       A    They had notes in front of them, whatever.  I

9   don't know if they writing or not.

10      Q    Did they alternate questions?  Did they go back

11  and forth?

12      A                No, it was basically Mark, and then

13  Dave Couture interjected one or two questions.

14      Q    But the remainder of the questions, how do you

15  feel you did on those questions?

16      A    Very good, and when Mark flew -- I mean, he

17  jumped right up out of his seat, shook my hand, "Good job,

18  Janice." I was, "Wow.  That's good. I did do good," and I

19  felt very proud of myself and I go, "Wow.  That's good."

20      Q    When they were asking questions, and you were

21  answering them, did they make any comments after you had

22  given answers?

23      A    There would be an interjection of "that's good,

24  um-hm, good, oh good."  You know, like that.

25      Q    Any comments during the questioning that you did

83

1  not completely answer a question or they wanted you to
2  elaborate on your answer?

3      A      There might have been something, you know, would
4  you add something else.  I really don't know.  I've been
5  through so many interviews with this thing.  They all tend
6  to blend in together.

7      Q      So why do you believe that you did a good job in
8  that interview?

9      A      Just Mark's reaction.  He flew out that seat,
10  shook my hand, big smile on his face and said, "Good job,
11  Janice!  Good job, Janice!"

12     Q      Is it your conclusion that you did a good job in
13  that interview based on anything else other than Mark's
14  reaction after the interview?

15     A      I think as I gave responses, and so forth, a head
16  would shake, you know, "good, uh-huh," just behavior.

17          Mind, I say though, Mr. Couture sat the whole time
18  with his arms folded, not looking at me.  It was just like
19  that throughout the whole interview.

20     Q      And were you nervous at all during the interview?
21     A      Oh, you're always nervous.

22     Q      Were you nervous at all during the interview?
23     A      Yes.

24     Q      Who else did you say was interviewed for this
25  position?

84

1       A       In the May 1st interview was Richard Kinder and
2    Richard Krinsky.
3       Q       Did you speak with them after their interviews?
4       A       No.
5       Q       Do you know whether Mr. Kinder and Mr. Krinsky
6    were asked the same questions by Mr. Persson and Mr. Couture
7    as were asked in your interview?
8       A       I don't know.  I haven't spoken with either one.
9       Q       Do you know if whether Mr. Persson said, "Good
10   job," to Mr. Kinder and Mr. Krinsky when they finished their
11   interviews?
12      A       I'd have no way to know that.
13      Q       Was anyone selected for the position?
14      A       No.
15      Q       How did you learn that?
16      A       On May 2nd, Mark asked me to come down to his
17   office and he said to me that I did a good job.  However,
18   they were going to post the job nationwide.
19              And he went on to say that the reason I wasn't
20   selected is that I didn't have advocacy training and I
21   didn't have the experience, and they wanted someone to walk
22   right into the job.
23      Q       And this was on May 2nd, you said?
24      A       Right.
25      Q       Now, you are certain that on May 2nd, Mr. Persson

87

1          A F T E R N O O N   S E S S I O N

2                                              (2:00 p.m.)

3          BY MR. WILMOT:

4      Q     Before we move on, I just wanted to go back to the

5   May 2nd, 2003 conversation you had with Mr. Persson, when he

6   notified that that no one was going to be selected for the

7   position being applied for.

8          What else did he say in that conversation?

9      A     He told me to come into the office, which I did

10  do.

11     Q     This was into his office?

12     A     May 2nd.

13     Q     Okay.

14     A     And he told me that although I did good, that they

15  were going to post it nationwide and that neither Richard

16  Krinsky -- neither of the other people were being selected.

17         And that the reason for that is that I didn't have

18  advocacy training and I didn't have experience; that they

19  wanted someone to able to walk right into that job and do it

20  because he had been newly appointed as Labor Manager, and

21  Peter Attridge was new to his job, too.

22         And then I asked him, more or less, would I have

23  to reapply, or whatever, and he said he didn't think so,

24  that I wouldn't have to, but that to check with Personnel.

25     Q     What did he say about you reapplying for the

88

1  || position, if anything?

2  ||    A    He said he didn't think I'd have to reapply, but I

3  || had to check with Personnel.

4  ||         In fact, I can remember him saying, more or less,

5  || that none of the three that were interviewed would have to

6  || reapply.

7  ||    Q    Did he say, or give you any recommendations on

8  || what you can do to make yourself a better candidate?

9  ||    A    No.  No.  He told me I had done a good job.

10 ||    Q    He didn't recommend any training or what have you?

11 ||    A    No.  He told me that I didn't get the job because

12 || I didn't have advocacy training and that he wanted someone

13 || with experience who could walk right into the job.

14 ||    Q    Okay.

15 ||    A    And if he was posting the job then and there, how

16 || could I get advocacy training.  It wouldn't have been

17 || scheduled.

18 ||                        (Defendant's Exhibit No. 11

19 ||                          marked.)

20 ||         BY MR. WILMOT:

21 ||    Q    I'm showing you what's been marked as Exhibit 11.

22 ||         Would you review that document?

23 ||         (Pause.)

24 ||         BY MR. WILMOT:

25 ||    Q    Do you recognize that document?

115

1   me for making it that far, explained the process, started in

2   on their questions and they rotated questions and so forth.

3   It went very well.

4           I came out of there feeling very good.

5       Q   Do you remember what type of questions you were

6   asked during your interview?

7       A   Yes.  I remember because I did receive their

8   ratings and so forth.

9           There were questions pertaining to FMLA; there

10  were about three or four of those.

11          There were questions on union salary, how the

12  stewards are paid; questions pertaining to what's the

13  difference in arbitration between regular arbitration and

14  expedited.

15          There were about 15 questions altogether.

16      Q   Do you remember whether or not you struggled in

17  answering any of the questions that they asked you?

18      A   I wouldn't use the word "struggled."  There were

19  questions that I could answer right off the bat as such,

20  such as sick leave dependent care.

21          I thought I did very good on that because I had a

22  situation in my office with a woman who was using sick leave

23  dependent care, and I'm the timekeeper in the office.

24          So, FMLA, similar to that I had a fellow co-worker

25  in my office, who was on FMLA requesting that and so forth.

*APEX Reporting*
(617) 426-3077

141

1    clear transcript and I'm guessing you're kind of -- you're

2    not interchanging them purposely, so I just wanted to give

3    you another chance--

4         A    Well, it's been a long day.

5         Q    I understand.

6         A    Let me state it this way.

7              On my applications that I submitted in April of

8    2003, my qualifications were assessed in relationship and

9    against all the other qualifications and applications that

10   were submitted.

11             I was selected to be one of three people to go

12   forward with an interview.

13             Only recently did I find out that the head of that

14   committee, making the reviews of the 991 applications, was

15   the former labor manager, who had just been promoted,

16   himself, a few months before, who certainly should have had,

17   and did possess, the knowledge and experience to make the

18   determination who was qualified to go forward with

19   interviews.

20             I was selected.  Mr. Divasta was not.

21        Q    Mr. Wolcott wasn't selected either, is that right?

22        A    That's correct.

23        Q    Okay.  Can you continue?

24             So you were selected the first time--

25        A    By the Labor Relations Manager, ex-Labor Relations

142

1  Manager, who headed the committee.

2       Q    And weren't you selected the second time as well?

3       A    I was selected the second time as well.

4            But we're talking about May when I first applied.

5            You asked me why did I think I was qualified and

6  Mr. Divasta wasn't.

7            Here is a professional labor relations manager,

8  who was part of a committee assessing qualifications.

9            My qualifications passed.  I went on to the

10 interview.  Mr. Divasta's qualifications didn't pass.  He

11 didn't get an interview.

12      Q    Okay.  Now I understand.

13           So you're saying that because you were selected

14 for the earlier interview, May 2003--

15      A    The initial interview.

16      Q    --and Mr. Divasta was not, that's your basis as

17 you being more qualified than Mr. Divasta.

18      A    Oh, there's other things, too, such as I believe

19 my training, my experiences, my educational background, the

20 wide scope I have in terms of working not only in the field,

21 but in the plant and in the district, gave me a great deal

22 of interaction and knowledge of various craft levels,

23 managers, the whole bit.

24      Q    You mentioned your education.  We didn't get to it

25 earlier.

