<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

Docket No. 05-10052-WGY

| | |
|---|---|
| JANICE E. LANG, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN E. POTTER, Postmaster General, | ) |
| Defendant. | ) |
| | ) |

<div align="center">

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

</div>

I    INTRODUCTION

Janice Lang ("Lang" or "Plaintiff") filed this Complaint on the basis of her gender and age against her current employer, the United States Postal Service ("USPS" or "Defendant"), arising from the Defendant's failure to promote her to the position of labor relations specialist on two occasions in 2003, violating Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). The Defendant has now moved for summary judgment. Plaintiff files her opposition, claiming that there are genuine material facts in dispute which mitigate against summary judgment and which raise issues of pretext based upon age and gender discrimination.

II    PLAINTIFF'S MATERIAL FACTS

In March 2003, the USPS posted a position for Labor Relations Specialist for the Middlesex-Essex District.  Exhibit 10.  This position was the first position posted by Mark Persson since he became the Labor Relations Manager in 2003.  Exhibit 7, Persson Deposition, page 8. A vacancy had been created when he was promoted to Manager from a specialist position earlier in the year.  The job posting contained additional requirements for the labor relations specialist position that were added by the former labor relations manager, Robert Lopreste, when he last interviewed for the position. Melinda LaVecchio, human resources, took that job posting and utilized same for the current opening. The original job posting and its requirements were 'posted' without any review of same being conducted by Mr. Persson. Mr. Persson was not aware that the job posting had requirements beyond the standard vacancy announcement. Exhibit 7, Persson deposition, pages 10-13; Exhibit 12, LaVecchio deposition, 19-26.  Exhibits 10,11.

The job posting for labor relations specialist does not require operational experience, supervisory experience or advocacy training.  Exhibits 10, 11.  Exhibit 7, Persson deposition, pages 142-144; Exhibit 3, Couture deposition, page 86; Exhibit 12, LaVecchio deposition, page 67. In practice, the incumbents in the position, Peter Attridge and Stephen Meier, do not supervise any employees as labor relations specialists.  Exhibit 2, Attridge deposition, page 40; Exhibit 13, Meier deposition, pages 31, 53.  Exhibits 10, 11.  Similarly, grievance handling is not a prerequisite for the job.  Exhibit 7, Persson deposition, page 113.

As part of the selection process, once the candidates submit their applications (form 991) and a separate statement of qualification for each knowledge, skill or ability (KSA), to human resources, a review board is selected to begin the narrowing down process. Exhibit 10.  The

2

selecting official, Mr. Persson, is responsible for selecting the members of the Review Board, a three member panel comprised of management personnel who have experience in or knowledge of the vacant position. Mr. Persson, however, denied any involvement in the selection of the Review Board for either the original posting (March 2003) or following the re-posting in May, 2003. Exhibit 7, Persson deposition, page 24; Exhibit 5, Lopreste deposition, page 18; Exhibit 12, LaVecchio deposition, pages 12, 32, 52.

A Review Board can weed out candidates based upon a comparison of qualifications with other candidates, Exhibit 3, Couture deposition page 23, or can choose to screen 'out' or 'in' those applications (form 991) that are not 'in a star' format[1]. Exhibit 3, Couture deposition pages 23-24.    Once the Review Board completes its assessment of the candidates' application materials, it is required to advise the personnel unit, in writing, of the 'short list' of candidates for the selecting official to interview. The March 2003 Review Board did not submit a 'short list' of candidates in writing to the personnel unit. Exhibit 3, Couture, deposition pages 28, 56; Exhibit 12, LaVecchio deposition, page 35; Exhibit 5, Lopreste deposition, page 63. Any notes maintained by the Review Board in assessing the candidates for the March, 2003 and May, 2003 postings were destroyed or discarded. It is USPS policy and practice not to maintain Review Board notes once the Review Board has completed its assignment. Exhibit 12, LaVecchio deposition pages 14-15; Exhibit 3, Couture, deposition pages 26-27; Exhibit 5, Lopreste, deposition page 27; Exhibit 9, Admission number 1.

---

[1] The 'Star' format refers to the format a candidate is expected to utilize in completing their answers to questions on the 991 (situation, task, activity and result). Exhibit 5, Lopreste deposition, page 25.