# EXHIBIT 8

```
 1                          Volume I
                         Pages 1 - 69
 2

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
     JANICE E. LANG,                        )
 5                     Plaintiff           )
                                           )
 6        VS.                              )   05-10052-WGY
                                           )
 7   JOHN E. POTTER, Postmaster General    )
     United States Postal Service,         )
 8                Agency                    )
```

**COPY**

```
 9

10

11        DEPOSITION OF RALPH DIVASTA, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   12, 2005, commencing at 10:15 a.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21

22                     FOR THE RECORD
                 COURT REPORTING SERVICES
23                   11 FISKE STREET
              SHREWSBURY, MASSACHUSETTS   01545
24                    (508) 845-1096
```

1      Q.      You have down under other education and
2  training, beginning with lines three through nine,
3  you mention something in November 2001, Kansas City
4  P & DC.
5      A.      Correct.
6      Q.      What does that stand for?
7      A.      Processing and distribution center.
8      Q.      What type of training was it that you
9  had received there?
10      A.      Train the trainer training.
11      Q.      In essence, somebody was training you to
12  be a trainer for the postal service?
13      A.      Correct.
14      Q.      Any particular type of training?
15      A.      It was for the advanced flat sorter
16  machine.
17      Q.      Is that what the AFSM?
18      A.      100.
19      Q.      ·  TTT?
20      A.      AFSM 100.  The TTT is the train the
21  trainer training.
22      Q.      Was that something that you had
23  requested to go to or they asked you to attend?
24      A.      They asked me to go.

1          Q.      And the training for the aviation

2    security target mail training, is that simply a

3    security type training?

4          A.      Yeah, they had offered different

5    training at different times on that.

6          Q.      Sometime after 9/11 that occurred?

7          A.      I don't know for sure if it was just

8    after 9/11.

9          Q.      Well, you mentioned the date October of

10   '01?

11         A.      Yeah, that would be after but I don't

12   know if that was the first training class or not.

13         Q.      The entry alongside number five refers

14   back to AFSM 100 TTT keyer training?

15         A.      Yes.

16         Q.      What does that make reference to?

17         A.      The keyer training was a separate part

18   of the machine used for the remote encoding center

19   that we were going to have.  That was going to be a

20   separate entity.

21         Q.      So that, again, was something they were

22   asking you to learn how to be a trainer?

23         A.      Correct.

24         Q.      What does the July 1st Middlesex central

```
1    district step two designee training involve?

2         A.      Step two designee training?

3         Q.      Yes.

4         A.      That involved how to handle a step two

5    grievance, how to meet with the unions, how to

6    process the grievance, make decisions, how to write

7    up step 2s.

8         Q.      Was that something that you had asked to

9    go to or they asked to send you?

10        A.      They told me I was going.

11        Q.      Who directed you to do that?

12        A.      Linda Papa and Mark Hogan.

13        Q.      How long of a class is that?

14        A.      I'm going to say -- I don't know if it

15   was during that week or if it was just the one day.

16   I believe it was just one day.

17        Q.      The line seven refers back to a process

18   certification training?

19        A.      Correct.

20        Q.      For the AFSM 100; is that correct?

21        A.      Yes.

22        Q.      What did that involve?

23        A.      I was asked to be part of a team that

24   went out to Springfield to certify their operation.
```

1    We had -- there were certain specific requirements

2    that had to be met to be certified and I was asked to

3    go out as part of that team and to help certify them.

4              At the time, I hadn't done it before, so

5    they send me out as part of the team to train.

6         Q.     What would the entry alongside May of

7    2001 for charge writing involve?

8         A.     That was a two day class down at the

9    northeast area offices in Connecticut.

10        Q.     What does charge writing refer to?

11        A.     At the time, it involved corrective

12   action, discipline of that.

13        Q.     Is that something that you had requested

14   to go or they directed you?

15        A.     They asked me if I wanted to go.

16        Q.     Do you know who had asked you to do

17   that?

18        A.     I believe it was Mark Hogan.

19        Q.     Anybody else?

20        A.     Not that I can recall.

21        Q.     How about the entry alongside number

22   nine from May of '01 at Cornell for the FMLA and ADA,

23   what did that involve?

24        A.     I'm not sure I know what you mean.

1        Q.      Self-explanatory in terms of you were

2   being trained on the family medical leave and the

3   ADA?

4        A.      Correct.

5        Q.      Had you had any FMLA training or ADA

6   training prior to that time?

7        A.      Yes.

8        Q.      Where would that have been out of?

9        A.      It may not have been noted or it was

10  actually on the second page, I guess.

11       Q.      That would be back in '94 and '95?

12       A.      Correct.

13       Q.      Okay.  Knowing our conversation earlier

14  today about your co-facilitating program with Mark

15  Persson between 2001 and 2003, do you have any reason

16  to believe that the training program for the FMLA

17  occurred sometime after May of 2001?

18       A.      I don't know for sure.

19       Q.      Let me just finish up with the first

20  page, please.  Current position that you held at the

21  time of your application was what job, please?

22       A.      Supervisor of distribution operations.

23       Q.      Was that at a particular location?

24       A.      In the Middlesex plant.

1        Q.        Who were you supervising?

2        A.        Employees on the work room floor.

3        Q.        Any particular shift?

4        A.        At the time of this application, I was

5   actually detailed but my job title was what is listed

6   above.

7        Q.        Supervisor of distribution operations?

8        A.        What is it?

9        Q.        No, that was your title?

10       A.        Yes, correct.

11       Q.        When you have down grade 16/17, what

12   does that mean?

13       A.        They upgraded the position.

14       Q.        So you were put on a detail at the time,

15   referring back to the ATAL coordinator?

16       A.        Yes.

17       Q.        You referred to that before as ATAL?

18       A.        ATAL, yeah.

19       Q.        I'm from Jersey.

20       A.        I married from Jersey the first time.

21       Q.        And how did you get the ATAL coordinator

22   detail?

23       A.        I was -- I had shown an interest in it

24   and I -- I was asked if I was interested in it, so I

```
 1   ended up getting the position.
 2         Q.    Who had asked you if you had interest?
 3         A.    Mark Hogan.
 4         Q.    Was that an original detail or was that
 5   something that had been continued from the prior
 6   party?
 7         A.    Had been continued.
 8         Q.    Who held it before you?
 9         A.    Carol Jordan.
10         Q.    Was she the original incumbent to your
11   knowledge?
12         A.    No, Mark Hogan was.
13         Q.    Mark Hogan was the original ATAL
14   coordinator?
15         A.    To the best of my knowledge, yes.
16         Q.    Then Carol Jordan took it, then you took
17   it?
18         A.    Correct.
19         Q.    When you left the coordinator position
20   to assume the labor relations specialist job in the
21   fall of 2003, who took it then?
22         A.    Nobody.
23         Q.    Do you know why?
24         A.    They didn't have anybody.  Not enough
```

```
 1    staffing in the facility.

 2         Q.      Were you doing the ATAL coordinator on a

 3    full-time basis when you were assigned to that

 4    detail?

 5         A.      Yes.

 6         Q.      What were your responsibilities in that

 7    capacity?

 8         A.      The position stands for attendance time

 9    and leave.  So it was my duties to work with the

10    supervisors and the managers on the work room floor

11    to maintain control of their attendance for their

12    employees.  That was one primary responsibility.

13              As time went on, as part of the

14    position, I handled light duty requests.  I was

15    designated from the plant manager to handle light

16    duty requests.

17              I also did the train the trainer.  I had

18    also done classes on FMLA and step one processing,

19    grievance writing.  I became the FMLA coordinator

20    because that was directly related to the attendance

21    issues and I also went to and become a threat

22    assessment team member.

23              I was a step two designee for grievances

24    and I also worked, I was a member of the LMOU
```

```
 1    management team when the national contract was

 2    negotiated.  We have 30 days to do a local

 3    negotiation.  So that's what that was.

 4              And then in between I would fill in and

 5    maybe cover as manager on the floor for vacations and

 6    then anything else that may have come my way.

 7        Q.      Manager of what floor?

 8        A.      Distribution operations.

 9        Q.      Under number 18 refers back to acting

10    manager of distribution?

11        A.      Correct.

12        Q.      Is that what you were referring to just

13    now?

14        A.      Yup.

15        Q.      So you would have held that acting

16    manager job for 15 years?

17        A.      No, I didn't hold that.  That was a

18    periodic, covering a detail like a week here, week

19    there, days whenever they needed coverage.

20              I worked on tour two.  I covered that

21    position, I believe, for probably upwards of six

22    months, then I handled, when I first became a

23    supervisor, I was the manager on the weekends, then

24    just did it periodically throughout the years.
```

```
 1            Q.    But it would span that 15 year period.
 2    Is that what you're saying here?
 3            A.    Yes.
 4            Q.    How many step twos were you involved
 5    with as ATAL coordinator?
 6            A.    I don't have it.
 7            Q.    Approximate?
 8            A.    I couldn't even approximate other than
 9    to say lots.
10            Q.    And the other positions you had listed
11    down here for operations support specialist, what did
12    that involve?
13            A.    The operations support specialist, I was
14    the -- I'm trying to remember what he did.  He was
15    the security officer for the district.  That was the
16    position I covered.
17                  As security officer, I did the aviation
18    security reviews out into the associate offices.   I
19    also handled computer, forwarding error rate,
20    training with that.
21                  Also, we'd go out to the AOs, talk to
22    them about their -- I'm trying to recall what the
23    terminology is.  It's mail that gets kicked back.  We
24    try to -- no record mail.
```

```
 1          Q.      I didn't mean to jump down from the top

 2     here.  I did it by accident.  July of '88 to January

 3     of '93, you put down that you were supervisor of the

 4     MPLSM?

 5          A.      Multi-position letter sorting machine.

 6          Q.      Was that a full-time assignment for

 7     those four and half years?

 8          A.      Yes.

 9          Q.      Then you had relief supervisor from

10     April of '87 to July of '88?

11          A.      Uh-huh.

12          Q.      Is that correct?

13          A.      Yes.

14          Q.      What does that mean, relief supervisor?

15          A.      Cover different functional areas for

16     non-service days, vacations.

17          Q.      Was that a full-time position as well?

18          A.      Yes.

19          Q.      One of the details was supervisor

20     transportation operations.  What did that involve?

21          A.      I ran the motor vehicle services.

22     Involved our drivers going out, picking up mail from

23     private companies, scheduling maintenance of the

24     trucks, D.O.T. testing, holiday scheduling,
```