3

Ten employees submitted application materials for the labor relations specialist position in March 2003. Of the ten, the Review Board recommended three, Janice Lang (age 61 at the time of the application), Roger Kender and Richard Krinsky, for interviews with the selecting official. Ralph DiVasta (age 39 at the time of the application) did not make the cut. Mr. Lopreste, the chair of the Review Board, could not recall a great deal about why Mr. DiVasta was rejected by the Review Board. He speculated that the form of Mr. DiVasta's application may have been confusing and not 'processed' in a particular way. Mr. Lopreste could not recall any particular concerns he may have had with Mr. DiVasta's 'star' format. Exhibit 5, Lopreste deposition, 58-60.

Ms. Lang began her employment with the USPS as a mail handler in 1984. In 1985, she was promoted to Personnel Assistant. In 1992, she was promoted again to Human Resources Specialist (injury compensation unit and training), a position she continues to formally hold today. In those positions, she became intimately familiar with the National Agreements, federal and postal service regulations regarding employment, including sexual harassment, reasonable accommodations, FMLA, workplace violence, wage and hour and handling controversions relating to work related injuries. Her responsibilities also included preparation of reports, investigations, assisting in grievance resolution, extensive training/presentations and career counseling.

In addition, Ms. Lang was assigned to details, including acting manager (as needed) injury compensation, from 1986-1992, Officer in Charge, Dunstable post office from 1988-1989, acting manager of training in 2000 through 2001 and 2002 and, since 2004, she has been assigned to a detail as a labor relations specialist. Exhibit 8; Exhibit 6, Lang deposition 37-41.

4

Ms. Lang had supervisory experience, including supervising training technicians and a secretary in her office and as acting manager on details, including acting manger of training and officer in charge of Dunstable Post Office. Exhibit 6, Lang deposition, pages 54-58; Exhibit 8.

In addition to earning her law degree in 2000[2], Lang received her BS from Boston University in 1963, her Masters in Education from Boston State College in 1967 and several other college courses and certificates, including mediation and labor law. Exhibit 8. Mr. DiVasta did not have a college degree. Exhibit 16, DiVasta deposition, page 30.

Interviews for the labor relations specialist were conducted by Mr. Persson and Dave Couture, Human Resources Manager for the District, in May, 2003. Prior to the beginning of the interview with Ms. Lang, Mr. Couture announced to Ms. Lang that the USPS was going to re-post the position nationwide if the three candidates, Ms. Lang, Mr. Krinsky and Mr. Kender, were deemed not qualified for the position. Exhibit 6, Lang deposition, pages 77-78.

Despite not knowing two of the questions, Lang indicated that the interview went very well. Apparently, both Persson and Couture agreed. Immediately after the conclusion of the interview with Ms. Lang, Mr. Persson indicated that she had performed well during the interview and was prepared. Mr. Couture concurred. Exhibit 3, Couture deposition, page 58; Exhibit 6, Lang deposition, page 82.

Shortly thereafter, Mr. Persson informed Ms. Lang that she was not selected for the position because they wanted someone with advocacy training who could walk right into the

---

[2]Although a law degree was not a requirement for the position, Attridge, who was attending law school at the time of his deposition, believed the experience sharpened his writing skills. Exhibit 2, Attridge, deposition pages 57.

position. Exhibit 6, Lang deposition, page 84. Persson did not recall saying that. Exhibit 7,

Persson deposition, page 41. Neither Lang nor DiVasta (who was ultimately chosen for the

position in October, 2003) had advocacy training. Exhibit 14. Persson ranked Lang third of the

three candidates who interviewed, despite his assessment that Mr. Krinsky was unprepared for

the interview and expressed an unacceptable attitude during the interview. Exhibit 7, Persson,

deposition pages 32-35. Any notes taken or compiled by Mr. Couture and Mr. Persson during

the first set of interviews in May 2003 are no longer available. It is USPS policy and practice not

to maintain interview notes once the selecting official has completed interviewing for the open

position. Exhibit 9, Admissions, number 2; Exhibit 12, LaVecchio deposition, page 16; Exhibit

7, Persson deposition, pages 30, 140.