1    Christmas.

2              Actually involved a Christmas rush that

3    year.  Christmas scheduling, which involves a lot of

4    additional scheduling and drivers being needed.

5         Q.    Turn the page, please.

6         A.    Sure.

7         Q.    They asked you for non-postal positions;

8    is that correct?  Page two at the very top, they

9    asked for non-postal positions?

10        A.    Yes.  Sorry.  Didn't see that.

11        Q.    After you completed that section, then

12   they asked for any additional special assignments or

13   projects, et cetera, that you want to put down; is

14   that correct?

15        A.    Yes.

16        Q.    Now, there is a, in terms of the format

17   between the 991 for March of '03 and the one that you

18   did for May, I'm sorry, dated June of '03, the format

19   itself is completely different.  Do you see that?

20        A.    Yes.

21        Q.    Why did you make that change?

22        A.    I don't recall.

23        Q.    Did one of the individuals that you

24   spoke with advise you, specifically, to change the

 1          Q.      It indicates in the first paragraph,

 2   I've been involved in many arbitration cases as well

 3   as several informal EEO proceedings.  What were you

 4   referring to in that sentence?

 5          A.      Arbitration cases as a witness and EEO

 6   would be when our -- when they had people in the

 7   postal service that would come and try to resolve an

 8   issue locally.

 9          Q.      So that would be -- just give me an

10   example what you mean by that, without naming names.

11          A.      I believe I had, one example would be a

12   person felt that there was disparate treatment with

13   his attendance.  So I don't recall who was the EEO

14   person at the time, but they came and, you know, said

15   if you write this -- basically, after we reviewed the

16   documentation, if you write this statement and sign

17   it, then this goes away.

18          Q.      When you say you recently sat in on an

19   arbitration case as an observer and had requested and

20   will be given training as an arbitration advocate in

21   the near future, what specifically were you referring

22   to in this sentence?

23          A.      Now that I read it, I guess that was one

24   case I went with Bob LoPreste up to Manchester, New

1    Hampshire and sat in on a case that he had and Mark

2    Hogan had been trying to get me to be an advocate to

3    do arbitration cases and so he was putting in my

4    name.

5         Q.    Is that called advocacy training?

6         A.    It would be arbitration advocacy

7    training, yes.

8         Q.    When do you recall going?

9         A.    I believe I went -- when I ended up

10   getting the job, I went in like November or beginning

11   of December of 2003.  I'm not positive.  I'd have

12   to -- well, this was beforehand so I wouldn't be able

13   to find out.

14        Q.    To the best of your recollection,

15   between March of '03 and June of '03, is there any

16   additional training that you went to to improve your

17   education or opportunities to get the labor relations

18   specialist position?

19        A.    I don't believe so.

20        Q.    How did it come about that you

21   accompanied Mr. LoPreste as an observer for an

22   arbitration case in Manchester, New Hampshire?

23        A.    I asked him if I could sit in on a case

24   to get some understanding of what takes place since,

```
 1   you know, Mark Hogan had requested, you know, asked
 2   me if I was interested in advocacy.  So it was
 3   something that I felt I needed to do.
 4         Q.    And he agreed, Mr. LoPreste agreed to
 5   allow you to do that?
 6         A.    Yes.
 7         Q.    How many days were you there for that?
 8         A.    It was a matter of about four hours.
 9         Q.    So half a day?
10         A.    Yes.
11         Q.    Did that prove, in your opinion, prove
12   of value to you?
13         A.    Yes.
14         Q.    In what way?
15         A.    Personally, to ensure that that is
16   something that I would be able to do.  I, you know,
17   having that kind of conflict going and arguing a case
18   in front of an arbitrator.
19         Q.    Did Mr. LoPreste actually conduct the
20   arbitration?
21         A.    He was an advocate for the service.
22         Q.    Was there anything you were asked to do
23   besides being an observer?
24         A.    No.
```

```
 1   information he needed but that was basically it.
 2        Q.    In terms of the three people who were
 3   the candidates and who were the interviewers, of the
 4   three, would Mr. Attridge have been the one that you
 5   knew the least?
 6        A.    Yes.
 7              MR. WILMOT:  Objection.
 8        A.    Sorry.
 9              MR. WILMOT:  That's okay.
10              MR. GOLDBERG:  Let's take a break for a
11   second.
12              MR. WILMOT:  Sure.
13              (Recess held.)
14              MR. GOLDBERG:  Just a few brief
15   questions.
16        Q.    In reference to your conversation with
17   either Mr. LoPreste or Mr. Papa, when you first found
18   out that you had not gotten an interview by the
19   initial review board, was there anything specific
20   that they had said to you as to why you did not get
21   the interview?
22        A.    Yeah, I was basically told that if you
23   had a zero on a KSA on their rating, then you were
24   automatically disqualified.
```

**EXHIBIT 9**

  

 **UNITED STATES POSTAL SERVICE**

**Vacancy Announcement**

| | |
|---|---|
| **Position Number:** | 03-020 |
| Issue Date: | 03/26/03 |
| Closing Date: | 04/09/03 |

| | |
|---|---|
| **LOCATION:** | **MIDDLESEX-ESSEX DISTRICT, N READING MA 01889-9401** |
| **TITLE:** | **LABOR RELATIONS SPECIALIST (CAREER LADDER)** |
| **GRADE:** | **EAS-17/EAS 19** |
| **FLSA DESIGNATION:** | EXEMPT |
| **OCCUPATION CODE:** | 0233-5017 (EAS 17) / 0233-5016 (EAS 19) |
| **NON-SCHEDULED DAYS:** | SATURDAY/SUNDAY |
| **HOURS:** | 0800-1700 |
| **SALARY RANGE:** | $39,942 - $65,452 |
| **FINANCE NUMBER:** | 24-4593 |

**PERSONS ELIGIBLE TO APPLY:** All qualified career employees within the Middlesex Central Performance Cluster and within the commuting distance of the vacancy office in contiguous districts with at least one year of current continuous career service

**This vacancy may be filled at EAS 17 or 19, depending on the qualifications of the applicant. If filled at EAS 17, the successful applicant will be eligible for non-competitive promotion to EAS 19 after 18 months.**

**FUNCTIONAL PURPOSE:** Resolves complex district-wide labor relations and equal employment (EEO) problems affecting arbitrations, grievances, contract administration, and labor relations practices and procedures.