After being rejected by the Review Board for the first posting for the labor relations

specialist, Mr. DiVasta sought assistance and guidance from Mr. Lopreste, Mr. Persson, Mr.

Meier and Dave Papa (review board member) in an effort to improve his opportunities the next

time around. Exhibit 15. Mr. Meier advised DiVasta of potential areas of questions for the labor

relations specialist interviews, including Metz Factors, Douglas Factors, contract issues, and

arbitration process (time limits; article 15). Exhibit 16, DiVasta deposition, pages 19, 24-33;

Exhibit 7, Persson, deposition page 52; Exhibit 16, DiVasta deposition page 13; Exhibit 15.

Exhibit 16, DiVasta deposition page 11, 24, 28, 43; Exhibit 5, Lopreste deposition page 67. Mr.

Meier reviewed his (Meier's) previous 991 with Mr. DiVasta. Exhibit 13, Meier deposition pages

24-33. Mr. DiVasta spoke with Mr. Meier after he initially applied for the job. Exhibit 16,

DiVasta deposition page 63.

6

It is inappropriate for a labor relations manager or peers to give advice regarding potential questions to candidates. Exhibit 12, LaVecchio deposition pages 83-84. It would be inappropriate/rare for someone to review and help revise a candidate's 991 application, especially after the first posting and before the second posting. Exhibit 12, LaVecchio deposition page 59.

When the job was re-posted in May 2003, the requirements for the labor relations specialist position were reduced, while at the same time, expanding the potential applicant pool to the entire country. Exhibit 7, Persson, deposition pages 37. Exhibit 11. Despite requesting the new posting, Mr. Persson claims he was unaware of the changes in the posting. Exhibit 7, Persson deposition pages 38-40. Although the requirements for the position were reduced and the applicant pool expanded, the Review Board only interviewed 5 candidates, all of whom were from Massachusetts. Exhibit 17.

In October, 2003, Ms. Lang, along with Miles Walcott and Mr. DiVasta, were the only candidates recommended by the second Review Board to be interviewed by the selecting official. Although Mr. Krinsky and Mr. Kender, two of the three original interviewees from the first posting, applied and were interviewed by the Review Board, their names were not recommended to the selecting official for further interviews. Ms. Lang was the only candidate to make it to the final interview stage for both postings. Exhibit 17.

For the next round of interviews, Mr. Persson asked his two subordinates, Mr. Attridge and Mr. Meier, to assist him in interviewing the three remaining candidates for the labor relations

7

specialist position.[3] They agreed.  Exhibit 2, Attridge, deposition page 19; Exhibit 13, Meier

deposition page 16.  Mr. Couture indicated that no one under his general direction had used

subordinates in the interviewing process before.  Exhibit 3,Couture deposition, page 74.

A series of 15 questions were developed between the three interviewers, with Mr. Persson

making the final decisions on the interview questions.  Exhibit 7, Persson deposition pages, 64-

66; Exhibit 2, Attridge, deposition page 18.  Mr. Persson never checked whether Mr. Attridge or

Mr. Meier had interview training, a prerequisite for conducting interviews.  Exhibit 7, Persson,

deposition pages 66, 100.  The questions were only finalized after Mr. Persson knew who was

recommended by the Review Board for final interviews.  Exhibit 7, Persson, deposition, page

131.

The 15 questions for the interview  were of equal weight and were to be scored on a scale

of 1-5.  Exhibit 7, Persson, deposition pages 69, 130; Exhibit 2, Attridge, deposition page 21;

Exhibit 13, Meier deposition page 20.  The three member interview panel did not have a scoring

grid to compare the answers given by the candidates with a 'correct answer.'   There was no

discussion in advance of the interviews as to what would constitute a full and complete response,

or even a 'passing' grade. The scoring system was completely subjective.  Exhibit 7, Persson

deposition, pages 67-80; Exhibit 13, Meier deposition page 21.  Meier believed that a score of 51

was good (score he gave to DiVasta), but that 47 was not good enough (score he gave to Lang).

Exhibit 13, Meier deposition page 43.

---

[3]As noted in Paragraph 11 of Plaintiff's Objections to Defendant's Concise Statement of Material Facts, all of the labor relations specialists over the past 15 years were male.