**EAS 17 REQUIREMENTS:**
1. Knowledge of labor relations programs, policies, and agreements at a level sufficient to advise local managers and to train supervisors.
2. Ability to collect, integrate, and analyze information in support of grievance and arbitration cases and local negotiations.
3. Ability to prepare position papers on grievance appeals.
4. Ability to represent the Postal Service in arbitration and EEO hearings and Merit System Protection Board cases.
5. Ability to communicate orally and in writing with supervisors, managers, and representatives of craft organizations in order to resolve problems and minimize formal grievance actions.
6. Ability to use computers systems to collect information, analyze data, and present findings.
7. Knowledge of the Rehabilitation Act and American Disabilities Act, as it pertains to hiring.
8. Ability to evaluate and make recommendations for hiring decisions requiring reasonable accommodations.
9. Knowledge of word and data processing, including spreadsheet software.

**EAS 19 REQUIREMENTS:**
1. Advanced knowledge of labor relations programs, policies, and agreements at level sufficient to advise local managers and employees, provide contract interpretations, and to develop and conduct training programs.
2. Ability to collect, integrate, and analyze information in support of grievance and arbitration cases and local implementation, negotiations, and contract administration.
3. Ability to prepare position papers on grievance appeals.
4. Ability to conduct audits of labor relations policies and procedures to ensure consistency in application.
5. Ability to represent the Postal Service in arbitration and EEO hearings and Merit System Protection Board cases.
6. Ability to communicate orally and in writing to provide guidance and training to managers and employees and to participate in prearbitration and arbitration with union representatives.
7. Ability to use computer systems to collect information, analyze data, present findings.
8. Knowledge of the Rehabilitation Act and American Disabilities Act, as it pertains to hiring.
9. Ability to evaluate and make recommendations for hiring decisions requiring reasonable accommodations.
10. Knowledge of word and data processing, including spreadsheet software.

**MAIL TO:**
Human Resources (ml), Middlesex Central District, 74 Main Street, North Reading MA 01889-9422.

Counselor's Report
Page 10 of 31

**HOW TO APPLY:** Employees must complete and submit Form 991, *Application for Promotion*, (pages 1 and 2), plus a separate statement of qualification for each knowledge, skill, or ability (KSA) (Page 3) to the application address for receipt on or before the closing date. Applicants for EAS positions will now be required to provide an information copy of their PS Form 991 to their current manager. Employees are encouraged to include their ZIP + 4 in their mailing address. THE UNITED STATES POSTAL SERVICE IS AN EQUAL OPPORTUNITY EMPLOYER. THE UNITED STATES POSTAL SERVICE PROVIDES REASONABLE ACCOMMODATION TO QUALIFIED INDIVIDUALS WITH DISABILITIES. IF YOU NEED A REASONABLE ACCOMMODATION FOR ANY PART OF THE APPLICATION.

 **EXHIBIT B**



USPS0034

# EXHIBIT 10

<u>SELECTION FORM</u>



**POSTING:**    03-020

**DATED:**    MARCH 26. 2003

**POSITION TITLE/OFFICE**              **LEVEL**          **OCC CODE**
LABOR RELATIONS SPECIALIST            EAS 17/19          0233-5017/0233-5016
CAREER LADDER
MIDDLESEX CENTRAL DISTRICT

## APPLICANTS

| NAME | SSN | POSITION TITLE/OFFICE | LEVEL |
|------|-----|----------------------|-------|
| CARROCCINO, MARYANNE F. | ▉▉▉▉ | SUPV CUST SERV/NEWTNVLLE | EAS 17 |
| DIVASTA, RALPH J. | ▉▉▉▉ | SUPV DIST OPRNS/MEPDC | EAS 17 |
| FOGEL, LINDA E. | ▉▉▉▉ | HR SPECIALIST/M-C DISTRICT | EAS 15 |
| HURLEY, PAUL G. | ▉▉▉▉ | CUSTODIAL LAB/NWP&DC | PS 3 |
| KENDER, ROGER P. | ▉▉▉▉ | MAILHANDLER/N HASP | PS 4 |
| KRINSKY, RICHARD M. | ▉▉▉▉ | ASSOC SUPV DIST OPRNS/BOS | EAS 15 |
| LANG, JANICE E. | ▉▉▉▉ | HR SPECIALIST/M-C DISTRICT | EAS 15 |
| MCAVOY, JANE E. | ▉▉▉▉ | HR SPECIALIST/M-C DISTRICT | EAS 15 |
| MEDINA, PAUL F. | ▉▉▉▉ | SUPV DIST OPRNS/MEPDC | EAS 17 |
| WALCOTT, MILES P. | ▉▉▉▉ | SUPV CUST SERV/W BOYLSTON | EAS 17 |

**SELECTING OFFICIAL'S DECISION**

**NAME**                                          **SSN**

_____          _____

**SELECTING OFFICIAL'S SIGNATURE**          **DATE**

_____          _____

**REVIEWING/APPROVING OFFICIAL**          **DATE**

_____          _____

**DISTRICT MANAGER'S REVIEW/APPROVAL**          **DATE**

_____          _____

# EXHIBIT 11



 **UNITED STATES**
**POSTAL SERVICE**

## Vacancy Announcement

**Position Number:** 08120

Issue Date: 05/27/03
Closing Date: 06/12/03

**LOCATION:**
MIDDLESEX-CENTRAL DISTRICT
7 MAIN STREET
NORTH READING MA 01889-9401

**TITLE:** Labor Relations Specialist (Career Ladder Program)
**GRADE:** E.A.S. - 17/19
**FLSA DESIGNATION:** Exempt
**OCCUPATION CODE:** 0233-5017/0233-5016
**NON-SCHEDULED DAYS:** Saturday/Sunday
**HOURS:** 0800 - 1700
**SALARY RANGE:** $39,942 - $65,452
**FINANCE NUMBER:** 24-4593
**PERSONS ELIGIBLE TO APPLY:** All qualified career Postal employees are eligible to apply for this position.

**This is a Career Ladder Program Position. This vacancy may be filled at either E.A.S. -17, OR E.A.S. -19 depending on qualifications. If filled at E.A.S. -17, the successful applicant will be eligible for non-competitive promotion to E.A.S. -19 after 18 months. Applicants who are requesting a lateral or downgrade must submit a complete PS Form 991 including completed knowledge, skills, and abilities along with their letter of request.**

**FUNCTIONAL PURPOSE:** Resolves districtwide labor relations and equal employment opportunity (EEO) problems affecting arbitration, grievances, contract administration and labor practices and procedures.

**REQUIREMENTS (LEVEL EAS.-17):**
. Knowledge of labor relations programs, policies, procedures, and agreements at a level sufficient to advise local managers and to train supervisors.
. Ability to collect, integrate, and analyze information in support of grievance and arbitration cases and local negotiations.
. Ability to prepare position papers on grievance appeals.
. Ability to represent the Postal Service in arbitration and EEO hearings and Merit System Protection Board cases.
. Ability to communicate orally with supervisors, mangers, and representatives of craft organizations in order to resolve problems and minimize formal grievance actions.

**REQUIREMENTS (LEVEL E.A.S.-19):**
. Knowledge of labor relations programs, policies, procedures, and agreements at a level sufficient to advise local managers and employees, provide contract interpretation, and to develop and conduct training programs.
. Ability to collect, integrate, and analyze information in support of grievance and arbitration cases and local implementation, negotiations, and contract administration.
. Ability to prepare position papers on grievance appeals.
. Ability to conduct audits of labor relations policies and procedures to ensure consistency in application.
. Ability to represent the Postal Service in arbitration and EEO hearings and Merit System Protection Board cases.
. Ability to communicate orally to provide guidance and training to managers and employees and to participate in prearbitration and arbitration with union representatives.