In addition to being subjective, the scoring system was flawed in that Mr. Meier and Mr. Attridge could not give answers to several of the interview questions during their depositions, raising concerns that grading each question was simply guesswork. Exhibit 2, Attridge, deposition pages 46; Exhibit 13, Meier deposition pages 46-50.

Mr. Persson, Mr. Meier and Mr. Attridge were more familiar with Mr. DiVasta and his work record than with Ms. Lang's. Exhibit 3, Couture deposition, page 34; Exhibit 7, Persson deposition pages 50, 112; Exhibit 12, LaVecchio deposition, pages 65-66; Exhibit 2, Attridge deposition, page 27; Exhibit 16, DiVasta deposition, pages 15, 20; Exhibit 13, Meier deposition, pages 24, 37; Exhibit 6, Lang deposition, page 110. Although the materials were available for review, at no time during the interview and selection process did Mr. Persson, Mr. Meier or Mr. Attridge review the candidates' personnel files, forms 991 (applications), KSA's or check their internal references. Exhibit 7, Persson, deposition page 117; Exhibit 2, Attridge deposition page 28; Exhibit 3, Couture deposition pages 29-33; Exhibit 12, LaVecchio deposition pages 62-64. Candidates who have less work place interactions with a selecting official could be at a disadvantage. Exhibit 12, LaVecchio deposition, page 66.

Although supervisory experience was not a requirement for the position, Mr. Persson did not believe that Lang had any past supervisory experience. Exhibit 7, Persson deposition, pages142-144. Although operational experience was not a requirement for the position, Mr. Persson did not believe that Ms. Lang had any past relevant operational experience. Exhibit 7, Persson deposition, pages 32-34.

Despite 'similar' difficulties as Ms. Lang in the interview, such as nerves and missing question(s), the interviewers were more lenient towards Mr. DiVasta in assessing his interview.

Mr. DiVasta testified that he was nervous, sweating profusely, stumbled on several questions-

was allowed to redo those questions later, and had a 'fairly decent interview.' Exhibit 16,

DiVasta deposition pages 46- 55. Mr. Persson indicated that Mr. DiVasta was nervous and

flustered but came out of it and did a pretty good job. Exhibit 7, Persson deposition pages 76.

Mr. Meier indicated that Mr. DiVasta was nervous and missed a couple of questions. Exhibit 13,

Meier deposition pages 62. Mr. Persson indicated that Lang did not do poorly, did well on

FMLA, sick, and dependent care, but did not nail the hypothetical(s). Exhibit 7, Persson

deposition page 72. Mr. Attridge, despite giving a 9 point scoring difference between Ms. Lang

and Mr. DiVasta, indicated that there was not a lot of disparity between the two interviews.

Exhibit 2, Attridge deposition pages 26.

  The interview questions were skewed in favor of Mr. DiVasta's 'experience' in

attendance and grievance handling. Of the 15 questions, 1/3 represented this line of questioning:

question 10 (FMLA), question 11 (FMLA), question 12 (grievance handling), question 13 ( step

2 grievance issue), and question 14 (bypass step 1 of the grievance process). Defendant's

Exhibits, 12-17. Overall, Mr. Persson graded Mr. DiVasta 5 points ahead of Ms. Lang (52-47),

with questions 10-14 comprising the difference plus some (23-17). Mr. Meier graded Mr.

DiVasta 4 points ahead of Ms. Lang (51-47), with questions 10-14 comprising the difference plus

some (23-17). Mr. Attridge graded Mr. DiVasta 9 points ahead of Ms. Lang (60-51), with

questions 10-14 comprising part of the difference (23-19)[4]. Defendant's Exhibits 12-17.

---

  [4]Mr. Attridge has himself questioned a promotional process in the past when he filed an
EEO complaint when a younger female was granted a postmaster's position over him. Exhibit 2,
Attridge deposition page 12-13.

According to Mr. Persson, the interview makes you or breaks you. Exhibit 7, Persson deposition page 77.

Mr. Couture indicated that he believed that Ms. Lang could not do the job due to lack of operational experience. Exhibit 3, Couture, deposition page 112. Yet, Ms. Lang has been providing guidance and counseling to managers for years and is currently assigned to a labor relations specialist detail since 2004. Exhibit 7, Persson deposition, page 149; Exhibit 8.