**MAIL TO:**
HUMAN RESOURCES
4 MAIN STREET
NORTH READING MA 01889-9422

Counselor's Report
Page 26 of 39

**HOW TO APPLY:**

Employees must complete and submit Form 991, *Application for Promotion*, (pages 1 and 2), plus a separate statement of qualification for each knowledge, skill, or ability (KSA) (Page 3) to the application address for receipt on or before the closing date. Applicants for EAS positions will now be required to provide an information copy of their PS Form 991 to their current manager. Employees are encouraged to include their ZIP + 4 in their mailing address. THE UNITED STATES POSTAL SERVICE IS AN EQUAL OPPORTUNITY EMPLOYER. THE UNITED STATES POSTAL SERVICE PROVIDES REASONABLE ACCOMMODATION TO QUALIFIED INDIVIDUALS WITH DISABILITIES. IF YOU NEED A REASONABLE ACCOMMODATION FOR ANY PART OF THE APPLICATION, BIDDING, INTERVIEW, AND/OR SELECTION PROCESS, PLEASE CONTACT THE OFFICE IDENTIFIED ON THE VACANCY ANNOUNCEMENT. THE DECISION ON GRANTING REASONABLE ACCOMMODATION WILL BE ON A CASE-BY-CASE BASIS.

EXHIBIT
11

8/4/05   SE



USPS0093

**EXHIBIT 12**



47

Interview Questions for Janice Lang
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

M

1.  Under what conditions will the postal service authorize payment of stewards and what article of the
    contract can this provision be found?

    Knows where to go in Contract.
    Paid to Negotiate Lmons - Investigations                1
    Not Completely Sure of how they're paid.

S  2.  Please describe at least two significant differences between Regional Panel arbitration cases and
       Expedited Panel cases?                                                           3

    Expedited - 14 days or less - Cases Agreed to between parties
    Reg. Interpretive Issue - Major discipline - Susps. 14 days or more

P  3.  Can you describe what the Douglas Factors are?

    Areas of Consideration to determine discipline.           +
    past records. Gave several examples of
    12 factors.  MSPB evaluations.

M  4.  HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of
       alcohol. His manager has called you for advice on how to handle the situation? What are you going to
       recommend?

    Check out Situation - not to make snap judgement.
    Remove keys if driving a vehicle.
    Contact family member or Someone in office to take ee' home.      2
    ensure safety of employee and to document fully w/ witness available.

>  5.  Can you explain what the Metz Factors are?

    MSPB based to determine if a threat has been made
    restraining actions
    knowing individual meeting someone
    actual circumstances                              EXHIBIT b       5
    what he as if me                                  Page 1 of 12

*James*

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance?

Documenting -having hard copy . 3971's - FMLA Approved Absences.
                                    3972
Check history w/other Supvisors   Check patterns                    3
Work related - ee's Attitude,  Previous discussions?

(No mention of vet Pref.) (Prior elements)

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information?

Knows where to go in N/A

Training - observing unsafe act  emergency Situation    4
or when agreed to by the parties due to extenuating Circumstances.

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?

To have Steward or person available -

Not during a discussion - Not allowed per Contract.    3

pre-meeting - Not necessary,
If discipline is involved

9. Please describe the difference between an abolishment and a reversion.

Abolishment - Job is totally eliminated

Revert - Position is available to be filled        1
         and ee' would have retreat rights.

Talked about RIF
(Did not mention occupied or not)

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection?

1 yr  - 1250 Hrs.

If Situation pertains to family or self    Birth of Child
                                           Adoption         5
Discipline cannot be issued

Med Docs used by Supv. - may need to be updated

EXHIBIT 12
Page 2 of 12

S  11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.

SLDC - Family Member - Leave can be given as long
as it is covered.
(long as)

Not too Sure what SLDC means.

How many hours (not Sure).   No mention Law vs. Contract          2

P  12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union?

States in Art. 15 that union waives right to go forward,      2

( Did not mention merits )

Unsure how to handle.

M  13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation?          3

In best interest of everyone involved - Take break for 15 min.
If necessary re-schedule.
Zero tolerance - Re: physical altercations.
(not using assertive)

S  14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2?

Art 2 + 14  discrimination and Safety Issues          5

P  15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met?

Has past experience in preparing and Allocating times.
Same appropriately
Check Contract                              EXHIBIT 13
Maintain All records                        Page 3 of 13          4
Time Management allows one to be prepared.
As different tools as reminders - Sticky Pads
whatever is good for you that works for you.

**Closing Comments?**

7½ years in Ivy Comp.

Many of those skills learned in that dept. Can be transferable.
Knew laws, put cases together to position Service to prevail.

wealth of experience - Excellent writer - loves law -

takes pride in work -

48 Controversions in IC 46 accepted - only 1 overturned

Stands tall in her record.

Abnormal week - Knows how to negotiate

Is a Certified Mediator - has not done cases though.

Team effort - Team player - Is humble with what she
                                           does not know.


Mark D. Penn

EXHIBIT 12
Page 4 of 12

**EXHIBIT 13**

Postal Attridge

Interview Questions for Janice Lang   11:05  — 11:30

Janice

Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

*MP*

1. Under what conditions will the postal service authorize payment of stewards and what article of the contract can this provision be found?
   • negotiating LMOU           ʌ        ②
   • investigating
   ~~won't be paid for~~ "not too own"

*SM*

2. Please describe at least two significant differences between Regional Panel arbitration cases and ③ Expedited Panel cases?
   · EXP   14 days or less = any other as determined by
   REGIONAL   interpretive · 14 days and above

*PDA*

3. Can you describe what the Douglas Factors are?
   • discipline is fairly administered /MSPB evolving that dis. is appropriate
   12 fine · chosen
           ④

*MP*

4. HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of alcohol. His manager has called you for advice on how to handle the situation? What are you going to recommend?
   • no SNAP judgment   • med assessment   • off floor
   • brought home by VRS   • Safety 1st
           ⑤

*SM*

5. Can you explain what the Metz Factors are?
   · MSPB
   · ...
   ① ... = reaction
   ② intent of the action
   ③ history of empl. v. ...
   ④ ...
   ⑤ ...

PLAINTIFF'S EXHIBIT #/
ATTRIDGE
8/11/05

EXHIBIT 14
Page 1 of 12

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance?

. document 72's
. FMLA considerations
. History w/other supvo (pattern abusive)
. work related Injury
. Attitude of employee
. discussion . due process

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information? (no article #)

. training
. Safety
. emergency situation
. mutual agree by man/comm

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?

. have steward present
. not @ official discussion
"yes"

9. Please describe the difference between an abolishment and a reversion.

. abolishment : totally eliminated
. reversion : available to be filled
(rights to return to office)

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection?

. 1 y/n
. 1250 hours

EXHIBIT 14
Page 8 of 12

11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.
- FMLA = must be eligible (quest #10) ②
- SLDC = Family Member

12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union?
- union waived rgts per NA ③

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation? ④
- take a break - come back
- if no change - reschedule
- ZTP

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2? ⑤
- Art 2 EEO
- Art 14 Safety

15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met. ④
- schedule appropriately
- calendar book -
  - strictly ruled
  - Goals (?)
  - time mngmnt classes
  - 7 HABITS (prioritize) • course

EXHIBIT H
Page 3 of 12

⑱

**Closing Comments?**

- 7½ years ICCO – skills are transferable   = research
- controvertion (4 of 4 upheld)   = analyze
- Studied Law   = present
- writing skills
- presentation skills
- take Pride in Work
- certified mediator = has not done mediation
- Team Player

EXHIBIT 4
Page 4 of 12

# EXHIBIT 14

Steve Mcie

47

Interview Questions for Janice Lang
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

1. Under what conditions will the postal service authorize payment of stewards and what article of the
   contract can this provision be found?

   *DO NOT KNOW ARTICLE*
   *LMOU - WAOUS*
   *NOT SURE ABOUT STEWARDS*

2. Please describe at least two significant differences between Regional Panel arbitration cases and
   Expedited Panel cases?

   *EXPEDITED - 14 DAYS OR LESS*
   *Regional - INTERPREND ISSUES 14 DAYS ABOVE*



PLAINTIFF'S
EXHIBIT 4
MEIER
8/11/05

3. Can you describe what the Douglas Factors are?   4

   *DISCIPLINE FAIRLY ADMINISTED*
   *SAVE SEVERAL EXAMPLES OF DOUGLAS FACTORS*
   *12 FACTORS THAT YOU SHOULD CONSIDER.*
   *MSPB.*

4. HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of
   alcohol. His manager has called you for advice on how to handle the situation? What are you going to   2
   recommend?