III    ARGUMENT

The Defendant maintains that summary judgment is appropriate since a) there are no genuine material facts in dispute, b) that Plaintiff is unable to establish a *prima facie* case of either age or gender discrimination, or, c) if the court determines that she is able to establish a *prima facie* case of discrimination, that the Plaintiff cannot establish that the reasons offered by the Defendant for awarding the labor relations specialist position to DiVasta and not to Lang, operational experience and interview results, are a pretext for discrimination. The Plaintiff will address each of the arguments advanced by the Defendant.

The Defendant argues that Plaintiff cannot maintain a *prima facie* claim of age or gender discrimination since she cannot establish that her qualifications were greater than the candidate selected, DiVasta. According to <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 71 (1st. Cir. 2004), relied upon by the Defendant, Plaintiff establishes a *prima facie* claim of discrimination by establishing that she is a member of a protected class (female, age 61), was qualified for the open position for which she applied (only candidate who was selected for both rounds of interviews), was rejected (twice), and was rejected in favor of someone possessing similar qualifications (and not within the protected classes). The Defendant contends that since DiVasta's qualifications are

11

so much superior to Lang's, then her case must fail at this stage.

However, Plaintiff's burden at the *prima facie* stage is a modest one. Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st. Cir. 2004). "When an employer claims to have hired or promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual." Rathbun v. Autozone, Inc., 361 F.3d 62, 73-74 (1st. Cir. 2004), citing Smith v. F. W. Morse and Co., 76 F.3d 413, 421 (1st. Cir. 1996). Courts recognize that "proof of competing qualifications will seldom, in and of itself, be sufficient to create a triable issue of pretext." Rathbun v. Autozone, Inc., 361 F.3d 62, 74 (1st. Cir. 2004). Courts, as noted by the Defendant, will not generally sit as super personnel departments assessing qualifications. Rathbun v. Autozone, Inc., 361 F.3d 62, 74 (1st. Cir. 2004).

Clearly, Plaintiff has established a *prima facie* case of discrimination and does not at this stage of the McDonnell Douglas burden shifting framework need to argue comparative qualifications[5]. Once the *prima facie* is established, the Defendant must articulate a legitimate,

---

[5]Although Plaintiff contends that her qualifications are equal to or superior to those of DiVasta, in order to prevail on a discrimination claim, she is not required to prove that she is better qualified. Patterson v. Mclean Credit Union, 491 U.S. 164, 186-188 (1989). Nonetheless, Lang's qualifications are impressive. After beginning her career with the USPS as a mail handler in 1984, she was promoted to Personnel Assistant in 1985. In 1992, she was promoted again to Human Resources Specialist (injury compensation unit and training), a position she continues to formally hold today. In those positions, she became intimately familiar with the National Agreements, federal and postal service regulations regarding employment, including sexual harassment, reasonable accommodations, FMLA, workplace violence, wage and hour and handling controversions relating to work related injuries. Her responsibilities also included preparation of reports, investigations, assisting in grievance resolution, extensive training/presentations and career counseling. In addition, Ms. Lang was assigned to details, including acting manager (as needed) for injury compensation, from 1986-1992, Officer in Charge, Dunstable post office from 1988-1989, acting manager of training in 2000 through 2001 and 2002 and, since 2004, she has been assigned to a detail as a labor relations specialist.

12

nondiscriminatory reason for its actions. The Defendant has met its burden in this regards by indicating that DiVasta scored better than Plaintiff on the final interview and that he had greater operational experience.

At this juncture of the analysis, Plaintiff must prove that the legitimate reasons offered by the Defendant were not the real reasons, but a pretext for age and gender discrimination. The Plaintiff maintains that if she was a younger male, like DiVasta, she would have been awarded the position. Being a 61 year old female, Plaintiff simply did not fit the mold of a labor relations specialist: a middle age male. All of the male incumbents were at least 10 years her junior.