   *SUPV SHOULD NOT MAKE A SNAP JUDGMENT.*
   *TAKE PERSON HOME.*
   *SAFETY OF EMPLOYEE*
   *DOCUMENT*

5. Can you explain what the Metz Factors are?   5

   *[illegible handwriting]*
   *[illegible handwriting] Considerations when [illegible]*
   *[illegible]*
   *Management [illegible]*
   *[illegible]*

EXHIBIT 13
Page 1 of 13

6.  Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related
    deficiencies, what are some important items you would need to verify prior to issuance?     *5*

    DOCUMENT
    39725.
    FMLA
    HISTORY OF PERSON - NOT POST DISCIPLINE
    STATUS OF PERSON
    PATTERN.
    DUC PROCESS

7.  Under what circumstances would a supervisor be allowed to perform bargaining unit work and which    *4*
    Article of the contract would you find this information?
    DOES NOT KNOW ARTICLE

    TRAINING — 9AVE
    EMERGANCY SITUATION

8.  HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the
    interviewing of an employee for a work related infraction is told they want to invoke their Weingarten   *3*
    Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?
    The Employee HAS THE Right To A REPRESENTATIVE

9.  Please describe the difference between an abolishment and a reversion.     *1*

    ABOLISHMENT - Position eliminated
    REVERSION - Position Reverts to Be filled
    RIF

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection?   *5*
    1 YEAR
    1250 HRS
    12 WKS ABS/PR DISCIPLINE

EXHIBIT  13
Page 2 of 12



11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.

DEPENENT CARE. Covered. for family
Houn.

12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union?

UNION'S WANES RISHT TO go FOWARD.

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation?

TAKE A BREAK  I = SITUATION HAS NOT CALMED DOWN REScheduln
Meen.9

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2?

ART    2 & 14
SAFETY = DISCRIMINATION.

15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met.

Status   Accurly
Having  work  Done on Time
Project  Placed on Time
Develop  plan
Se on
.                  . .

EXHIBIT    13
Page 3 of 12

Closing Comments?

7 1/2 YRS INJURY COM & STUDY, LAW CONTERVISIONS.
RECIEVED AN AWARD for CONTRODENTING
MANY ISSUE'S IN CONTEVERTING CLAIMS SIMILIAR TO LABOR ISSUES.
HB CONTERVERSIONS HE ASSERTED. LOVE THE LAW.
FEELS THAT AM A GOOD NEGOTIATION   CIRTIFIED MENDIATOR.

TEAM PLAYER. CONTINUOUS GROTH

EXHIBIT  13
Page 4 of 12

# EXHIBIT 15

MARK
PERSON

52

Interview Questions for Ralph Divasta
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

1. Under what conditions will the postal service authorize payment of stewards and what article of the contract can this provision be found?

M

Article 13 ( Art. 17 ),
Pay
Investigation of grievances - research and writing grievances
when mgmt requests mtg. (PDI for example).

1

2. Please describe at least two significant differences between Regional Panel arbitration cases and Expedited Panel cases?

S

1 for Contract issues - Black
Contained within N/A through discipline (process) - Art 15,

1

3 Can you describe what the Douglas Factors are?

P

12 Factors we would consider after we've proposed discipline
Broida book. Need for MSPB cases especially. (Good)

3

4. HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of alcohol. His manager has called you for advice on how to handle the situation? What are you going to recommend?

M

Take em off w/r floor - in office - may advise to have
Union Steward present - Contact Med. unit- Set up E FFD
b/a test - Talk with ee' - been driving on meds why?
May offer ERP, Has reao prior Exper....

4

5 Can you explain what the Metz Factors are?

S

5 factors - va Dept of Treasury - MSPB ...
... Reaction what we once ....
Examples given - that would designate a threat.
... confident ...

4

EXHIBIT 12
Page 5 of 12

*Ralph DeVast*

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related
deficiencies, what are some important items you would need to verify prior to issuance?

Check prior disc. - 3971's ¿ 3972 Ensure ee' was given PDI     4

That P.S. has just cause.

If Vet Pref. Area must review                    (NO FMLA?)

Make Sure all documentation is accurate,
                              ↑
                            Good

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which
Article of the contract would you find this information?

Art. 3 mgmt's rights - Extreme Cirumstances - may expedite   2
Moving of mail when necessary.
(would like more info)

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the
interviewing of an employee for a work related infraction is told they want to invoke their Weingarten
Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?

If ee' believes discussion could lead to discipline    T
they have a right to representation. Can meet w/ steward
privately - Steward can assist w/ process (the ee'),

9. Please describe the difference between an abolishment and a reversion.

Art. 12 talks about staffing.    2
would hold reversion

Abolishment - would remove job altogether
Time frames - Not Sure

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection?

1 yr of Service - does not have to be continuous)    S
1250 of   Absence of employee or family member
HRS

EXHIBIT  13
Page 6 of 13

S    11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.    4

Qualified for a Serious health Condition    Did not mention Law.

SLDC must have S/L

Caring for Child - Entitled to 80 hours during year.

Unsched. Would Count against ee. (discipline)

P    12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union?    5

Rapport established w/ union

Respond that grievance is untimely and would address merits

Has handled many grievances.

M    13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation?    S

Tell Steward - Certain Conduct must be followed -

If not mtg. ends. May suggest I break to calm down, etc.

Advise Conduct is not proper. Control Situation -

S    14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2?    4

Safety and discrimination - Articles?

* Came back - Articles 2 - 14

P    15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met    4

Time management - Need to be able to prioritize - when boss asks for something ____ becomes the priority etc.

Knows how to prioritize from his experience in his present position. Uses calendar - tracks reports - Sends e-mails to himself, cues himself as we ____ him of what needs to be done.

EXHIBIT 12
Page 7 of 12

**Closing Comments?**

18 yrs. P.S. (in mgmt) many details - brings a lot of experience, ATAL Coordinator now —

3 facets of his position —  Training - Operations - ATAL - FMLA
                                                  L/R Issues —
                                                  Drafts discipline

Gets involved w/ things - grievances - employee disputes etc.

Has improved 991 to increase his chances — Spoke w/ people
Bob, Dave, Marc, Steve.

Attended hearing w/ Bob LoPresta —

Knows where he can find information

    very important part of his job.
Communication - gets along with people.
Advising / he enjoys that aspect of job.
Knowing where to research things. Folio transportation of info.
                                                              means it
Works hard at what he does. - Can be relied upon that he
will give his all and is happy for this organization.

EXHIBIT  13
Page 8 of 10

# EXHIBIT 16

SM
MP
PA

Interview Questions for Ralph Divasta    10:02 AM = 10:45 Am
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

*MP*    1.  Under what conditions will the postal service authorize payment of stewards and what article of the
(continual)        contract can this provision be found?    AP4 *13*    (go back)
        • investigation of grievance
        • PDI
        • when req by mgmt to be present @ meeting

*SM*    2.  Please describe at least two significant differences between Regional Panel arbitration cases and
ulese would        Expedited Panel cases?
your cost
- Art 15                                                        ②

PLAINTIFF'S
EXHIBIT 8 >
ATTRIDGE
8/11/05

PA →③    Can you describe what the Douglas Factors are?
        12 factors / ERS on Vet error / MSPB    ④

            " after "

*MP*    4.  HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of
        alcohol. His manager has called you for advice on how to handle the situation? What are you going to
        recommend?                                                        ⑤
        • take off floor    • advise steward available    • Med Unit
        • Transport empl to ERM)                        Set up E. FFD
        • contract station    • Ask employee    • driving? medo?
        • offer EAP

*SM*    5.  Can you explain what the Metz Factors are?
        • 5 Factors    metz v. D.O.$    ⑤
        ✱ listen reduction        ...the ...
        ✱ intent    EXHIBIT 14
        ✱ conduct    Page 5 of 12
        ✱ circumstance
        ✱ math-

                                                                    18

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance? ④

- past elements
- 3971's
- 3972
- PDI / DIC
- Just cause
- Veteran

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information? AnA 3 ③

- emergency circumstances
- "  "

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor? ⑤

- disc may involve discipline = steward present ✗
→ • yes ✗ con assist w/ answers

9. Please describe the difference between an abolishment and a reversion. ③

- An # 12    C/M
- revert / hold
- abolish

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection? ⑤

- 1 year of service & NOT continuous
- 1250 hrs prior to absence

EXHIBIT 14
Page 6 of 12

11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care. ④
- FMLA = protected
- SLDC = 80 hrs / could be used in disc.[?]