The Plaintiff argues that DiVasta was not awarded the position due to his alleged superior qualifications, e.g. operational experience, supervisory experience or grievance handling, since all of those qualifications were not established qualifications or requirements for the posted position. Those qualifications were not part of either job posting and could not form an appropriate basis for selection. Even advocacy training, the reason given to Plaintiff by Persson for not being selected for the position during the initial posting, is not a requirement for the position. Exhibits 10, 11. Exhibit 7, Persson deposition, pages 113,142-144; Exhibit 3, Couture deposition, page 86; Exhibit 12, LaVecchio deposition, page 67; Exhibit 2, Attridge deposition, page 40; Exhibit 13, Meier deposition, page 31, 53.

---

Exhibit 8; Exhibit 6, Lang deposition 37-41. Lang has supervisory experience, including supervising training technicians and a secretary in her office and as acting manager on details, including acting manger of training and officer in charge of Dunstable Post Office. Exhibit 6, Lang deposition, pages 54-58; Exhibit 8. Lang, having already earned her Bachelors and Masters degrees, earned her Law degree in 2000. Exhibit 8. Mr. DiVasta, on the other hand, did not even have a college degree. Exhibit 16, DiVasta deposition, page 30.

13

Secondly, the interview process for the labor relations specialist posting was a sham and a pretext for discrimination for the following reasons:

1.    Despite the changing job requirements, Plaintiff was the only candidate who was recommended by two review boards for final interviews. DiVasta's initial application could not even advance him to the interview stage.

2.    There is uncertainty as to why DiVasta's application was denied by the first review board. Mr. Lopreste's recall was rather vague. Notwithstanding same, USPS policy and practice is to destroy review board notes once the review board completes its task. The Defendant would have been in the best position to maintain those records, but failed to do so. A negative inference must be applied to their actions. Blinzler v. Marriott International, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996).

3.    At the outset of the first interview with Persson and Couture, Couture announced that the position was going nationwide if they were not satisfied with any of the final three candidates. This had the intended consequence of destroying any hope that Plaintiff had in getting the position.

4.    Persson's reason for initially rejecting Plaintiff, not having advocacy training, was pretextual since advocacy training was not a requirement for the position and even DiVasta did not have any advocacy training when he was selected.

5.    Persson's bias towards Plaintiff was evident in the first interview when, despite indicating that she did a good job and was prepared, ranked her third behind Kender and Krinsky, two males. Krinsky, according to Persson, was unprepared and displayed an attitude during the interview. Notwithstanding same, USPS policy and practice is to destroy interview notes once

14

the interviews are complete. The Defendant would have been in the best position to maintain those records, but failed to do so. A negative inference must be applied to their actions. <u>Blinzler</u> <u>v. Marriott International, Inc.</u>, 81 F.3d 1148, 1159 (1st Cir. 1996).

6.     DiVasta received assistance in the interview process from Lopreste, the former manager of labor relations, Papa, former labor relations specialist, Meier, current labor relations specialist and Persson, manager of labor relations and the selecting official. More dramatically, Meier provided DiVasta with insight into areas/questions that might arise during the interview process, a process Meier later participated in and assisted Persson in formulating questions for same. At the very least, Meier should have excused himself from the interview process. Meier's assistance and participation was inappropriate and prejudicial.

7.     When the position was re-posted with reduced requirements consistent with the standard nationwide vacancy announcement for labor relations specialist, the writing requirement in #5 (for level 17) and in# 6 (for level 19) were also removed. Lang was always viewed as a solid writer, especially in light of her law degree and that she was considered an internal expert in preparing 991's. LaVecchio deposition, page 71.

8.     Persson prepared the questions for the second round of interviews only after he found out the names of the final three candidates. In other words, he prepared the questions knowing the names and experiences of the candidates, knowledge he used to skew the interview in favor of DiVasta. One-third of the questions were geared to FMLA and grievances, two of DiVasta's alleged strengths. The scoring differences between Lang and DiVasta in those 5 questions constitute the entire difference in their total scores on Persson's and Meier's interview sheets. Interestingly enough, the interview notes for the second round of interviews were

retained, a practice that is inconsistent with past practice and policy. Exhibit 9, Admission 1, 2. Why? So there could exist a documented paper trail in the event Plaintiff challenged the decision.

9.      Persson asked his two male subordinates to assist him in the selection process for the labor relations specialist re-posting, without even checking whether they had received proper training for same. Using subordinates in the final selection process was never done before under Couture's management and led to a younger male bias .