12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union? ⑤
- mark it as untimely
- answer merits

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation? ⑤
tell him
- address conduct immediately
- if no change = needing such [?]
- allow him/her time to calm down

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2? ④
- Safety
- EEO / DTS Grievance
[?] me = what ARE #'s

15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met. ④
- time mngmnt
- prioritize
- Boss "I need this" - priority
- [?] background
- Tools Used? - calendar on ol / co [?] msoft w/reminders
- Send email / allow [?]

EXHIBIT 14
Page 7 of 12

Closing Comments?

- 18 years / 17 EAS
- Numerous details to different areas (OPS/MVS/AMC
- Write Comp guidelines - trained 200 mgrs / craft
- train the trainer
- FMLA training
- Step 1 training
- FMLA Coordinator
- type up all discipline in Plant
- 2½ years ATM
- work various schedule = (T1 - T2 - T3)

EXHIBIT H
Page 8 of 12

# EXHIBIT 17

Steve Meier

51

Interview Questions for Ralph Divasta
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

1.  Under what conditions will the postal service authorize payment of stewards and what article of the
    contract can this provision be found?

    *ARTICLE 43*
    *INVESTIGATION OF GRIEVANCE*
    *ON THE CLOCK*
    *WHEN MANAGEMENT REQUEST*

2.  Please describe at least two significant differences between Regional Panel arbitration cases and
    Expedited Panel cases?

    *CONTRACT ISSUES*
    *ARTICLE 15.*

3.  Can you describe what the Douglas Factors are?    3

    *12 FACTORS    CONSIDER AFTER*
    *VIOLATION, ENS*
    *MSPB ADMIN. JUDGE*

PLAINTIFF'S
EXHIBIT
MEIER
8/11/05

4.  HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of
    alcohol.  His manager has called you for advice on how to handle the situation?  What are you going to
    recommend?

    *OFF WORKROOM FLOOR.*          *DID NOT MENTION EAP*
    *MEDICAL UNIT*
    *EMERGENCY FIT*
    *APPLICATION - ?*

5.  Can you explain what the Metz Factors are?    4

    *LITIGATION OF OTHER'S*
    *...*
    *...*

    EXHIBIT 13
    Page 5 of 12

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance?

*4*

PAST DISCIPLINE                                    ✗ DID NOT MENTION    FMLA

3971
3972
DAY IN COURT
JUST CAUSE
SUPPORTING DOCUMENTATION

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information?

*2*

TRAINING –

ART 3
EMERGENCY CONDITIONS

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?

*4*

DISCIPLINE   RIGHT TO UNION STEWARD.

UNION STEWARD   ALLOWED TO TALK and ask questions Must be there

9. Please describe the difference between an abolishment and a reversion.    /

ABT 12
can reassign others
Revert Position NOT

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection? 

/ VERY SPECIFIC

...

EXHIBIT 13
Page 4 of 13

11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.    4

*FMLA LV- ACT 1993*
*Serous Medical Health cond.*
*80 HRS SL D.C.*
*FMLA NOT HELD Agains YOU*

12. Article 15 requires timely responses from management, how would you handle grievances that are    5
    untimely appealed by the union?

*ANSWER UNTIMLY*
*ALSO ANSWER Content OF Grievance*

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in
    this position.  Many times tempers can flare.  If a steward became upset during a meeting, and was    5
    yelling, swearing, and generally out of control, how would you handle this situation?

*End Meeting*
*Teh Steward To Cam down*
*Give Steward Time To Cam Down*

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to    4
    Step 2?

*SAFTEY & DISCRIMINATION*
*ARTICLE'S DID NOT KNOW*

15. Priorities change very often in the labor relations environment, how do you propose to ensure all    4
    deadlines are met.

*TiME Managment*          *DID NOT SAY HOW HE*
*Delegate*               *Manages Time*
*& Manage Time myself*

EXHIBIT 13
Page 7 of 12

Closing Comments?

18 YRS IN P.S.
MANAGEMENT HIST.
MANY FORMS OF P.S.
HUMAN RESOURCES
TRAINING WROTE CIMP Guidlines.
FMLA TRAINING
TYPE ALL Discipline
MET WITH PEOPLE TO IMPROVE KNOWLEDGE OF JOB
Know where I can find things.

EXHIBIT 13
Page 8 of 12

**EXHIBIT 18**

*Mark Persson*

*30*

Interview Questions for Miles Walcott
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

M    1.  Under what conditions will the postal service authorize payment of stewards and what article of the contract can this provision be found?

*Steward time - on the Clock - working on a grievance*
*Cannot be paid outside of their own office unless they are*
*a VP.*       *2*
*Article 4*

S    2.  Please describe at least two significant differences between Regional Panel arbitration cases and Expedited Panel cases?

*Reg. involves a whole area*
*Expedited cases are local Cases - cannot be used in*
*arbitrations that are not local to that area*       *2*
*Reg. are precedent Setting.*

P    3.  Can you describe what the Douglas Factors are?

*Just Cause would be one of them*
*Talked about Just Cause - without it you can't take discipline.*   *0*

M    4.  HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of alcohol. His manager has called you for advice on how to handle the situation? What are you going to recommend?

*Immediately taken off clock and w/c floor. Drive to med.*    *3*
*Facility. Call EAP -*
*May have to take home or to hospital to determine if other*
*factors contribute to his condition.*

S    5.  Can you explain what the Metz Factors are?

*Did not know*       *0*

EXHIBIT *12*
Page *01* of *12*

USPS0105

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related
 • deficiencies, what are some important items you would need to verify prior to issuance?

3992's  3991's  previous  facility's  records-  prior record    3
Not FMLA Protected
Making Sure 12's having notations on back,
(no mention of pref. eligible)   (No PDI)

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which
 Article of the contract would you find this information?                                    2

Certain offices allow PM's to perform bargaining unit work
when emergencies exist
Article 16?   Wasn't Sure

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the
 interviewing of an employee for a work related infraction is told they want to invoke their Weingarten
 Rights. The supervisor has no idea what this means. What are you going to tell the supervisor?

To get the union Steward,                                                                 1
Can not speak privately with Steward -

9. Please describe the difference between an abolishment and a reversion.

Abolish - position is totally gone
Reversion - position changes in level                                                    1

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection?

1250  WH's prior -  WH 380  Pub 71  to be given
Must be approved by mgmt.
(no mention of 1 yr service),                                                            3

EXHIBIT /2
Page /0 of /2

USPS0106

S   11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.

SLDC  80 hrs. must provide documentation to prove who they're caring for.

FMLA  3 mos.  120 Hours                                                                3

Don't have to use for SLDC

        (Did not mention Law/Contract)

P   12. Article 15 requires timely responses from management, how would you handle grievances that are untimely appealed by the union?

Untimely grievances should be ousted from the system.

Would argue unions failure to notify mgmt. of untimliness.        3

Grievance would stop there - Cite Art. 15.

(Did not talk about addressing merits)

M   13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation?

Been in that situation. Knows how to calm people down.        3

Schedule for another day when cooler heads prevail.

S   14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2?

If their personal belongings are stolen out of a postal facility.     0

If mgmt. fails to meet w/union timely,

Come  →  not having a step 1 official to meet with
back
TO
P   15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met.

As an op. del. person - has many things to do and knows

how to manage time.

Has good organizational skills - knowing time limits, etc.

Ensuring commitments are met.

Support network is crucial as is working with Unions,

EXHIBIT 2
Page 11 of 12

Closing Comments?

24 yes. w/ PS. Knows business - enjoys L/R
Has enjoyed, had fun Arguing - preparing cases.
Has also enjoyed Negotiated settlements.
Believes union has tough chance of beating him.
Takes things seriously and likes to assist or help
others in need.

Looks forward to doing this on a full time basis.
Wears many hats - would like to wear one - be more
consistent w/ one job.

Would benefit the District if this was his FT job,
He learns more and more each and every time he meets
with the L/R Staff.

Deals with this type of work daily - Appreciates
opportunity,

Made it clear - position applied for - Level 19-was
purposeful - "Did math", wouldn't be worthwhile
to travel back and forth from Worcester with only
a 5? increase in pay. (?),
8% increase resulting from promotion to 19
would make a difference,
Asked if anyone else put in for 19 only.