10.     Despite the existence of the same 15 questions for each of the three candidates, the interview process was inherently subjective and biased. There was no scoring grid, no answer grid, no discussion on what constituted a complete answer, and no range for 'good' v. 'poor' answers.

11.     Both Meier and Attridge could not answer several of the questions that were asked of the candidates during the interview. Their lack of knowledge in answering those questions raises concerns as to how they could appropriately grade the answers.

12.     The three member interview panel knew DiVasta better than Lang, which resulted in mis-perceptions about her experience and abilities. The panel members had all the information about Lang available to them before making a decision, but failed to review same.

13.     The three member panel was more lenient towards DiVasta than Lang. Despite difficulties in the interview, such as nerves and missing question(s), the interviewers were more 'impressed' with Mr. DiVasta than Ms. Lang. Mr. DiVasta admittedly testified that he was nervous, sweating profusely, stumbled on several questions, but was allowed to redo those questions later. He described his interview as a 'fairly decent interview.' Exhibit 16, DiVasta

16

deposition pages 46- 55.  Mr. Persson indicated that Mr. DiVasta was nervous and flustered, but came out of it and did a 'pretty good job.' Exhibit 7, Persson deposition page 76.  Mr. Meier indicated that Mr. DiVasta was nervous and missed a couple of questions.  Exhibit 13, Meier deposition page 62.  Mr. Persson indicated that Lang 'did not do poorly,' did well on FMLA, sick, and dependent care, but did not 'nail the hypothetical(s).'  Exhibit 7, Persson deposition page 72.  Mr. Attridge, despite giving a 9 point scoring difference between Ms. Lang and Mr. DiVasta, indicated that there was not a lot of disparity between the two interviews.  Exhibit 2, Attridge deposition page 26.   As Persson noted, the interview makes or breaks you.

14.    Couture did not believe that Lang could do the job, yet she has been providing guidance and counseling to managers for years and performing in a labor relations specialist detail for the past 2 years.[6]

As noted in Hodgens v. General Dynamics Corporation, 144 F.3d 151, 167-168 (1st Cir. 1998), where subjective issues are at play, if a plaintiff can establish a *prima facie* case, courts must be particularly cautious about granting summary judgment.  If plaintiff can offer more than speculation or improbable inferences, courts should use restraint where discriminatory animus is at issue.  Subjective evaluations "are more susceptible of abuse and more likely to mask pretext than objective job qualifications."  There are reasons to be concerned because an employer could

---

[6]As noted by the Defendant, Persson commented during his deposition that he is convinced he made the right decision since DiVasta is performing so much better than Plaintiff in a similar capacity.  Contrast that testimony with his other testimony at his deposition.  Persson testified that while Lang has been in a labor relations detail, he has not received any complaints about her, but has received comments from others, critical of her advice, similar to comments that other labor relations specialists have also received.  Persson indicated that Lang is doing a good job, she is a hard worker and very diligent, tries to improve herself all the time.  She is a good worker.  Persson has no regrets that she is on his staff.  Exhibit 7, Persson deposition, pages 149-151.

manipulate its decision to purge employees from its workforce.

"The fact that a court may think that an employer misjudged the qualifications of an applicant does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are a pretext for discrimination.' <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 531 (3rd. Cir. 1992), citing <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981). Here, Plaintiff has clearly established that the reasons offered for the promotion of DiVasta and the rejection of Lang, operational experience and interview results, are probative for whether the employer's reasons are a pretext for age and gender discrimination. Since Plaintiff can offer more than mere speculation or improbable inferences, and since all reasonable inferences are to be viewed in a light most favorable to the Plaintiff, this court should use restraint where discriminatory animus is at issue and deny Defendant's Motion for Summary Judgment.

IV    CONCLUSION

Based upon the above, there can be no dispute that Plaintiff has established genuine issues of material fact which mitigate against summary judgment on both her age and gender claims.

<div style="margin-left:40%">

Plaintiff, by her attorney
s/s Gary H. Goldberg

Gary H. Goldberg, Esquire
120 Main Street
Worcester, MA 01608
508 797-1018
BBO No. 553887

</div>

April 5, 2006