EXHIBIT 12
Page 12 of 12

Mark A. Pen

EXHIBIT 19



*Peter Attridge*

Interview Questions for Miles Walcott
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

1:00 - 1:40
(Tone: 17-19  1:40 - 1:58)

*MP*  1. Under what conditions will the postal service authorize payment of stewards and what article of the contract can this provision be found?  ART ④  ②
 • Steward time = grievance
 • not paid outside of duty station

*SM*  2. Please describe at least two significant differences between Regional Panel arbitration cases and Expedited Panel cases?  + precedent setting  ③
 • Regional = involve whole area → can be used as an "example"
 • Expedited = "local cases" = can't be cited in other cases

*PA*  ③. Can you describe what the Douglas Factors are?  ①
 • JUST CAUSE (?)  Just Cause ①



PLAINTIFF'S
EXHIBIT #3
Attridge
9/11/05

*MP*  4. HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of alcohol. His manager has called you for advice on how to handle the situation? What are you going to recommend?
 • taken off clock and off floor
 • drive him to hospital / taken home  ③
 • call EAP
 • take discipline (?) perhaps

*SM*  5. Can you explain what the Metz Factors are?  ⓪
 • haven't heard of yet ⓪

EXHIBIT 14
Page 9 of 12


9

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance? ③ *

- 3972's
- 3971's
- past elements
- FMLA considerations

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information? *Article 16* ③

- Small office = rural
- Emergency situations

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor? ③

SM "prior meeting" w/ steward

- get union steward for employee
- → "NO"

9. Please describe the difference between an abolishment and a reversion. ②

- abolish = totally gone
- reversion = transferred/downgraded to lower level position

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection? ③

- 1250 unit hours
- Submit WH 380

EXHIBIT 17
Page 10 of 12

11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care. ③

- SLDC = 80 hours - must be documented
- FMLA = 3 months - pub 71

12. Article 15 requires timely responses from management, how would you handle grievances that are ③ untimely appealed by the union?

- ousted from system = unless extension granted
-

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in this position. Many times tempers can flare. If a steward became upset during a meeting, and was yelling, swearing, and generally out of control, how would you handle this situation? ④

- reschedule = "cooler heads"
- take break
- send a different step 2 rep

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to Step 2?

- personal belongings stolen ① (go back)
- failure to meet w/in time limits @ Step 1

15. Priorities change very often in the labor relations environment, how do you propose to ensure all deadlines are met.

- As operations plan = must prioritize ④
  calendarize
- organizational skills

Tools?
- See NA for guidance re: time limits

EXHIBIT 14
Page 11 of 12



Closing Comments?

- 24 years seniority - know the business
- Enjoy LR - FUN - LEARNING EXPERIENCE
- Fostered Relationships w/ Union Stewards/office
- Get a lot of calls from offices = ENJOYS being supportive of other mngmt
- IS Sitting in on REDRESS
- Full Time would be easier than wearing many hats. (5)
- proved he can handle it.
- Can only learn more + more
- WAS 5 for 6 1st year - tenacity
- Deals w/ NALC + APWU every day on unknown flow.

? to MP = (did not apply for IT)
what is $ SITUATION ⇐ could get 5% as a lateral to 17
⇐ driving from work is faster = 5% would become 2%
⇐ 19(8%) would just fy drive from work to NOR[?]

⟶ difficult interview to prepare for good int[?]
⟶ plus was applied apply[?]

# EXHIBIT 20

Steve Meier 

Interview Questions for Miles Walcott
Wednesday, October 08, 2003
Board Members: Mark Persson; Steve Meier; Peter Attridge

1. Under what conditions will the postal service authorize payment of stewards and what article of the
   contract can this provision be found?

   *STEWARD TIME GRIEVANCE PERTAINING TO OFFICE.*
   *ARTICLE 4*

2. Please describe at least two significant differences between Regional Panel arbitration cases and
   Expedited Panel cases?

   *REGIONAL. EXAMPLE = PRESIDENT SETTING*
   *EXPEDITED- CANNOT USE.*



PLAINTIFF'S EXHIBIT #3
MEIER
8/11/05

3. Can you describe what the Douglas Factors are?

   *JUST CAUSE*        *DOES NOT KNOW WHAT THE DOUGLAS FACTORS*
                       *ARE OR WHEN THEY ARE USED FOR.*

4. HYPOTHETICAL SITUATION - An employee has arrived at his assignment staggering and reeking of
   alcohol. His manager has called you for advice on how to handle the situation? What are you going to
   recommend?

   *EMPLOYEE TAKEN OFF CLOCK + OFF FLOOR*
   *EAP*
   *EMPLOYEE BE DRIVIN HOME.*
   *THESE CONTRIBUTES TO CONDITION*

5. Can you explain what the Metz Factors are?

   *DID NOT KNOW*

EXHIBIT 13
Page 4 of 13

6. Prior to preparing a draft to remove a bargaining unit employee from our rolls for attendance related deficiencies, what are some important items you would need to verify prior to issuance? *-3*

*3972*
*3971*
*PREVIOUS FACILITY 3972*
*PREVIOUS DISCIPLINE*
*FMLA*

*LEFT OUT VET PREF*

7. Under what circumstances would a supervisor be allowed to perform bargaining unit work and which Article of the contract would you find this information? *2*

*FACILITY SIZE WHERE POSTMASTER IS REQUIRED TO PERFORM BARGAINING UNIT WORK*
*EMERGENCY WORK*
*ARTICLE 16 (WRONG)*

*WRONG ART    DID NOT MENTION TRAINING.*

8. HYPOTHETICAL SITUATION: You receive a call from a supervisor, who while during the interviewing of an employee for a work related infraction is told they want to invoke their Weingarten Rights. The supervisor has no idea what this means. What are you going to tell the supervisor? *2*

*UNION STEWARD IS ALLOWED TO BE PRESENT.*
*UNION STEWARD IS NOT ALLOWED TO SPEAK IN PRIVATE WITH EMPLOYEE (WRONG)*

9. Please describe the difference between an abolishment and a reversion. *1*

*ABOLISHMENT   POSITION GONE*
*REVERSION - DOWNGRADED*

10. FMLA Eligibility - What are the criteria that determine if an employee is eligible for this protection? *3*

*12 mo. who are previous to time they put in present work*
*WH. 380*

EXHIBIT *13*
Page *10* of *13*

11. Please describe the difference between FMLA leave and Sick Leave for Dependent Care.    2

SLDC - 80 HRS.; MEDICAL DOCUMENTATION
/20 HRS 3 MONTHS

DID NOT TALK ABOUT DISCPLINE (CANNOT BE DISCIPLED for FMLA)

12. Article 15 requires timely responses from management, how would you handle grievances that are    3
untimely appealed by the union?

ARGUE TIME LIMMETS WITH UNION.
GRIEVANCE IS ISTOPPED RIGHT here

(DID NOT TALK ABOUT ADDRESSING the MERITS OF THE CASE)

13. HYPOTHETICAL SITUATION: You will more than likely be meeting on many step 2 grievances in    3
this position. Many times tempers can flare. If a steward became upset during a meeting, and was
yelling, swearing, and generally out of control, how would you handle this situation?

I KNOW how TO CALM PEOPLE DOWN
TAKE A BREAK TRY AGAIN LATTER
WOULD EXPLAIN THAT THERE IS NO ROOM for THAT TYPE OF BEHAVIOR.
TRY ANOTHER UNION STEWARD

14. Under what situations may an employee bypass Step 1 of the grievance process and proceed directly to
Step 2?    0

PERSONAL Belongings STOLEN
FAILURE TO MEET WITHIN TIME limits

15. Priorities change very often in the labor relations environment. how do you propose to ensure all
deadlines are met.    4

I KNOW HOW TO MANAGE TIME
CALENDERIZING. PRIORTIZING, PLANNING
SPENT [illegible]

EXHIBIT 15
Page 11 of 12

Closing Comments?

24 YRS, ENJOY L/R. ENJOYED FOSTERING RELASHIONP w/ UNIONS.
ATTACK ISSUES UNION HAS TUFF TIME WINNING.
ANSWER QUESTIONS FROM PEERS REGARDING L/R.
~~Was~~ WEAR MANY HATS & DO A good JOB AT IT.
OIG, DOING CASSES, I WOULD BENIFIT THE L/R STAFF
I WOULD ENJOY LEARNING FROM L/R
15 YR ARGUED 6 CASES ONLY LOST ONE
DEALS WITH THIS TYPE OF WORK EVERY DAY.



MILES ASKED ABOUT THE PAY, & TRAVEL
MILES ASKED IF ANYONE & SO PUT IN FOR THE 19 ONLY.

EXHIBIT    13
Page 12 of 12