UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
JANICE LANG,                   )
     Plaintiff,                )
                               )
v.                             ) C.A. No. 05-10052-WGY
                               )
JOHN E. POTTER, POSTMASTER GENERAL,)
UNITED STATES POSTAL SERVICE,  )
     Defendant.                )
_____)
```

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
### HIS MOTION FOR SUMMARY JUDGMENT

Defendant, John E. Potter, Postmaster General of the United States Postal Service ("USPS"), by his attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, respectfully submits this Reply Memorandum in Support of his Motion for Summary Judgment dismissing Plaintiff Janice Lang's Complaint in its entirety.

**A.  THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN DISPUTE**

Plaintiff hopes to survive summary judgment by inventing issues of genuine fact that are clearly not supported by the record.  While Plaintiff is careful, at times, to cite to the record in support of her proffered "facts" as Local Rule 56.1 requires,[1] a close read of the record reveals that Plaintiff often overstates or misrepresents what it actually says.  The

---

[1]    Local Rule 56.1 states in relevant part:  "Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  L.R. 56.1.

Court, therefore, must ignore these unsupported statements and summarily strike them from her papers.[2]

Specifically, in her objection to paragraph 46 of Defendant's Statement of Facts, Plaintiff misrepresents that Robert LoPreste could not recall why the review board did not recommend Ralph Divasta for an interview for the first posting of the Labor Relations Specialist position.  This is simply untrue. Mr. LoPreste clearly remembered that Mr. Divasta's errors in his 991-Form was the reason the review board did not select him.  See Deposition of Robert LoPreste ("LoPreste Dep."), p. 25-26, 46-48, 58-60, attached hereto as Exhibit A.  Mr. LoPreste simply could not remember during his deposition in August of 2005 what Mr. DiVasta's errors on the application were in 2003.  Id.

In her objection to paragraph 49 of Defendant's Statement of Fact, Plaintiff also misrepresents that the record does not indicate who prepared the questions for the first set of interviews for the Labor Relations Specialist position.  On the contrary, Mark Persson indicates that he drafted the questions, which he used for the basis of his questions during the second set of interviews for the position.  See Deposition of Mark Persson ("Persson Dep."), p. 30, 72, 131, attached hereto as

---

[2]    There are many assertions in Plaintiff's Statement of Material Facts that are both inaccurate and immaterial.  Solely for purposes of this motion, the defendant does not take issue with paragraphs 1-15, 22, 23, 26, 29-32, 37-39 of Plaintiff's Statement of Material Facts, because they are immaterial.

Exhibit B.

In paragraph 16 of her Statement of Facts, Plaintiff states that Steve Meier informed Mr. Divasta of the questions interviewers would ask him during the selection process. The records show, however, that Mr. Meier merely discussed with Mr. DiVasta what the responsibilities of a Labor Relations Specialist entailed and how to better prepare his 991-Form. <u>See</u> Deposition of Steve Meier ("Meier Dep."), p. 19, 24-33, attached hereto as Exhibit C. Paragraph 18 of Plaintiff's Statement of Facts states that Mr. Persson discussed with Mr. DiVasta "how to improve his chances" to obtain the Labor Relations Specialist position. This statement is also unsupported by the record. Indeed, Mr. Persson could not remember any details about his conversation with Mr. DiVasta concerning the Labor Relations Specialist position. Persson Dep., p. 52. And, Mr. DiVasta testified that Mr. Persson refused to discuss the Labor Relations Specialist position with him in any detail as Mr. Persson was the selecting official. Deposition of Ralph DiVasta ("DiVasta Dep."), p. 13-14, attached hereto as Exhibit D. As did Mr. Meier, Mr. Persson only told Mr. DiVasta generally what the functions of the Labor Relations Unit were. <u>Id.</u>, p. 14.

Plaintiff's emphasis in paragraph 24 of her Statement of Facts that "Mr. Persson never checked whether Mr. Attridge or Mr. Meier had interview training" is disingenuous. In response to

Plaintiff's request for documents, Defendant provided Plaintiff documentation showing that Messrs. Persson, Attridge, and Meier all completed the USPS's interview and selection training programs. See Defendant's Responses to Plaintiff's Document Requests Nos. 26-28, and corresponding documents Bate Stamped USPS0251 to USPS0256, attached hereto as Exhibit E.

Defendant also objects to Plaintiff's inference in paragraph 25 of her Statement of Facts that Mr. Persson finalized his interview questions for the second set of interviews for the Labor Relations Specialist position once he learned Mr. DiVasta and Plaintiff were interviewing candidates. Mr. Persson testified that he slightly revised the interview questions, which he had prepared for the first set of interviews, because Plaintiff, having already heard the questions, would have an unfair advantage over the other candidates if he asked the same questions again. Persson Dep., p. 131. Mr. Persson did not, as Plaintiff implies without any support, change the questions to harm Plaintiff or to benefit Mr. DiVasta.

Plaintiff's statement in paragraph 27 of her Statement of Facts that Mr. Persson did not review the candidates' 991-Forms "at no (sic) time during the interview and selection process" is also contrary to the record evidence. Mr. Persson testified that he reviewed the candidates' 991-Forms. Persson Dep., p. 110-111. Defendant also objects to Plaintiff's disingenuous statement in

paragraph 34 of her Statement of Facts that Messrs. Meier and Attridge could not answer several of the interview questions during their depositions.  This is untrue.  While they could not remember exactly what answer they were looking for in 2003, Messrs. Meier and Attridge answered each of the interview questions during their depositions.  Meier Dep., p. 45-61; Deposition of Peter Attridge ("Attridge Dep."), p. 39-59, attached hereto as Exhibit F.

The record also does not support Plaintiff's outrageous contentions in paragraphs 35 and 36 of her Statement of Facts (and paragraph 67 of her objections to Defendant's Statement of Fact) that Messrs. Persson, Meier, and Attridge "were more lenient toward Mr. DiVasta in assessing his interview," and that Mr. Persson changed (or "skewed") the interview questions to favor Mr. Divasta over Plaintiff.  Beyond lacking merit, these allegations are completely unsupported by the record and the Court should strike them as well.

The Defendant's Statement of Facts, however, is supported properly and not properly opposed on the facts discussed above. Because Plaintiff fails properly to controvert those facts, the "material facts of record set forth in [the government's concise statement of material facts] will be deemed for purposes of the motion to be admitted by [the Plaintiffs] . . . ."  L.R. 56.1; see also Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102

(1st Cir. 2003) ("Because the [plaintiff] did not controvert the statement of undisputed material facts that the defendants filed with their summary judgment motion, we deem those facts admitted"); GE Capital Healthcare Fin. Servs. v. Fall River Walk-In Emergency Med. Office, P.C., CA No. 02-11789-RCL, 2004 U.S. Dist. LEXIS 75, at *3 (D. Mass. Jan. 7, 2004).  As such, the Court must take the government's proffered facts as true and undisputed.  Given that the material facts are undisputed, this Court need only apply the law to resolve the Complaint.

**B.  PLAINTIFF'S CLAIMS OF AGE AND GENDER DISCRIMINATION FAIL AS A MATTER OF LAW**

Even if Plaintiff establishes a prima facie case of age and/or gender discrimination, which the Defendant disputes,[3] she fails to establish that the USPS's legitimate, non-discriminatory reason for selecting Mr. DiVasta for the Labor Relations Specialist position is a pretext for unlawful discrimination.  It bears repeating that at this final stage of the McDonnell Douglas analysis, Plaintiff is required to show, unassisted by the original inference of discrimination, that the USPS's proffered reason is actually a pretext for age or sex discrimination. Thomas v. Eastman Kodak Co., 183 F.3d 38, 57-58 (1st Cir. 1999), cert. denied, 528 U.S. 1161 (2000) ("The plaintiff must present

---

[3]     Defendant maintains that Plaintiff cannot establish that she possessed similar qualifications to Mr. DiVasta and, thus, cannot establish a prima facie case of age or gender discrimination.

sufficient evidence to show both that 'the employer's articulated reason for laying off the plaintiff is a pretext' and that 'the true reason is discriminatory.'") (citation in parenthetical omitted); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 91st Cir. 1991).  "In assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Mesnick, 950 F.2d at 825 (citations omitted).  "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [she] must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [unlawful] discrimination.'"  Id.  Plaintiff can satisfy this burden through circumstantial evidence, such as, statistical evidence showing disparate treatment of members of Plaintiff's protected class, comments by decision makers that denigrate members of her class, and other incidences of differential treatment in the workplace. Id. at 824.  It is clear, however, that Plaintiff cannot meet this burden.  Indeed, a rational jury could not, in the face of the undisputed record evidence, reach the inferences Plaintiff asserts; and even if a jury could reach such inferences, they, at best, show flaws in the selection process but not a pretext for age or sex discrimination.

There is no merit to Plaintiff's argument that Mr. Persson's

desire to hire a person with operational or (purportedly) advocacy experience, when the job posting did not require such experience, indicates that his reason for selecting Mr. DiVasta over Plaintiff is a pretext for discrimination.  See Plaintiff's Opposition, p. 13.  There is no support in the record for Plaintiff's contention that a selecting official must focus solely on the basic requirements listed on a job posting and cannot consider all of a candidate's experiences and skill sets in making his or her hiring decision.  This argument is not only unsupported by the record but it flies in the face of commonsense and logic.

Plaintiff disingenuously finds pretext in the fact that two different review boards selected Plaintiff to interview for the Labor Relations Specialist position, whereas only one review board selected Mr. DiVasta.[4]  Plaintiff's Opposition, p. 14.

---

[4]    In connection with this point, on pages 14 and 15 of her opposition, Plaintiff requests that the Court infer that the USPS destroyed the review board's and other interview notes because it realized that their contents were unfavorable.  This request is completely without merit.  A negative inference may only be drawn after a party establishes "a sufficient foundation showing that the party who destroyed the document had notice both of the potential claim and of the document's potential relevance."  See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996).  In Plaintiff's own words, "USPS policy and practice is to destroy review board notes once the review board completes its task. . . . [And] USPS policy and practice is to destroy interview notes once the interviews are complete."  Plaintiff's Opposition, p. 14-15.  There is no indication in the record, nor does Plaintiff make such an argument, that the USPS, separate from this policy and practice, destroyed the review board's or other interview notes concerning the Labor Relations

Again, the undisputed record shows that the first review board
did not select Mr. DiVasta because he completed his Form-991
improperly, not because it found him to be unqualified.  See
LoPreste Dep., p. 25-26, 46-48, 58-60; DiVasta Dep., p. 58.

    Plaintiff also claims that the fact Mr. DiVasta received
assistance in the interview process from Messrs. LoPreste, Papa,
Meir, and Persson demonstrates that Mr. Persson's reason for
hiring Mr. DiVasta is a sham to mask his discriminatory motives.
Plaintiff's Opposition, p. 15.  This statement ignores the record
evidence that it is USPS policy that managers advice employees on
how to improve their candidacy for promotions within the postal
service.  Persson Dep., 53-54; Deposition of Melinda LaVecchio
("LaVecchio Dep."), p. 60, attached hereto as Exhibit G.  Such
advice is available to any employee who wishes to take advantage
of the opportunity.  Persson Dep., p. 146-147.  In fact, in
addition to Mr. DiVasta, Mr. LoPreste also gave advise to Miles
Walcott, who sought his guidance.  LoPreste Dep., p. 66-67.

    Plaintiff further insinuates that when the USPS re-posted
the vacancy announcement for the Labor Relations Specialist
position nationally in May 2003, it reduced the requirements of
the announcement to enhance Mr. DiVasta chances of obtaining the
position.  Plaintiff's Opposition, p. 15.  The record evidence

_____

Specialist position because it thought that their contents were
unfavorable.

- 9 -

shows that this contention is not true.  Indeed, the national
vacancy announcement in May 2003 was the USPS's *standard* posting
for the position.  LaVecchio Dep., p. 19, 37, 67.  Put another
way, USPS did not *lessen* the requirements when it re-posted the
position nationally, instead, Ms. LaVecchio, when she posted the
position locally, had *increased* the requirements.  Id.
Considering the fact that Plaintiff does not allege that USPS's
headquarters office was trying to discriminate against her, it is
also important to note that the headquarters office, not anyone
in the local office, posted the national vacancy announcement for
the position.  Id.

     Plaintiff claims that one could infer that the USPS diverged
from its policy and practice when it retained Messrs. Persson's,
Attridge's, and Meier's notes of their interviews in October
2003, to document a "paper trail in the event Plaintiff
challenged the decision."  Plaintiff's Opposition, p. 15-16.
Plaintiff seems to forget that a party is obligated to retain
material evidence not only during litigation but also before
litigation once it reasonably should know that the evidence may
be relevant to anticipated litigation.  See Slvestri v. Gen.
Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001).  The record is
clear that on October 14, 2003, Plaintiff immediately informed
Mr. Persson that she was going to speak with her lawyer when he
informed her that he had selected Mr. DiVasta for the position.

Deposition of Janice Lang ("Lang Dep."), p. 126, attached hereto as Exhibit H. Plaintiff also filed an informal complaint of discrimination within two weeks of Mr. Persson's decision. <u>Id.</u>, p. 130-131.  Not surprisingly, the USPS, notwithstanding its document retention policy with regard to interview notes and the like, preserved all material evidence in accordance with its duty under the law.

Plaintiff also argues that the fact all of the Labor Relations Specialist positions are held by males younger than her tends to show that the USPS's legitimate, non-discriminatory reason is a pretext for discrimination.  Plaintiff's Opposition, p. 16.  If this fact were unexplained perhaps it would have some importance (or relevance).  However, the undisputed record evidence shows that all of the Labor Relations Specialists are male due to the facts that there is small turnover in the lean-staffed Labor Relations unit, and few women apply for the positions when they become available.  <u>See</u> Deposition of David Couture ("Couture Dep."), p. 101-102, attached hereto as Exhibit I; LaVecchio Dep., p. 74-75.  The undisputed record also demonstrates that the USPS actively has tried to recruit and hire women to these positions.  Couture Dep., p. 103-104; Persson Dep., p. 152; LaVecchio Dep., p. 71-74; LoPreste Dep., p. 76. Moreover, while Messrs. Persson, Meier, and Attridge were all younger than Plaintiff, they were all over the age of forty.

- 11 -

Plaintiff also presents the following six factors she says support her claim of pretext: (1) Mr. Couture's purported bias against Plaintiff when he announced at the beginning of the first interview that USPS would re-post the position if the interviewers were not pleased with the candidates; (2) Messrs. Persson's and Couture's ranking Plaintiff third after Messrs. Kender and Krinsky following the first set of interviews; (3) Mr. DiVasta, like Plaintiff, purportedly did not have advocacy skills; (4) the interview questionnaire for the second interview was subjective; (5) Messrs. Persson, Meier and Attridge knew Mr. DiVasta better than they knew Plaintiff; and (6) Mr. Couture was mistaken about Plaintiff's work experience.  Plaintiff's Opposition, p. 14-17.  None of these allegations, however, demonstrate that Plaintiff's age or sex was a "determining factor" in USPS's decision to select Mr. DiVasta over her.  See Mesnick, 950 F.2d at 825; see also Thomas, 183 F.3d at 57-58.

Indeed, even if a jury could, despite the record evidence, reach the inferences Plaintiff pitches, they, at best, show flaws in the selection process but not a pretext for age or sex discrimination.  This is fatal to her claims.  Title VII and the ADEA do not prevent an employer from refusing to hire an employee for any reason--fair or unfair--so long as the decision does not stem from a protected characteristic.  See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999); Mesnick,

950 F.2d at 825. Accordingly, evidence of favoritism, by itself, cannot establish that an employer's legitimate, non-discriminatory reasons are a pretext for discrimination. <u>See</u> <u>Rodriquez-Cuervos</u>, 181 F.3d at 21-22 ("While [plaintiff's evidence] may prove disparate treatment, there is simply no evidence that such treatment was on account of [plaintiff]'s status as a Puerto Rican. Absent such evidence, [plaintiff] cannot avert summary judgment."); <u>Foster v. Dalton</u>, 71 F.3d 52, 56 (1st Cir. 1995) (recognizing that Title VII is not limitless and does not outlaw cronyism); <u>Keyes v. Sec'y of the Navy</u>, 853 F.2d 1016, 1027 (1st Cir. 1988) ("Plaintiff, who had the ultimate burden of proving the claim, did not offer a scintilla of evidence which tended to show that her color or her sex – as opposed to . . . cronyism – was a factor in the decisionmaking process.") <u>Lamothe v. N.H. Dep't of Corr.</u>, No. 02-442-JD, 2003 U.S. Dist. LEXIS 19050, at *12 (D.N.H. Oct. 24, 2003) (granting summary judgment where the record, although demonstrating favoritism, did not support contention that such favoritism was based on race). With this framework in mind, it is clear that Plaintiff's claims fail at this stage of the analysis.

Putting aside the unsupported allegations already addressed above in Section A above, Plaintiff is left only with evidence of her professional competence, arguable flaws in the USPS's selection process and policies, insignificant shortcomings in the

selection process for the Labor Relations Specialist position in 2003, and, at best, possible favoritism.  This evidence, however, has nothing to do with Plaintiff's age or gender, nor does it demonstrate that the USPS's true motives in selecting Mr. DiVasta were discriminatory.  Each tidbit of evidence, viewed singly or in combination, would not allow a rational jury to find that USPS had a hidden, age- or gender-oriented agenda.  Accordingly, Plaintiff's claims fail as a matter of law.

**IV.  CONCLUSION**

    For the foregoing reasons, and for those contained in the Defendant's Memorandum in Support of his Motion for Summary Judgment, this Court should enter summary judgment for the Defendants dismissing Plaintiff's Complaint in its entirety.

                              Respectfully submitted,

                              Michael J. Sullivan
                              United States Attorney

                         BY:  /s/ Damian W. Wilmot
                              DAMIAN W. WILMOT
                              Assistant U.S. Attorney
                              Moakley Federal Courthouse
                              One Courthouse Way, Suite 9200
                              Boston, MA 02110
Dated: April 17, 2006         (617) 748-3398

EXHIBIT A

1                              Volume I

2                           Pages 1 - 83

3            UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

4

JANICE E. LANG,                  )

5           Plaintiff        )

                                )

6     VS.                   ) 05-10052-WGY

                                )

7  JOHN E. POTTER, Postmaster General  )

    United States Postal Service,      )

8         Agency           )

**COPY**

9

10

11     DEPOSITION OF ROBERT LOPRESTE, taken at the

12  request of the Plaintiff, pursuant to the applicable

13  provisions of the Federal Rules of Civil Procedure,

14  before Karen G. Farragher, RPR and Notary Public in

15  and for the Commonwealth of Massachusetts, on August

16  11, 2005, commencing at 10:27 a.m., having been

17  identified by the Notary Public through satisfactory

18  evidence of identity per Executive Order No. 455

19  (03-13) at the offices of Gary H. Goldberg, Esq., 120

20  Main Street, Worcester, Massachusetts.

21               ————————————————————

                  FOR THE RECORD

22          COURT REPORTING SERVICES

                11 FISKE STREET

23    SHREWSBURY, MASSACHUSETTS  01545

                (508) 845-1096

24

1    up to the criteria, the skills one would expect to

2    have in order to be successful in the assignment.

3              So, generally, what I do do in reviewing

4    the 991 is I look -- well, you know, you first look

5    at the background.  The first page of the 991 tells

6    you about their education, about the other types of

7    assignments that they have had.

8              That may be important because there may

9    be some experience that they have that you think

10   would help them in whatever assignment they are

11   looking or seeking to be placed into.  And then you

12   look at the responses to these questions to see how

13   they kind of tie in their experiences to these

14   skills.

15             One of the things that I know that I'm

16   pretty picky on is to see that they follow the

17   instructions.  There is something called a star

18   format that you're suppose to follow, situation,

19   task, activity, result.

20             It's asked in answering those questions

21   that you kind of respond in that format.  You sort of

22   state what the situation is, what the task is to

23   accomplish, how you did it and what the final result

24   was.

1          It kind of helps to show that you can

2    sort of perform this function even though it might

3    have been in some other avenue, some other function,

4    some other company for that matter, you know, some

5    other experiences other than your employment

6    experiences.

7          I'm kind of picky about making sure that

8    they do that because I think that if you can't kind

9    of follow instructions, there is some question as to

10   how well you're going to perform in the function,

11   especially in the labor relations function because I

12   think there is a lot of technicalities in the labor

13   relations function.

14          So I would look at the background.  I

15   would look at the format of their response.  I would

16   look at the meat of their response then evaluate how

17   well I think they did generally, and generally you

18   evaluate for each of the responses for these, for

19   lack of a better word, questions.

20       Q.     Is there some kind of a note taking or

21   grid that you as a member of a board would generally

22   keep?

23       A.     Keep?  I don't know about keeping but I

24   often would get -- I'm looking at -- I'm not sure if

```
 1   Persson deposition, please?  These are the agency's
 2   answers to Ms. Lang's first set of interrogatories.
 3   Can you turn to the second page, just read the
 4   question and response to number three?
 5        A.     I have read it.
 6        Q.     Does the identification of Mr. Kender,
 7   Mr. Krinsky and Ms. Lang, refresh your memory at all
 8   as to the individuals that you recommended for
 9   interview by the selecting official?
10             MR. WILMOT:  Objection.  You can answer.
11        A.     Not much more.  You know, Mr. Krinsky, I
12   can't even remember who he is quite frankly.  I don't
13   question that I did but I don't have a vivid
14   recollection of having reached these individuals.
15   Mr. Kender, I recall.  I don't even remember who
16   Mr. Krinsky is.  Ms. Lang, obviously, I know.
17        Q.     Do you have any recollection whatsoever
18   of any concerns that you or any of the other board
19   members had regarding Mr. DiVasta's 991?
20        A.     I have a vague recollection that there
21   was some concerns.  I don't remember -- I believe now
22   that you mention it, we had some concerns about how
23   he completed his 991 and I believe the concerns were
24   shared by -- I know, I believe I had some concerns.
```

1    Mr. Papa, I'm just trying to remember.

2             Ms. Legro had some concerns as well.  I

3    don't remember what it was but I recall being

4    disappointed, so to speak, you know, not -- I didn't

5    think the 991 was put together as well as it should

6    have been.

7        Q.      You had indicated before that in some

8    instances the board member's experience with the

9    candidate could assist the candidate's 991 even if

10   some of the answers to the 991s were either not

11   complete or not to the full satisfaction of the

12   board; is that correct?

13       A.      That's correct.

14       Q.      Do you recall whether or not that your

15   knowledge or Mr. Papa's knowledge of Mr. DiVasta's

16   performance played a role in your decision not to

17   recommend him out of the review board?

18             MR. WILMOT:  Objection.  You can answer.

19       A.      I can't speak for Mr. Papa, I don't

20   recall, but it didn't for me because I think if it

21   had, it probably would have been in reverse because

22   my experience with Mr. DiVasta had been good and the

23   work that I had seen that he had performed I thought

24   was good, but like I said early on, I'm maybe

```
1   different than some others but I'm pretty picky about

2   the 991 process and I can't -- my recollection is he

3   didn't do his 991 as good of a job as he should have

4   in applying for the position.

5        Q.     Are there any other documents that you

6   have at your disposal besides the 991s and attached

7   questions and answers as a member of the review

8   board?

9        A.     I don't recall having anything other

10  than the 991s.

11       Q.     When you are in the capacity as a

12  selecting official, are the 991s returned to you as

13  part of your selection process?

14       A.     I believe I have always taken the 991s.

15  I don't know that everybody does but my practice is

16  to look at the 991s as well.

17       Q.     In addition to the interview?

18       A.     In addition to the interview but I think

19  everybody is different but that's what I do.

20       Q.     Why do you do that?

21       A.     Well, like I said before, one of the

22  things you look at in the 991 is some experiences and

23  sometimes that's helpful to understand and to help

24  evaluate the responses that they give in interviews
```

1  follow-up question is going to be, I'm going to ask

2  you if by reviewing the exhibit, whether or not that

3  assists you in recalling what part of Mr. DiVasta's

4  991 may have been viewed by you or other members of

5  the board as being deficient in some capacity?

6        A.     Okay.

7               MR. GOLDBERG:  Off the record while he's

8  reviewing that.

9               THE WITNESS:  Could I see the posting

10  for this?

11              MR. WILMOT:  I think it's Exhibit No. 1.

12              THE WITNESS:  This was the posting that

13  resulted in this.  I have looked at it.

14       Q.     Are you able to answer the pending

15  question?

16       A.     Not specifically.  I can say that on the

17  sixth of ten pages, that's my handwriting and I

18  believe the cross-offs and changes in the numbers are

19  mine and I don't remember the details but there was

20  some problem with, you know, how he put the

21  application together for a 17 and 19 and I was just

22  looking here to see if there was more specific

23  directions, but my recollection is this wasn't the

24  way -- I mean, I crossed out, looks like I crossed

1    out advanced, which is the 19 requirement but that's

2    the only distinction between the two and juxtaposed

3    some of these responses and without recalling the

4    details of it, there is no question in my mind that

5    was something that raised some concern of mine.   I

6    just can't recall what it was beyond -- it seems as

7    if he didn't process this in the way it was supposed

8    to be processed.

9              I mean, I can look at the other

10   applications, see how, if they were done differently,

11   but that's the best of my recollection that jumps out

12   as to, you know, one of the reasons why he wouldn't

13   have been recommended.

14        Q.    The page that you have open, which you

15   described as page six of ten, I believe?

16        A.    Yes.

17        Q.    What is the word that appears to be

18   crossed out?

19        A.    I don't know.

20        Q.    Below that, what is the words which are

21   written?

22        A.    It's ranked on 17 KSA.

23        Q.    What does that refer to?

24        A.    If you look at Exhibit No. 1, EAS 17

1  requirements and EAS 19 requirements.  So,

2  presumably, this question is question number five:

3  Ability to communicate orally and in writing.  So

4  there is a distinction in the -- apparently, what I

5  had done was I used his response as a response to the

6  17 KSA even though it was written as the 19 KSA and

7  that's sort of the example of what appears to be the

8  problem.

9          He didn't separate these things

10  properly.  So if he was applying for both, so to

11  speak, he should have identified specifically the 17

12  and the 19 and he was applying, if I'm not mistaken,

13  he was kind of vague but he put a slash, 17/19.

14          I know in some instances people realize

15  in all likelihood they're not going to get the 19 and

16  just write 17.  He wrote 17/19 but didn't really say

17  here are my requirements for the 17 and some of them

18  might have been duplicate or just, you know, change a

19  little bit but this, I mean, I'm picky.

20          This is the type of thing that would

21  aggravate me and say that's not the way I expected

22  the application to be processed.

23      Q.    So just so I can summarize just one

24  second, when Mr. DiVasta applied for the labor

```
 1          A.      2003?

 2          Q.      Yes.

 3          A.      No, I don't.  I do a lot of

 4   arbitrations.  They kind of go...

 5          Q.      In Exhibit No. 20 from Mr. Persson's

 6   deposition, I think it's the second to the last page

 7   of the document, Mr. DiVasta writes in his revised

 8   991 for the reposting that he recently sat in on an

 9   arbitration case as an observer and has requested and

10   will be given training as an arbitration advocate in

11   the near future?

12          A.      Where does he say that?

13          Q.      Sorry, first paragraph, last line.

14          A.      Okay.

15          Q.      Does that assist you at all in recalling

16   whether or not that it was yourself he was referring

17   to in the arbitration matter?

18                  MR. WILMOT:  Objection.  You can answer.

19          A.      No.

20          Q.      Do you have any recollection today of

21   Mr. DiVasta coming to you, subsequent to his

22   rejection and not getting an interview from the

23   review board or from the selecting official in the

24   initial posting and asking you, specifically, for
```

1   advice and guidance as to how to improve his chances

2   or opportunities?

3              MR. WILMOT:  Objection.  You can answer.

4       A.     I think that he did contact me.  I can't

5   remember if he came in person or on the phone, to

6   discuss it to some extent.

7       Q.     What is your recollection of that

8   discussion?

9       A.     I really can't.  I don't have any

10  specifics that I can recall, unfortunately.

11  Mr. Walcott had done the same, if I'm not mistaken.

12      Q.     I'm sorry please?

13      A.     Miles Walcott, I think he did the same.

14  I think they both approached me and asked, you know,

15  why they weren't recommended.  Was Walcott

16  recommended?  I forget the order of it but I know

17  they both at some point approached me.

18      Q.     Well, there is documentation to support

19  the fact Mr. Walcott did apply for the first posting

20  and was not given an interview .

21      A.     Okay, so it could have been the same

22  time frame that they approached me, not together but

23  individually.

24      Q.     And would such a conversation or meeting

1   for the position?

2               MR. GOLDBERG:   Objection.

3       A.       Yes, I'm trying to recall how many

4   applicants there were.  I don't really recall many

5   applicants but there was one applicant, Ann Marie

6   Stoica, who I actually selected for the assignment.

7               I can't recall whether it was the one

8   Mr. Venti got or the one Mr. Meier got, and she

9   declined.  She ultimately declined the assignment.

10  We didn't get a lot of women applicants that I can

11  recall.

12      Q.       So you don't remember getting a lot of

13  female applicants but you have a memory of offering a

14  labor relations specialist position to, did you say

15  Ann Marie Stoica?

16      A.       Yes, I offered her -- again, I just

17  can't recall which of the assignments but in one of

18  the selections, I had selected her.  I offered her

19  the assignment and she declined.

20      Q.       Now, we have talked a lot about Exhibit

21  1 which was identified in a previous deposition as

22  the first posting that the plaintiff, Ms. Lang,

23  applied for.

24              Were you the decision maker with regards

# EXHIBIT B

1           Volume I
            Pages 1 - 159
2

3           UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
4
JANICE E. LANG,                    )
5               Plaintiff          )
                                   )
6       VS.                        )  NO. 05-10052-WGY
                                   )
7  JOHN E. POTTER, Postmaster      )
   General, United States Postal   )
8  Service,                        )  **COPY**
                Agency             )
9

10

11      DEPOSITION OF MARK D. PERSON, taken at the

12  request of the Plaintiff, pursuant to the applicable

13  provisions of the Federal Rules of Civil Procedure,

14  before Karen G. Farragher, RPR and Notary Public in

15  and for the Commonwealth of Massachusetts, on August

16  9, 2005, commencing at 10:11 a.m., having been

17  identified by the Notary Public through satisfactory

18  evidence of identity per Executive Order No. 455

19  (03-13) at the offices of Gary H. Goldberg, Esq., 120

20  Main Street, Worcester, Massachusetts.

21  _____
              FOR THE RECORD
22        COURT REPORTING SERVICES
             11 FISKE STREET
23    SHREWSBURY, MASSACHUSETTS   01545
               (508) 845-1096
24

1    asked at that time.  They usually are.

2        Q.      Were there written questions that you

3    utilized in your interview?

4        A.      I thought there were and I have looked

5    for them and I cannot find them but my memory tells

6    me that there were.

7        Q.      Did Mr. Couture participate in the

8    interview?

9        A.      Yes, he did.

10       Q.      Did he ask any of the questions during

11   the interview?

12       A.      Yes, he did.

13       Q.      Was it a 50-50 type of sharing of the

14   questions?

15       A.      I believe it was.  I believe I asked a

16   question, then Dave would ask a question and so on.

17       Q.      Did Mr. Couture, to the best of your

18   knowledge have a copy of the questions that you

19   believe existed at the time?

20       A.      I do believe he had a copy of the

21   questions.  I'm almost positive.  I cannot find them

22   and my only guess is the reason I didn't keep them

23   was because nobody was selected.  I usually don't

24   keep stuff like that.

```
 1              (Persson Deposition Exhibit No. 9
 2    marked.)
 3         Q.      Take a moment, please, to review Exhibit
 4    No. 9.  When you're finished, please identify it for
 5    me.
 6         A.      I know what it is.  It is the questions
 7    that were asked Ralph DiVasta on the second interview
 8    occurring on October 8, 2003, and it looks like
 9    this -- yeah, it is the one.  This is my sheet that I
10    used.
11         Q.      Refer back to the last page, do you see
12    where it says closing comments at the top?
13         A.      Yes.
14         Q.      In the middle of the page, it says:  Has
15    improved 991 to increase his chances.  Spoke with
16    people, Bob, Dave, Mark and Steve.  Attended hearing
17    with Bob LoPreste.  Do you see that?
18         A.      Yes.
19         Q.      Do you know who Bob, Dave, Mark and
20    Steve is referring to in that comment?
21         A.      I would say Bob LoPreste, Dave Papa,
22    myself, I guess, and Steve Meier, I would assume.
23         Q.      Do you know what each one of them spoke
24    to Mr. DiVasta about in reference to improving his
```

1    991?

2              MR. WILMOT:  Objection.  You can answer.

3        A.      Specifically, no.  Like I said, it's
common for people to do that.  A lot of people do it.
Where did I go wrong?  They go by a star format.
Where did I -- you know, how can I improve that?  Did
I explain myself not sufficiently enough or whatever.

8    Depends.  I don't recall what he spoke to me about.

9        Q.      Yourself and Steve Meier were two of the

10   individuals who were on the final panel with the

11   second posting?

12       A.      Yes.

13       Q.      Do you know what hearing that he

14   attended with Bob LoPreste?

15       A.      I do not.

16       Q.      Do you know how it came to be that he

17   attended a hearing with Bob LoPreste?

18       A.      Well, many times we have people who are

19   interested in labor relations, attend hearings as an

20   observer.  Again, not unusual for people.  Which

21   specific one, I have no idea.

22       Q.      Do you know if any of the individuals

23   identified, Bob, Dave, yourself or Steve, assisted

24   Mr. DiVasta in either preparing or reviewing his 911?

1   that exists today that would say a five would include

2   the following responses?

3        A.      That's correct, there was no document.

4        Q.      And there was no even discussion about

5   that prior to the interviews?

6        A.      That's correct.

7        Q.      Can you describe for me to the best of

8   your recollection, what your impression was of

9   Ms. Lang during this interview process for the second

10  posting?

11       A.      Well, again, I think she was prepared as

12  best she could, for a lot of the questions.  Some of

13  the same questions as a matter of fact were from the

14  first interview.

15           So there was an advantage there for

16  those being interviewed the second time, that I

17  recall there were Metz questions.  There were Douglas

18  questions, FMLA questions.  So she did pretty good on

19  those, I believe.

20           This particular interview she appeared

21  to be very nervous, anxious, basically told her, you

22  know, relax, you know, we understand everybody is

23  nervous when you get to these interviews.

24           We've all been through them so we know,

1    regarding his successful defending or attacking this

2    parking ticket in municipal court, how would you

3    respond, from your perspective as the interviewer and

4    reviewer of the 991, as to how that was responsive to

5    the question itself about his ability to represent

6    the postal service in arbitration and EEO hearings?

7                MR. WILMOT:    Objection.    You can answer.

8         A.       Well, I wasn't in that capacity at that

9    time to review the 991s.    As I said earlier, the

10   991s, basically, are reviewed by a review panel and

11   they determine whether or not the answers are

12   acceptable or not in order to get them into the

13   interview process.

14               So, basically, I mean, you know, I may

15   look at the 991s but we are not going to go over the

16   991s again and then tell the interview panel that

17   this isn't acceptable because the 991 isn't

18   acceptable or an answer is questionable or whatever.

19               You might say something to them

20   afterwards but it wasn't done in this case.    We give

21   this a really, at least I do and I know managers are

22   different.    Some go through it with a fine tooth

23   comb.

24               When I have people selected for an

1  interview, I typically just give it a quick perusal

2  and don't really get into the stars and all that

3  stuff, the categories, the KSAs and stuff like that.

4  It's just not something that I have been doing, right

5  or wrong.

6      Q.    Did you ask any questions during the

7  interview or the reposting that would specifically

8  identify whether an individual had step 2 experience?

9      A.    Well, I knew -- to answer your question,

10 I'd have to look at it.

11     Q.    Feel free.

12     A.    Do we know which one it is?  There's one

13 in here.  I've got it, Exhibit 9, 13.  I just refer

14 to the fact that they may be sitting at step 2 with

15 the unions and went over a hypothetical situation

16 whereby if a steward became upset during a meeting,

17 what would they do.

18         That happens quite often in step 2,

19 especially with the newer stewards and some of the

20 older ones, meaning not age-wise but ones that are

21 veterans, I guess, that have been in the process and

22 14 we talk about a step 2 answer.  How the union can

23 bypass step one, go to step 2.

24         Direct involvement with step 2, I don't

1  the person have FMLA experience or knowledge?

2        A.      I don't think it was listed on the

3  application but it was something that we deal with on

4  a very routine basis and so that was important to me.

5        Q.      Were the questions prepared after you

6  knew the identity of the candidates?

7        A.      That, I can't be sure of.  I know, like

8  I said, I think what I did was take some of the

9  questions and I may have had them just, you know, on

10  a word doc and just saved them from one to another

11  one and just made copies of that way.  I'm not sure.

12              I just changed some of the questions

13  around.  I'm pretty sure I did it that way because I

14  knew Janice, for one, was going to be an applicant.

15  I wasn't going to ask her the exact same questions

16  that were asked before.  So I would have to say it

17  was after we knew who the applicants were.

18        Q.      Just give me a second.  Can you refer

19  back to Exhibit No. 5, please, your affidavit.

20  Would you read on page three, 6 B, the very top?

21        A.      Okay.

22        Q.      See where it says:  What was the

23  criterion used by the selecting official in making

24  his or her selection?  Do you see that?

1    period, was anything associated with supervision

2    required listed?

3          A.    No, I think, you know, that's not

4    listed.  I can pretty much say that's a fair

5    statement to make.

6          Q.    Were you involved in the selection

7    process for Peter Attridge?

8          A.    I don't think I was.  I think Bob

9    LoPreste was the sole selecting official there.

10              MR. GOLDBERG:  Let me confer with my

11    client.  I will be right back.

12              MR. WILMOT:  Okay.

13              (Recess held.)

14              MR. GOLDBERG:  I am done with my

15    questioning.

16              MR. WILMOT:  I just have maybe six

17    questions or so.  It will be very quick.

18    <u>EXAMINATION BY MR. WILMOT</u>:

19          Q.    Mr. Persson, hypothetically speaking, if

20    Ms. Lang had come to you and asked how she could

21    enhance her candidacy for the labor relations

22    specialist position while the second posting was

23    pending, would you have given her advice if you had

24    any?

```
 1              MR. GOLDBERG:  Objection.

 2              THE WITNESS:  Can I answer?

 3              MR. GOLDBERG:  Sure.

 4              MR. WILMOT:  Absolutely.

 5        A.    Yes, I would have.

 6              MR, WILMOT:  We are objecting as to

 7  form; is that right?  Is that what we reserved, all

 8  objections except as to form?

 9              MR. GOLDBERG:  Yup.

10              MR. WILMOT:  A hypothetical question,

11  you're objecting to?

12              MR. GOLDBERG:  Yes.

13              MR. WILMOT:  All right.

14        Q.    Before making your decision to hire

15  Mr. DiVasta for the labor relations specialist

16  position, did you make any inquiries of his previous

17  supervisors to determine his abilities to determine

18  the functions of that position?

19        A.    No.

20        Q.    Prior to making your decision to hire

21  Mr. DiVasta for the labor relations specialist

22  position, did you make any inquiries of Mr. Walcott's

23  previous supervisors to make any determination as to

24  his abilities to perform the functions of the labor
```

1 have just brought the sheet down said, you know,

2 Dave, this is who I want to select.  I don't think it

3 was an in-depth meeting.

4            Probably did discuss it at some length

5 but very briefly, very brief discussion.  He knew who

I wanted.  He knew I was in need of getting someone

in the position and, therefore, he concurred with me.

     Q.    So you made your decision to hire

9 Mr. DiVasta before meeting with Mr. Couture?

10      A.    Yes, it was my -- it was my

11 determination that that is who I wanted and I knew I

12 had to get it by Dave Couture then by the district

13 manager as well and he does not rubber stamp these

14 things.

15      Q.    Was Ms. Lang's age a factor in your

16 decision not to hire her for the labor relations

17 specialist position in 2003?

18      A.    It was not, no, absolutely not.

19      Q.    Was Ms. Lang's sex or gender a factor in

20 your decision not to hire her for the labor relations

21 specialist position in 2003?

22      A.    No.

23      Q.    Was Mr. DiVasta's age a factor in your

24 decision to hire him for a labor relations specialist

# EXHIBIT C

1                              Volume I

2                            Pages 1 - 79

3

4                 UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
5
  JANICE E. LANG,                          )
6                    Plaintiff            )
                                           )
7        VS.                               )  05-10052-WGY
                                           )
8  JOHN E. POTTER, Postmaster General     )
   United States Postal Service,          )
9            Agency                       )

**COPY**

10

11        DEPOSITION OF STEPHEN MEIER, taken at the

12  request of the Plaintiff, pursuant to the applicable

13  provisions of the Federal Rules of Civil Procedure,

14  before Karen G. Farragher, RPR and Notary Public in

15  and for the Commonwealth of Massachusetts, on August

16  11, 2005, commencing at 10:05 a.m., having been

17  identified by the Notary Public through satisfactory

18  evidence of identity per Executive Order No. 455

19  (03-13) at the offices of Gary H. Goldberg, Esq., 120

20  Main Street, Worcester, Massachusetts.

21       _____
                  FOR THE RECORD
22            COURT REPORTING SERVICES
                  11 FISKE STREET
23       SHREWSBURY, MASSACHUSETTS  01545
                  (508) 845-1096
24

```
 1   be involved in that interview process?

 2        A.    How it came to be?  He just came in and

 3   asked, asked if I was going to be on the -- if I

 4   minded being on the review board or I'm not sure how

 5   he referred to it, just that he wanted to interview

 6   the applicants for that job at that time with the

 7   three labor relations specialists that were already

 8   there or the two, however many of us were already in

 9   that department.

10        Q.    So besides yourself, who else was on the

11   interviewing team?

12        A.    I believe it was just myself, Pete

13   Attridge and Mark Persson.

14        Q.    Did you ask him what your role was going

15   to be in this process?

16        A.    Yes, basically, yes, I did.

17        Q.    What did you ask him?

18        A.    I asked him what he wanted me to do.

19        Q.    What did he say?

20        A.    He said that he wanted -- I believe he

21   said he wanted us to come up, submit a couple

22   questions, then he was going to put questions

23   together and we were each going to ask questions.

24        Q.    Do you recall whether you did that or
```

1  I used to talk to him on a regular basis because he
2  was in an office under my responsibility.
3      Q.    Meaning customer service?
4      A.    Yes.
5      Q.    Did you ever socialize with Mr. DiVasta
6  outside of work?
7      A.    No.
8      Q.    Did Mr. DiVasta ever inform you that he
9  did not receive an interview in the first posting?
10     A.    Yes.
11     Q.    And do you recall how you learned of
12 that?
13     A.    Yes, he asked advice on how to improve.
14     Q.    How to improve what?
15     A.    How to improve his knowledge of labor
16 relations.
17     Q.    He asked that of you?
18     A.    Yes.
19     Q.    Do you know who else he may have asked
20 that of?
21     A.    I believe he went to Bob LoPreste.  I
22 know he went to Bob LoPreste and asked him the same.
23     Q.    What is your recollection as to what you
24 shared with him about how to gain additional

1   knowledge of labor relations?

2       A.      I really don't recall.  I believe I sat

3   down with him and just went over some, maybe my old

4   991 and things that he could do and maybe some things

5   that he was doing currently in his other job that he

6   could use as examples in an interview.

7               I really don't recall word for word

8   exactly what I did but it would have been along those

9   lines.

10      Q.      Do you recall whether or not he showed

11  you his 991?

12      A.      No, I don't recall.

13      Q.      Do you recall whether he showed you his

14  991 that was used for the reposted position?

15      A.      No, I don't recall.

16      Q.      Part of your interview that involved

17  Janice and Miles and Ralph, did you review any of

18  their 991s prior to the interview itself?

19      A.      I don't believe so.

20      Q.      Let me just go through some of these

21  exhibits for a moment, please.  I'm going to be going

22  through some documents that were previously

23  identified at Mr. Persson's deposition.

24              Exhibit No. 1 was a vacancy announcement

that was issued in March of '03.  This would have
been the initial posting for the labor relations
position.

4              Do you see where it has the listing of
5    the requirements for the job for level 17 and level
6    19?  Do you see that?
7         A.     Yes.
8         Q.     What is your current level today?
9         A.     19.
10        Q.     When you were put into the job back in
11   '99 or 2000, what level were you assigned?
12        A.     17.
13        Q.     How does one get from 17 to 19, if you
14   know?
15        A.     I believe after a period of time goes
16   by, I believe it's 18 months, if you have been in the
17   job and basically have demonstrated that you are able
18   to perform the duties of the 19 job and have been,
19   then your manager can boost you up to 19 if he
20   believes that you don't need any more development.
21   If you have developed into the 19, then after 18
22   months, you're put into the 19.
23        Q.     See where it says under the level 17 as
24   requirements one through nine?

```
 1        A.      Yes.

 2        Q.      Do you see them?  In reference to

 3   requirement numbers six, seven, eight and nine, just

 4   read them to yourself for a moment.

 5        A.      Okay.

 6        Q.      Are six, seven, eight and nine

 7   responsibilities that you currently have as a labor

 8   relations specialist?

 9        A.      Yes.

10        Q.      In reference to, I understand you said

11   before that you do a lot of staffing issues under

12   article twelve.  So my question really is not that

13   clear.

14               Since the time that you took over the

15   job back in '99 or 2000, up to the present time, have

16   those responsibilities of six, seven, eight and nine

17   been part of your duties and responsibilities?

18        A.      Yes.

19        Q.      Are they still currently part of your

20   duties and responsibilities or have they changed

21   based upon this current detail?

22        A.      They would all fit in.

23        Q.      So as part of the labor relations job,

24   you would need to be able to use computer systems to
```

1    collect information, analyze data and present

2    findings?

3         A.    Yes.

4         Q.    Is that just a built in part of your job

5    responsibilities?

6         A.    I don't know what you mean by built in.

7    I'm not sure what you mean.

8         Q.    Okay.  Is that something that you just

9    do as a regular component of your day to day

10   responsibilities as opposed to it being a separate

11   task?

12        A.    Yeah, yes.

13        Q.    In reference to number seven, you get

14   involved in issues associated with the rehab act and

15   the ADA?

16        A.    Yes.

17        Q.    And is that on a routine basis?

18        A.    It pretty much is, yes.

19        Q.    And, similarly, I assume that number

20   eight, where you have to evaluate and make

21   recommendations regarding reasonable accommodations,

22   would also be part of your responsibilities?

23        A.    Yes.

24        Q.    Is that more so today with the staffing

1    or not?

2        A.      Yes, it is more so today with the

3    staffing.

4        Q.      And as part of your job responsibilities

5    you need to have knowledge of Word and data

6    processing?

7        A.      Yes.

8        Q.      How much writing is involved in your

9    position?

10       A.      Writing on paper?

11       Q.      Well, not writing in terms of using a

12   pen and pencil but actually preparing the reports or

13   documents that would require the ability to write

14   clearly and comprehensibly?

15       A.      A fair amount.

16       Q.      How many arbitrations have you been

17   involved with over the past five years and you can

18   round it off?

19       A.      Geez.

20       Q.      If you want to say, for example, if it's

21   under ten, more than ten, under 20, more than 20?

22       A.      In the past five years?

23       Q.      Yes.

24       A.      When you say involved in, what do you

1    mean?

2         Q.      Where you actually have gone to an

3    arbitration, there was a hearing and that you were a

4    party who presented the arbitration?

5         A.      I would say more than 20.

6         Q.      Did you have any of that experience

7    prior to becoming a labor relations specialist?

8         A.      Yes.

9         Q.      What were you doing that caused you to

10   present or be the responsible party for arbitrations

11   on behalf of the postal service prior to the time you

12   were a labor relations specialist?

13        A.      I was a field advocate.

14        Q.      Is that something that you get special

15   training on?

16        A.      Just the regular advocacy training.

17        Q.      Do you believe, from your perspective,

18   to have advocacy training is a necessity to becoming

19   a labor relations specialist?

20        A.      To have it prior to the job?  Is that

21   the question?

22        Q.      Yes.

23        A.      No.

24        Q.      And what type of experience or

1   involvement did you have with step two grievances

2   prior to becoming a labor relations specialist?

3       A.    Just answering grievances in my own

4   office where I was a supervisor.

5       Q.    As customer service supervisor you mean?

6       A.    Yes.

7       Q.    When you say answer them, you mean you

8   would answer the step two piece?

9       A.    At some point during that customer

10  service supervisor, yes, I would answer step ones and

11  step twos.

12      Q.    Do you believe that it is required to

13  have step two experience prior to becoming a labor

14  relations specialist?

15      A.    No.

16      Q.    Let me show you what was marked as

17  Exhibit No. 8 in Mr. Persson's deposition.  I'm going

18  to inform you that document has been identified as

19  Mr. DiVasta's 991 that he submitted on or about March

20  31st of 2003 for the first posting?

21      A.    Okay.

22      Q.    I'm just going to ask you just to flip

23  through the document for the purpose of seeing if any

24  of this information that you recall seeing it before

1    today?

2                MR. WILMOT:  You're asking him to

3    identify the document?  I'm not sure what you're --

4                MR. GOLDBERG:  No, no, the document has

5    already been identified.  He wasn't sure whether in

6    prior testimony that he had seen it before.  I'm

7    asking him if by looking at it now whether that

8    refreshes his memory whether he's seen it before or

9    not.

10        A.    It does not refresh my memory whether I

11   have seen it before or not.

12        Q.    You have a particular memory of at least

13   talking to Mr. DiVasta about possibly improving his

14   991?

15        A.    Yes.  Well, I'm sorry, no, not about

16   improving his 991, but his knowledge in labor

17   relations as far as interviewing, not improving his

18   991 but improving his general knowledge of labor

19   relations.

20        Q.    But you don't recall specifically what

21   you may have shared with him or given him as

22   direction?

23        A.    Not word for word.  It would have been

24   grievances.  I talked to him about using examples

1   from the job that he was in currently at that time.

2   I pointed out to him some things that he does in that

3   job that's very similar to what we do in labor

4   relations.

5           Q.      For example?

6           A.      For example, writing discipline, dealing

7   with some reasonable accommodation issues.  Those are

8   just two that I remember right off the top of my

9   head.

10               FMLA, Family Medical Leave Act, he was

11  involved in that and I just remember saying, you

12  know, you just need to sharpen your knowledge in

13  that, read up on the act.  Read up on the ADA.  I

14  really didn't spend a lot of time with him on it.

15          Q.      Do you know, I think you mentioned Bob

16  LoPreste had spoken with him as well?

17          A.      Yes, I know Ralph went to Bob LoPreste

18  to ask him for advice also.

19          Q.      Do you know any substance of that

20  conversation that they had?

21          A.      No.

22          Q.      Do you know if he went to Dave Papa for

23  advice?

24          A.      I don't know.

1    candidates, just neither one of them really had a

2    great knowledge of labor relations.

3        Q.      Just work with me the best you can

4    through Exhibit No. 1 --

5        A.      Okay.

6        Q.      -- which is Ms. Lang's.  Can you, in

7    terms of number five, are you able to read what your

8    notes are?

9        A.      No, no.

10       Q.      Are you able to tell me what the Metz

11   Factors are?

12       A.      The Metz Factors are a group of factors

13   that have to be -- they don't have to be but that are

14   met to determine what a legitimate threat is.  There

15   is a group of factors we use.

16               They are, for instance, the employee or

17   person that was felt threatened, you know, what

18   actions did they take?  Did they call the police,

19   different things like that.

20       Q.      Are there a certain number of factors

21   that comprise the Metz Factors?

22       A.      I believe there is twelve of them.  I'm

23   not positive.

24       Q.      Do you know what those factors are?

     A.     All twelve?

2    Q.     Whatever they are.

3    A.     Right now off the top of my head, no.

4    Q.     Do you know what any number of the

5    twelve are?

6    A.     Yeah, did the employee notify the

7    police?  Did they file charges?  Did they take

8    themselves out of the situation?

9    Q.     Anything else --

10   A.     No.

11   Q.     -- that you can recall right now?

12   A.     No.

13   Q.     In terms of question number 15, are you

14   able to read what your answer is?

15   A.     You mean my notes?

16   Q.     Yes, I'm sorry.

17   A.     No.

18   Q.     Did you ever compare your notes to the

19   notes that were taken by either Mr. Attridge or

20   Mr. Persson to make sure that each one of you got the

21   full answer from the interviewee?

22   A.     Not the notes, no, we compared scores.

23   Q.     In terms of question number one, what is

24   the full answer to the question?

```
 1        A.      I believe it's article 17 and the
 2   conditions are that if the steward was in the
 3   performance of his job as a steward, we would pay
 4   them.
 5              A lot of times we have a steward that is
 6   a steward for more than one office.  We would pay
 7   them to investigate a grievance.  We would pay them
 8   while they are on the clock investigating a
 9   grievance.
10              We wouldn't pay them for travel time if
11   they had to travel to another office or if they are a
12   witness, we would pay them for their time testifying.
13   We wouldn't pay them for travel time and we would pay
14   them so long as they were the -- a lot of offices
15   have alternate stewards also.  So long as they were
16   the steward investigating a grievance in the office
17   that they are supposed to be in.
18        Q.      Is that something, the answer to
19   question one, is that something that you had known
20   prior to becoming a labor relations specialist?
21        A.      Yes.
22        Q.      How did you become aware of or have
23   knowledge of question number one?
24        A.      Because of my interactions with stewards
```

1    in my office where I was a supervisor.

2         Q.      Do you know whether or not it was a

3    requirement for the position of labor relations

4    specialist to have interaction with stewards prior to

5    assuming the position?

6         A.      No, it was not a requirement.

7         Q.      Question number two, can you tell me

8    what the answer should be for number two?

9         A.      For number two, the big difference

10   between regional panel and expedited panel, actually,

11   there's several differences.  One is if you're going

12   to -- well, the main one is that regional cases can

13   be cited and other cases, regular panel cases cannot

14   be cited.

15            If you're going to settle a case prior

16   to hearing for a regional case, you have to do it

17   before 30 days.  If you go inside that 30 days,

18   you're obligated to pay the arbitrator a certain

19   amount of money depending how far into the 30 days

20   you are.  On regular panel -- I mean, on expedited

21   panel cases, you have to settle the case if you're

22   going to settle it, outside of seven days.  If you go

23   inside of seven days, then you're obligated for

24   payment to the arbitrator.

1              And again, the big difference what we

2     look for is regional panel cases are citable.

3     Expedited are not citable.  Expedited is discipline,

4     mostly lower level discipline cases and your regional

5     cases are contract cases, more complicated issues.

6         Q.      When you use the term citable, what do

7     you mean by that?

8         A.      I mean if you have a case and you want

9     to refer to that case, you might want to cite that

10    case.

11        Q.      So it has some level of precedence and

12    authority within your argument?

13        A.      It's for persuasive value only.  You can

14    only cite it for persuasive value.  Doesn't have any

15    value in any other case unless it's a national case.

16        Q.      Is that something, the answer to

17    question number two, is that something that you had

18    known prior to becoming a labor relations specialist?

19        A.      Yes, because I was a field advocate.

20        Q.      You testified before that the advocacy

21    training was not a requirement for the position; is

22    that correct?

23        A.      I don't believe it was.

24        Q.      What would be the answer to number

1    three, please?

2        A.      The Douglas Factors are a set of factors

3    that we use for MSPB or MSPB cases.  It's a set of

4    twelve, twelve factors that you look for to show if

5    there was a violation, basically, for MSPB hearings.

6        Q.      Were you looking for identification of

7    what the factors are?

8        A.      No, I personally was not, no.

9        Q.      Are there twelve different factors?

10       A.      Yes.

11       Q.      Do you know what the factors are?

12       A.      Not off the top of my head right now.

13       Q.      In terms of the Douglas Factors, is that

14   something that you were knowledgeable of prior to

15   becoming a labor relations specialist?

16       A.      To an extent, yes.

17       Q.      And how did you become knowledgeable?

18       A.      As a field advocate.

19       Q.      What is the answer to number four,

20   please, that you were looking for?

21       A.      Basically, we were just looking for what

22   the person, what advice the interviewee would give in

23   that situation.  We were looking for to send a person

24   to emergency fitness for duty, get all the, what we

call the OHNA, occupational nurse, who would try to

2  set up what we call a fitness for duty, get him to

3  the doctor's or somebody that can determine whether

4  the person was impaired.

5           Basically, get the person off the work

6  room floor, how would the interviewee get the person

7  off the work room floor or what the interviewee would

8  do if the person refused to go to the doctor's. What

9  the interviewee would do, how would the interviewee

10  get the person out of the workplace and, basically,

11  how they would handle that situation.

12     Q.     Anything further that you want to add to

13  your answer to number four?

14     A.     No.

15     Q.     Turn to the second page, please. What

16  would be your answer to number six?

17     A.     How would I answer this question?

18     Q.     No, I'm looking for what is the answer

19  to number six.

20     A.     Well, some things we were looking for is

21  that we would verify if the employee was a veteran.

22  We would verify if the person received their due

23  process rights prior to the discipline.

24           We would be looking for prior

1   discipline, what prior discipline the employee had on

2   record, if part of the due process is what we refer

3   to as a day in court, we would be sure that was

4   given, what notes the supervisor had taken during the

5   day in court.

6           So we would want to hear that the person

7   isn't protected, the absences were not protected

8   under FMLA. We would try and make sure he -- we

9   ensure to make sure the absences were recorded

10  properly and 3972 and basically sit down with the

11  supervisor, go over all the absences, just ensure

12  that the discipline is actually -- just that the

13  removal is actually justified and that the employee

14  is receiving due process and FMLA is not an issue.

15          Q.     You have down here a note that says

16  history of person - not, I think it says past

17  discipline. Did I read it correctly?

18          A.     Yeah, I don't know what I meant.

19          Q.     Is the word past or post?

20          A.     It looks to me like that's past.

21          Q.     Okay.

22          A.     I honestly don't remember if that's your

23  question. It may have been something Janice said.

24  She may have said history of person but maybe I was

looking for past discipline.

    Q.    Okay.  Tell me what the answer would be to number seven, please?

4    A.    That would be article three of the

5 national agreement.  In lower level offices

6 postmasters have -- postmasters routinely perform

7 what we call bargaining unit work in some small level

8 offices.  I believe it's level 15 and below.

9          Other than that, an unforeseen

10 circumstance is what we call an emergency situation

11 which we refer to as something that is unforeseen,

12 something that you -- if I knew ten people were going

13 to be off tomorrow and I knew that today and I didn't

14 plan for it, it doesn't justify me performing

15 bargaining unit work.  I would have been looking for

16 an example similar to that.

17    Q.    Is that something you knew prior to

18 becoming a labor relations specialist?

19    A.    To some extent, yes.

20    Q.    How did you become aware of it?

21    A.    Just from being a supervisor in a level

22 office I was in.

23    Q.    As a labor relations specialist, do you

24 supervise any staff?

1       A.       No.

2       Q.       Tell me what the answer would be to

3  number eight, please?

4       A.       The answer would be I would tell the

5  supervisor what the Weingarten rights are, basically.

6  I would tell the supervisor that if the employee

7  wanted to invoke his Weingarten rights, you have to

8  get the employee a steward before you can continue

9  questioning if and only if the employee that is being

10 interviewed could result in the employee being

11 disciplined.

12           If you were asking the employee about a

13 situation that occurred in the office that maybe he

14 saw that doesn't involve him or her and he wasn't the

15 subject of the questioning, then he needs to continue

16 answering your questions without a steward because

17 Weingarten, you can only invoke Weingarten rights if

18 you're the one that's going to be investigated or

19 disciplined or it's reasonable to assume you're going

20 to be the one that is disciplined.

21           We don't have to -- I would also inform

22 the supervisor that we are not responsible to tell

23 the employee of these rights.  We are not.

24           It's not like on TV when you see someone

1    arrested, you have to give them Miranda rights.  We

2    don't inform them of their rights.  If they ask for a

3    steward, then we have to give them a steward if they

4    are the ones being disciplined.

5         Q.      Did you know the answer to this question

6    prior to becoming a labor relations specialist?

7         A.      I would say no.

8         Q.      Can you tell me what the answer to

9    number nine is, please?

10        A.      Abolishing a position is if we abolish a

11   duty assignment of an employee -- I'm sorry, a duty

12   assignment that is occupied and revert a position,

13   you revert a duty assignment that's vacant.

14             Basically, both terms means that there

15   is going to be one less duty assignment in the

16   office.  It's not -- I would be looking for the

17   difference between a repost, which means there is no

18   reduction in the number of duty assignments and

19   abolishment is the reduction in the number of duty

20   assignments in the office.

21             The only difference between that and

22   reversion is one, the position is occupied and one,

23   the position is vacant.  Those are the things that I

24   would be looking for.

1    Q.    In the abolishment of a position, is the

2    position occupied or vacant?

3    A.    It's occupied.

4    Q.    And in the reversion, it's vacant?

5    A.    It's vacant and there is different

6    things you have to do that would have been in my mind

7    a plus if the applicants went on to talk about the

8    different notifications and the different things you

9    have to do when you're abolishing compared to

10   reversions but, basically, what we were looking for

11   is what the difference is.

12   Q.    And was that something that you were

13   aware of prior to becoming a labor relations

14   specialist?

15   A.    No.

16   Q.    Number ten what would be your answer,

17   please?

18   A.    Basically, an employee is eligible for

19   FMLA if they have been employed for a year and they

20   have one thousand two hundred fifty work hours

21   directly previously to the date back from when they

22   requested the leave.

23   There is a couple.  I haven't dealt with

24   FMLA for a couple years, so I'm a little rusty on it

1   but, basically, there is requirements that we have to

2   be eligible for FMLA.

3          Q.      What is the third note under number ten?

4          A.      Looks like twelve weeks of leave.    I

5   believe that -- I believe twelve weeks leave, no

6   discipline I think that says.  I think what it was is

7   that she knew how much leave that they get.  I really

8   can't make it out.

9          Q.      Is that something that you were aware of

10  prior to you becoming a labor relations specialist?

11         A.      Yes.

12         Q.      How did you become aware of that?

13         A.      Through training.

14         Q.      Tell me your answer, please, to number

15  11?

16         A.      Things that I would be looking for is

17  FMLA is a law.  Sick leave dependent care is a

18  contractual thing.  It is given to our employees.

19  It's negotiated in our contract.  It's not a law.

20             It's separate, however, several times

21  leave taken under sick leave could be covered under

22  the FMLA.  I'd be looking for the differences in the

23  hours.  Basically, FMLA is -- I mean, dependent care

24  sick leave, you can only use 80 hours.

1                  The big difference is you can be

2    disciplined for using sick leave and dependent care.

3    It's not a protected absence.  However, some of it

4    could be protected but, initially, it is not a

5    protected absence, where FMLA absences are protected.

6    You can't discipline an employee for taking FMLA.

7    Basically, those are the big differences that I was

8    looking for.

9         Q.      And your knowledge of the sick leave for

10   dependent care, was that learned prior to becoming a

11   labor relations specialist?

12        A.      I don't think so because I don't think

13   we had it then.

14        Q.      Okay.  Question number twelve, what

15   would be your answer, please?

16        A.      The answer to that would be that you

17   address the merits of the grievance.  However, you

18   also address that the -- you make an argument that

19   the grievance is untimely and you state why, but you

20   also need to address the merits of the grievance.

21        Q.      Is that something that you were aware of

22   prior to becoming a labor relations specialist?

23        A.      Yes.

24        Q.      And how did you become aware of that?

1      A.      From my experience answering grievances

2  as a supervisor.

3      Q.      How about question 13, what would be

4  your answer to that, please?

5      A.      Basically, just that you would explain

6  to the steward that he needs to conduct himself -- he

7  or she needs to conduct himself or herself

8  professionally.

9          No one is going to get anywhere yelling

10  and screaming and take a break, if you have to, and

11  come back later or reschedule or give the, you know,

12  give the steward an opportunity to calm down but not

13  to let the steward act in an unprofessional manner

14  like that, not to let them carry on like that.

15          Somehow end the situation.  Whether you

16  come back to it later or reschedule it on another

17  day.

18      Q.      Is the answer to that question something

19  that you had learned prior to your labor relations

20  specialist position?

21      A.      Yes.

22      Q.      How did you become aware of that?

23      A.      Basically, from answering grievances and

24  sitting with union stewards as a supervisor.

1      Q.      What is your answer to fourteen, please?

2      A.      There is only a few circumstances where

3  the union can initiate -- to initiate a grievance at

4  step two.  Basically, any issue, any grievance

5  pertaining to safety.  Where the union believes a

6  member's safety is in jeopardy or a member has been

7  discriminated against, they can initiate a grievance

8  right at the step two process and skip over the step

9  one process.

10      Q.      Are there any particular articles that

11  are relevant?

12      A.      It would be article 15, article -- I

13  believe it's article 15.

14      Q.      I notice Janice put down article two and

15  article 14?

16      A.      That's what I put down on this.

17      Q.      I apologize for my question.  Your notes

18  reflect article two and article 14.  Are they

19  relevant to the answer?

20      A.      I don't -- I don't know.  They could be.

21  I honestly don't know right now.

22      Q.      Okay, how about your answer to question

23  number 15, please.

24      A.      Basically, by what some things I would

1    use to manage my time, outlook calendar, whether it

2    be a notebook, outlook or some process that you have

3    to make sure you manage your time.  Something, just

4    to ensure that the interviewee had something in

5    place, whether it be outlook, whether they use the

6    alarm system or the calendar system in outlook or

7    whether they have their own system and what the

8    system is.

9         Q.    So question 15 is more in line as a time

10   management approach?

11        A.    Yes.

12        Q.    Do you have today any particular

13   recollection or memory of the interview that you and

14   Mr. Persson and Mr. Attridge had with Ms. Lang?

15        A.    Any recollection?  Some.

16        Q.    What do you recall about the interview

17   itself?

18        A.    Just Janice's interview?

19        Q.    For right now.

20        A.    Just that she was nervous, appeared to

21   be very nervous.  That's really about it.

22        Q.    Do you recall specifically any

23   particular comments that she made that may have

24   stayed with you through today?

EXHIBIT D

```
 1                              Volume I
                             Pages 1 - 69
 2

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
     JANICE E. LANG,                       )
 5                    Plaintiff            )
                                           )
 6       VS.                               )   05-10052-WGY
                                           )
 7   JOHN E. POTTER, Postmaster General    )
     United States Postal Service,         )
 8             Agency                       )
```

**COPY**

```
 9

10

11       DEPOSITION OF RALPH DIVASTA, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   12, 2005, commencing at 10:15 a.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21

22                    FOR THE RECORD
                 COURT REPORTING SERVICES
23                   11 FISKE STREET
             SHREWSBURY, MASSACHUSETTS   01545
24                   (508) 845-1096
```

1    Mr. Meier?

2        A.    With Mr. Persson, I went to him and

3    expressed an interest in the position, told him I was

4    going to be applying for it, and just asked him in

5    general if there is anything that I could read up on,

6    learn, try to get familiar with, that might help me

7    in terms of this applying for the position.

8        Q.    Are you able to put a time frame on that

9    conversation?

10       A.    No.  It was before the -- it was before

11   this, at the time around the application, when that

12   was going in.

13       Q.    So if the application is dated around

14   March 31st of '03, somewhere around that time period?

15       A.    Somewhere in that general area.

16       Q.    Okay.  And you believe it was before you

17   actually completed the 991 or after you completed the

18   991?

19       A.    I'm not positive.

20       Q.    What did Mr. Persson say to you?

21       A.    Mark just informed me that he would

22   probably be the deciding official on the position so,

23   you know, he didn't -- he stated that he couldn't

24   give me anything specific.

1          He just informed me of what they do in

2     labor relations, what their responsibilities are,

3     what the job consists of and sent me on my way.

4          Q.     What did he tell you about the labor

5     relations responsibilities?

6          A.     Just basically what they do, you know,

7     in terms of day to day work, working with the

8     associate offices, working with managers, working

9     with the unions.

10         Q.     Had you reviewed the job description?

11         A.     Yes.

12         Q.     Isn't that pretty much what the job

13    description indicates?

14         A.     Yup.

15         Q.     So did Mr. Persson give you any further

16    insights beyond what the job description states?

17         A.     No, not that I can recall.

18         Q.     How long was your discussion with

19    Mr. Persson?

20         A.     15 minutes, 20 minutes tops.

21         Q.     Was it in his office?

22         A.     I believe it was.

23         Q.     Was this something that was a scheduled

24    appointment with you and him?

```
 1   information he needed but that was basically it.
 2         Q.      In terms of the three people who were
 3   the candidates and who were the interviewers, of the
 4   three, would Mr. Attridge have been the one that you
 5   knew the least?
 6         A.      Yes.
 7                 MR. WILMOT:  Objection.
 8         A.      Sorry.
 9                 MR. WILMOT:  That's okay.
10                 MR. GOLDBERG:  Let's take a break for a
11   second.
12                 MR. WILMOT:  Sure.
13                 (Recess held.)
14                 MR. GOLDBERG:  Just a few brief
15   questions.
16         Q.      In reference to your conversation with
17   either Mr. LoPreste or Mr. Papa, when you first found
18   out that you had not gotten an interview by the
19   initial review board, was there anything specific
20   that they had said to you as to why you did not get
21   the interview?
22         A.      Yeah, I was basically told that if you
23   had a zero on a KSA on their rating, then you were
24   automatically disqualified.
```

# EXHIBIT E

25.    Documents identifying female applicants for labor relations specialist positions in the Middlesex-Essex District from 1992 through the present, but not including documents already produced for 03-020 and 08120.

**Response to Document Request No. 25:** Defendant objects to this document request on the grounds that it is vague, overly broad, and unduly burdensome. Without waiving these objections, and subject to the confidentiality agreement entered into by the parties, Defendant refers Plaintiff to the attached documents, which are within Defendant's possession, custody or control and are responsive to this request. Defendant reserves the right to supplement this response in the event that it locates documents that are responsive to this request.

26.    Documents identifying training records of Mark Persson relating to USPS personnel selection practices and procedures training prior to May 2003.

**Response to Document Request No. 26:** Subject to the confidentiality agreement entered into by the parties, Defendant refers Plaintiff to the attached documents, which are within Defendant's possession, custody or control and are responsive to this request.

27.    Documents identifying training records of Stephen Meier relating to USPS personnel selection practices and procedures training prior to May 2003.

**Response to Document Request No. 26:** Subject to the confidentiality agreement entered into by the parties, Defendant refers Plaintiff to the attached documents, which are within Defendant's possession, custody or control and are responsive to this request.

28.    Documents identifying training records of Peter Attridge relating to USPS

personnel selection practices and procedures training prior to May 2003.

  **Response to Document Request No. 26:** Subject to the confidentiality agreement

entered into by the parties, Defendant refers Plaintiff to the attached documents, which are within

Defendant's possession, custody or control and are responsive to this request.

      JOHN E. POTTER, POSTMASTER
      GENERAL, UNITED STATES POSTAL
      SERVICE,

      By its Attorneys,

      MICHAEL J. SULLIVAN,
      United States Attorney


      DAMIAN W. WILMOT
      Assistant U.S. Attorney
      1 Courthouse, Suite 9200
      Boston, MA 02210
      (617) 748-3398

## CERTIFICATE OF SERVICE

Suffolk, ss.      Boston, Massachusetts
        September 28, 2005


  I, Damian W. Wilmot, Assistant U.S. Attorney, do hereby certify that I caused a copy of the foregoing document to be served on Plaintiff's attorney, Gary Goldberg, 120 Main Street, Worcester, MA 01608, by first class mail, postage pre-paid.

      DAMIAN W. WILMOT
      Assistant U.S. Attorney

USPS0251

HUMAN RESOURCES INFORMATION SYSTEM
EMPLOYEE TRAINING HISTORY REPORT
CURRENT THROUGH 08-15-2005

RECORDED 08-15-2005

PAGE: 5

| COURSE NUMBER | COURSE TITLE | OPER NUMBER | SUBJECT AREA CODE | COMPLETED | GE CLOCK | TRAINING FURNCE | START DATE | COMPLETE DATE | TRAINING HOUR/MIN |
|---|---|---|---|---|---|---|---|---|---|
| 32M00-00 | COMPUTER FAMILIAR | | | Y | Y | 24-0093 | 09-01-1992 | 09-01-1992 | 4:00 |
| 32M51-95 | INTRO TO WORD PROCESS-ALLIED Pt.2 | | | Y | Y | 24-0093 | 01-10-1992 | 01-10-1992 | 4:00 |
| 32M51-94 | INTRO TO WORD PROCESS ALLIED Pt. 1 | | | Y | Y | 24-0093 | 01-23-1992 | 01-23-1992 | 4:00 |
| 21310-00 | PRESENTATION SKILL | | | Y | Y | 24-0093 | 09-01-1991 | 09-01-1991 | 24:00 |
| 31M82-00 | CULTURAL DIVERSITY | | | Y | Y | 24-0093 | 09-01-1991 | 09-01-1991 | 3:00 |
| 31M28-00 | MANUAL TIME & ATTN | | | Y | Y | 24-0093 | 09-01-1991 | 09-01-1991 | 4:00 |
| 43511-01 | NEW DRIVER ORIENT | | | Y | Y | 24-0093 | 09-01-1991 | 09-01-1991 | 13:00 |
| 21310-00 | PRESENTATION SKILLS TRAINING | | | Y | Y | 24-0799 | 07-29-1991 | 09-02-1991 | 24:00 |
| 31M82-00 | CULTURAL DIVERSITY | | | Y | Y | 24-0093 | 08-01-1991 | 08-01-1991 | 3:00 |
| 31M28-00 | MANUAL TIME & ATTN | | | Y | Y | 24-0092 | 08-01-1991 | 08-01-1991 | 4:00 |
| 43511-01 | NEW DRIVER ORIENT | | | Y | Y | 24-0093 | 08-01-1991 | 08-01-1991 | 13:00 |
| 43511-01 | DRIVER ORIENTATION (CLASSROOM) | | | Y | Y | 24-0799 | 07-17-1991 | 07-18-1991 | 13:00 |
| 21M31-96 | BRIDGES MODULE 6 | | | Y | Y | 24-0093 | 06-25-1991 | 06-25-1991 | 3:00 |
| 31M51-00 | BRIDGES (CULTURAL DIVERSITY) | | | Y | Y | 24-0799 | 06-10-1991 | 06-10-1991 | 3:00 |
| 31M51-00 | CRL MANAGEMENT WOR | | | Y | Y | 24-0093 | 04-01-1991 | 04-01-1991 | 13:00 |
| 31M28-00 | ATTENDANCE CONTROL REVIEW | | | Y | Y | 24-0798 | 03-29-1991 | 03-29-1991 | 4:00 |
| 31765-01 | MANAGING BY PARTICIPATION 101 | | | Y | Y | 24-0799 | 03-20-1991 | 03-21-1991 | 13:00 |
| 31357-96 | SKILL MANAGEMENT | | | Y | Y | 24-0093 | 09-03-1990 | 09-03-1990 | 2:00 |
| 31357-96 | SKILL MANAGEMENT WORKSHOP | | | Y | Y | 24-0799 | 05-03-1990 | 05-03-1990 | 2:18 |
| 31M54-03 | H.A.S.P. (HUB & SPOKE PROJECT) | | | Y | Y | 24-0799 | 04-11-1990 | 04-11-1990 | 4:00 |
| 31552-00 | ESTABLISHING HAS I | | | Y | Y | 24-0093 | 04-01-1990 | 04-01-1990 | 0:00 |
| 31551-00 | HAS SELECTION METH | | | Y | Y | 24-0093 | 04-01-1990 | 04-01-1990 | 7:00 |
| 31M65-00 | CRL MANAGEMENT WOR | | | Y | Y | 24-0093 | 04-01-1990 | 04-01-1990 | 3:00 |
| 31552-00 | ESTABLISHING HAS REQUIREMENTS | | | Y | Y | 24-0799 | 03-20-1990 | 03-20-1990 | 0:18 |
| 31553-00 | HAS SELECTION METHODS | | | Y | Y | 24-0799 | 03-20-1990 | 03-20-1990 | 7:18 |
| 31765-00 | MANAGING BY PARTICIPATION 101 | | | Y | Y | 24-0799 | 03-20-1990 | 03-20-1990 | 3:00 |
| 31M54-03 | JOB PREP IMPACT TR | | | Y | Y | 24-0093 | 03-01-1989 | 03-01-1989 | 4:00 |
| 31M54-03 | H.A.S.P. (HUB & SPOKE PROJECT) | | | Y | Y | 24-0799 | 08-21-1989 | 08-21-1989 | 4:00 |

**** DATA RESTRICTED INFORMATION ****

U.S. POSTAL SERVICE
## RECORD OF TRAINING

| NAME OF PERSON COMPLETING COURSE | TRAINEE POSITION TITLE | SOCIAL SECURITY NO. |
|---|---|---|
| PERSSON, Mark A. | Tour Supt. | ■■■■■ |

| POSTAL INSTALLATION | TITLE OF COURSE | |
|---|---|---|
| BOSTON DIVISION | EAS SELECTION METHODS TRAINING | #21553-00 |

| NAME AND LOCATION OF TRAINING FACILITY | DATE COURSE COMPLETED | RATING OR GRADE |
|---|---|---|
| HUMAN RESOURCES BOSTON MA  02205-9410 | Feb. 20, 1990 | SATISFACTORY |

INFORMATION ON COURSE

NUMBER OF HOURS OF INSTRUCTION
**8**

MAJOR ELEMENTS OF COURSE

o   Application Review Techniques

o   Interviewing Techniques

REMARKS

| DATE | TITLE | SIGNATURE |
|---|---|---|
| 02/22/90 | FIELD DIRECTOR HUMAN RESOURCES | |

PS Form 1734
Oct. 1970

**U.S. POSTAL SERVICE**
# RECORD OF TRAINING

| NAME OF PERSON COMPLETING COURSE | TRAINEE POSITION TITLE | SOCIAL SECURITY NO. |
|---|---|---|
| PERSSON, Mark A. | Tour Supt. | |

| POSTAL INSTALLATION | TITLE OF COURSE | |
|---|---|---|
| BOSTON DIVISION | VIDEO - "ESTABLISHING EAS REQUIREMENTS" | #21552-00 |

| NAME AND LOCATION OF TRAINING FACILITY | DATE COURSE COMPLETED | RATING OR GRADE |
|---|---|---|
| HUMAN RESOURCES BOSTON MA 02205-9410 | Feb. 20, 1990 | Satisfactory |

**INFORMATION ON COURSE**

**NUMBER OF HOURS OF INSTRUCTION**
20 minutes

**MAJOR ELEMENTS OF COURSE**

This video is provided as an introduction to the Handbook on Establishing Nonbargaining Requirements. The film presents the basic philosophies of EAS requirements review and development including:

- requirements must be related to the duties of the position;

- requirements are normally written as knowledge or ability statements;

- only requirements which are critical or important to the job should be included;

- only requirements needed at entry should be included, rather than those that can be learned after a short orientation period or after training you are willing to provide;

- only requirements useful for distinguishing between minimally acceptable and superior employees should be included;

**REMARKS**

- only consider "ability to mean present competence rather than capacity to learn; and

- don't use the old standby "well-developed human relations and communication skills."

| DATE | TITLE | SIGNATURE |
|---|---|---|
| 02/21/90 | FIELD DIRECTOR HUMAN RESOURCES | |

PS Form 1780
Oct. 1970

USPS0253

RPT040P1

HUMAN RESOURCES INFORMATION SYSTEMS
EMPLOYEE TRAINING HISTORY REPORT
CURRENT THROUGH: 09-15-2005

PRODUCED: 09-15-2005

PAGE: 4

EMPLOYEE ID: ●●●●●●●●●
NAME: SMITH, STEPHEN M
INSTALLATION: MASSACHUSETTS CM DISTRICT
FINANCE NO: 24-4583
PAY LOCATION: 018

PAY SCHEDULE CODE: M
LEVEL: 19
STATUS CODE: A
FLAG CODE: X
DED/ACT CODE: 19-0
LOC: 62
OCC CODE: 0233-5016
JOB TITLE: LABOR RELATION SPCL

| COURSE NUMBER | COURSE TITLE | OFFER NUMBER | SUBJECT AREA CODE | QUALIFIED | ON CLOCK | TRAINING FINANCE | START DATE | COMPLETE DATE | TRAINING HOUR/MIN |
|---|---|---|---|---|---|---|---|---|---|
| SNTM1-01 | STOP - Module 1 | 1 | | Y | Y | 24-9554 | 07-22-1997 | 07-22-1997 | 2:30 |
| 16152-00 | Assertiveness Training | 1 | | Y | Y | 24-9554 | 06-18-1997 | 06-18-1997 | 8:00 |
| 13111-00 | EVA (Economic Value Added) | 1 | | Y | Y | 24-9554 | 02-04-1997 | 02-04-1997 | 1:00 |
| 18233-00 | Customer Perfect | 1 | | Y | Y | 24-9554 | 02-04-1997 | 02-04-1997 | 1:00 |
| 18240-00 | Markets/Competition | 1 | | Y | Y | 24-9554 | 02-04-1997 | 02-04-1997 | 1:00 |
| 18244-00 | Business Indicators & Goals | 1 | | Y | Y | 24-9554 | 02-04-1997 | 02-04-1997 | 1:00 |
| 18250-00 | Corporate Messaging | 1 | | Y | Y | 24-9554 | 02-04-1997 | 02-04-1997 | 4:00 |
| 18204-00 | EEFC Training | 1 | | Y | Y | 24-9554 | 01-29-1997 | 01-29-1997 | 0:30 |
| 22556-92 | Correcting Safety Deficiencies | 1 | | Y | Y | 24-9554 | 01-29-1997 | 01-29-1997 | 1:00 |
| 64353-92 | Delivery Operations Training | 1 | | Y | Y | 24-9554 | 01-29-1997 | 01-29-1997 | 0:30 |
| DRT16-13 | Delivery Operations Management | 1 | | Y | Y | 24-9554 | 08-08-1996 | 08-08-1996 | 6:00 |
| 17813-00 | Rural Delivery Basics | 7 | | Y | Y | 24-9554 | 04-03-1996 | 04-03-1996 | 16:00 |
| CSVM1-30 | Excellent Service - Reinforcing the Vision | 1 | | Y | Y | 24-9554 | 03-05-1996 | 03-05-1996 | 6:00 |
| 21558-00 | Workplace Violence Awareness | 1 | | Y | Y | 24-9554 | 01-11-1996 | 01-11-1996 | 8:00 |
| 60254-01 | CustomerPerfect! | 1 | | Y | Y | 24-9554 | 11-15-1995 | 11-15-1995 | 2:00 |
| 45502-00 | Credit/Debit Card Training | 1 | | Y | Y | 24-9554 | 11-14-1995 | 11-14-1995 | 3:00 |
| 21505-00 | Interview Training | 7 | | Y | Y | 24-9554 | 11-02-1995 | 11-02-1995 | 6:00 |
| 11225-00 | Labor Relations II | 6 | | Y | Y | 24-9554 | 04-17-1995 | 04-21-1995 | 40:00 |
| 44591-94 | DEL SVCS SPVRS IN | | | Y | Y | 24-9554 | 10-01-1992 | 10-01-1992 | 8:00 |
| 17234-00 | SUPERV LEADERSHIP | | | Y | Y | 24-9554 | 07-01-1992 | 07-01-1992 | 40:00 |
| 64852-00 | JOB PERF INFRV TRN | | | Y | Y | 24-9554 | 07-01-1992 | 07-01-1992 | 3:00 |
| 21N53-00 | CULTURAL DIVERSITY | | | Y | Y | 24-9554 | 05-01-1992 | 05-01-1992 | 8:00 |
| 11225-94 | ADV MGMT PROG PH 1 | | | Y | Y | 24-9554 | 04-01-1992 | 04-01-1992 | 4:00 |
| 17210-00 | DS SKLS BLDG | | | Y | Y | 24-9554 | 04-01-1992 | 04-01-1992 | 80:00 |
| 17510-00 | SUPV BASICS DS | | | Y | Y | 24-9554 | 04-01-1992 | 04-01-1992 | 40:00 |
| 17503-00 | SUPV BASICS BR/ADM | | | Y | Y | 24-9554 | 03-01-1992 | 03-01-1992 | 80:00 |
| 44591-94 | DEL SVCS SPVRS IN | | | Y | Y | 24-9554 | 11-01-1991 | 11-01-1991 | 6:00 |
| 31504-94 | ORIGIN-DESTINATION | | | Y | Y | 24-9554 | 08-01-1991 | 08-01-1991 | 4:00 |

**** USPS RESTRICTED INFORMATION ****

USPS0254

***** THIS RESTRICTED INFORMATION *****

REPORT:

HUMAN RESOURCES INFORMATION SYSTEM
EMPLOYEE TRAINING HISTORY DATA
COURSE TRAINING ACTIVITY REPORT

EMPLOYEE ID:
NAME:
INSTALLATION: MASSACHUSETTS CS DISTRICT
ATTLEBORO, PETER P
FINANCE NO:
PAY LOCATION: 018
24-6593

PROCESS DATE: 09-15-2005    PAGE: 1

DATE SCHEDULE CODE: 9
LEVEL: 14
GRADE TYPE: Y
PS&A CODE: Y
LSA/ CODE: 19-0
OCC CODE: 81
RSC/RSC CODE:
OCC CODE:
OCC CODE:
JOB TITLE:    0731-5516
LABOR RELATIONS EMPL

| COURSE NUMBER | COURSE TITLE | OFFER NUMBER | SUBJECT AREA CODE | QUALIFIED | OF CLOCK | TRAINED FINANCE | START DATE | COMPLETE DATE | TRAINING HOUR/MIN |
|---|---|---|---|---|---|---|---|---|---|
| 60190-04 | QUALITY FIRST! (14 HOURS) | | | Y | Y | 24-0799 | 10-31-1994 | 10-31-1994 | 24:00 |
| 10273-94 | Crisis Prevention Training | | | Y | Y | 24-0799 | 05-16-1994 | 05-16-1994 | 4:00 |
| 11281-75 | EXECUTIVE PERFORMANCE | | | Y | Y | 24-0799 | 04-01-1994 | 04-01-1994 | 8:00 |
| 11206-97 | Somerv Postal Team Building | | | Y | Y | 24-0799 | 01-13-1994 | 01-14-1994 | 16:00 |
| 55644-03 | ACCOUNT INVESTIGATION | | | Y | Y | 24-0399 | 11-23-1993 | 11-24-1993 | 16:00 |
| 55644-43 | ACCOUNT INVESTIGATION BASICS | | | Y | Y | 24-0799 | 11-23-1993 | 11-24-1993 | 16:00 |
| 11221-94 | GETTING BACK TO BUSINESS (EEPV) | | | Y | Y | 24-0799 | 05-06-1993 | 05-06-1993 | 4:00 |
| 43301-05 | FINANCIAL TRAINING FOR EAS EMPLOYEES | | | Y | Y | 24-0799 | 09-01-1992 | 09-01-1992 | 16:00 |
| 43513-06 | LRV EEO ORIENTATED | | | Y | Y | 24-0799 | 09-01-1992 | 09-01-1992 | 2:00 |
| 43513-05 | LRV EEO TRAINING | | | Y | Y | 24-0799 | 07-16-1992 | 07-16-1992 | 2:14 |
| 11015-00 | GENERAL AUTOMATION | | | Y | Y | 24-0799 | 07-01-1992 | 07-01-1992 | 8:00 |
| 40911-00 | BRD 8 SKILLED SER | | | Y | Y | 24-0799 | 07-02-1992 | 07-02-1992 | 3:00 |
| 44952-00 | JOB PREP INFRY THM | | | Y | Y | 24-0799 | 07-01-1992 | 07-01-1992 | 3:00 |
| 21715-10 | ROLL FLOW TRAINING (1991-1992) | | | Y | Y | 24-0399 | 06-04-1992 | 06-04-1992 | 8:00 |
| 44952-05 | PLANNED PIVOT TRAINING - 2ND TIME | | | Y | Y | 24-0799 | 05-05-1992 | 05-05-1992 | 3:00 |
| 17573-95 | FINANCIAL TRAINING FOR SUPERVISORS | | | Y | Y | 24-0799 | 02-06-1992 | 02-07-1992 | 16:00 |
| 11325-94 | MANAGING CHANGE | | | Y | Y | 24-0799 | 11-07-1991 | 11-07-1991 | 4:00 |
| 40911-00 | BRD SKILLED SERVICE | | | Y | Y | 24-0799 | 11-04-1991 | 11-04-1991 | 3:18 |
| 31918-00 | MANUL TIME & LATE | | | Y | Y | 24-0799 | 09-01-1991 | 09-01-1991 | 4:00 |
| 44952-00 | JOB PREP INFRY THM | | | Y | Y | 24-0799 | 09-02-1991 | 09-02-1991 | 3:00 |
| 31918-00 | MANUL TIME & LATE | | | Y | Y | 24-0799 | 08-01-1991 | 08-01-1991 | 4:00 |
| 44952-00 | JOB PREP INFRY THM | | | Y | Y | 24-0799 | 08-02-1991 | 08-02-1991 | 3:00 |
| 41320-12 | BDS LET CCT UPDATE | | | Y | Y | 24-0799 | 07-01-1991 | 07-01-1991 | 4:00 |
| 41320-12 | CTT TRAINING | | | Y | Y | 24-0799 | 06-10-1991 | 06-10-1991 | 4:00 |
| 44952-00 | PLANNED PIVOT TRAINING | | | Y | Y | 24-0799 | 06-07-1991 | 06-07-1991 | 3:00 |
| 31828-00 | ATTENDANCE CONTROL REVIEW | | | Y | Y | 24-0799 | 04-17-1991 | 04-17-1991 | 4:00 |
| 21552-00 | ESTABLISHING EAS & | | | Y | Y | 24-0799 | 08-01-1990 | 08-01-1990 | 9:00 |
| 21553-00 | EAS SELECTION NETS | | | Y | Y | 24-0799 | 08-01-1990 | 08-01-1990 | 7:00 |

USPS0255

USPS0256

HUMAN RESOURCES INFORMATION SYSTEM
EMPLOYEE TRAINING HISTORY REPORT
CREDIT THROUGH 09-13-2005

PRODUCED: 02-13-2001

PAGE: 6

EMPLOYEE ID: [redacted]
NAME: [redacted], PETER D
INSTALLATION: ANDOVER, MASSACHUSETTS CS DISTRICT
FINANCE NO: 24-4599
PAY LOCATION: 018

RATE SCHEDULE CODE: N
LEVEL: 16
STATUS CODE: A
WORK CODE: Y
DESG/ACT CODE: A
LOC: 19-0
OCC CODE: 61
JOB TITLE: 0233-0016
LABOR RELATION BPC:

| COURSE NUMBER | COURSE TITLE | OFFICE NUMBER | SUBJECT AREA CODE | QUALIFIED | CE CLOCK | TRAINING FINANCE | START DATE | COMPLETE DATE | TRAINING HOUR/MIN |
|---|---|---|---|---|---|---|---|---|---|
| 23457-94 | PERSONAL HARASSMENT | | | | X | 24-0719 | 08-01-1990 | 08-01-1990 | 2:00 |
| 43516-01 | DATA EXPRESS CLASS | | | X | X | 24-0259 | 08-01-1990 | 08-01-1990 | 4:00 |
| 43516-02 | TIER TWO REFRESHER (CLASSROOM) | | | X | X | 24-0259 | 08-12-1990 | 08-12-1990 | 4:00 |
| 21857-94 | SEXUAL HARASSMENT | | | X | X | 24-0719 | 08-01-1990 | 08-01-1990 | 2:00 |
| 21852-00 | ESTABLISHING EAS REQUIREMENTS | | | X | X | 24-0719 | 05-31-1990 | 05-31-1990 | 0:18 |
| 21553-00 | EAS EVALUATION METHODS | | | X | X | 24-0719 | 05-31-1990 | 07-31-1990 | 7:14 |
| 21557-94 | SEXUAL HARASSMENT WORKSHOP | | | X | X | 24-0719 | 04-01-1990 | 04-01-1990 | 3:44 |
| 21853-00 | GRIEVANCE STANDARD | | | X | X | 24-0719 | 04-01-1990 | 04-01-1990 | 3:00 |
| 23752-00 | LETTER PROCESS TRAINING | | | X | X | 24-0719 | 03-01-1990 | 03-01-1990 | 3:00 |
| 11828-00 | SEXUAL TINE & ATTN | | | X | X | 24-0799 | 09-01-1989 | 09-01-1989 | 4:00 |
| 21576-00 | MANAGEMENT SAFETY | | | X | X | 24-0799 | 08-01-1989 | 08-01-1989 | 2:00 |
| 17224-00 | SUPPLY LEADERSHIP | | | X | X | 24-0799 | 07-01-1989 | 07-01-1989 | 40:00 |
| 21576-00 | COACHING | | | X | X | 24-0799 | 06-11-1989 | 06-11-1989 | 2:00 |
| 11828-00 | ATTENDANCE CONTROL REVIEW | | | X | X | 24-0799 | 05-26-1989 | 05-26-1989 | 2:00 |
| 80900-00 | MGT EQUIP ANALYSIS SERVICE | | | X | X | 24-0799 | 05-01-1989 | 05-01-1989 | 2:00 |
| 17810-00 | EX RELS FLDO | | | X | X | 24-0799 | 05-01-1989 | 05-01-1989 | 80:00 |
| 44857-00 | ROUTE EXAMINATION | | | X | X | 24-0799 | 01-01-1989 | 01-01-1989 | 4:00 |
| 44857-00 | ROUTE EXAM - 1838 + 1838C | | | X | X | 24-0799 | 12-06-1988 | 12-06-1988 | 2:00 |
| 15810-00 | STOP BATCH 2B | | | X | X | 24-0799 | 12-01-1988 | 12-01-1988 | 40:00 |
| 15810-00 | 4TH DELIVERY SERVICE | | | X | X | 24-0799 | 10-24-1988 | 10-28-1988 | 40:00 |
| 17803-00 | EIS SUPV BASIC: EEOH REL/ADMIN | | | X | X | 24-0799 | 10-13-1988 | 10-17-1988 | 40:00 |
| 17803-00 | SUPV BASIC EE/LBR | | | X | X | 24-0799 | 10-01-1988 | 10-04-1988 | 56:00 |
| 11161-00 | INTRO TO POSTAL SUPERVISION | | | X | X | 24-0799 | 06-20-1988 | 06-24-1988 | 24:00 |
| 21707-00 | EMPLOYEE INVOLVEMENT | | | X | X | 24-0799 | 11-13-1987 | 11-13-1987 | 16:00 |
| 21807-00 | OPL WORK TEAM TEAM | | | X | X | 24-0799 | 11-01-1987 | 11-01-1987 | 16:00 |
| 21505-00 | JOB INSTRUCTOR TRAINING | | | X | X | 24-0799 | 08-26-1987 | 08-26-1987 | 8:00 |
| 43505-00 | RIGHT HAND DRIVE DELIVER TRAINING | | | X | X | 24-0799 | 07-01-1985 | 07-01-1985 | 2:00 |
| 14501-32 | INTRO TO THE USPS | | | X | X | 24-0799 | 07-01-1985 | 07-01-1985 | 3:00 |

# EXHIBIT F

1

```
 1                              Volume I
                             Pages 1 - 74
 2

 3                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 4

 5   JANICE E. LANG                     )
                   Plaintiff            )
 6                                      )
          VS.                           )  NO. 05-10052-WGY
 7                                      )
     JOHN E. POTTER, Postmaster General)
 8   United States Postal Service,      )
                   Agency               )  COPY
 9

10

11         DEPOSITION OF PETER ATTRIDGE, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   11, 2005, commencing at 1:22 p.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21                    _____
                          FOR THE RECORD
22                      COURT REPORTING SERVICES
                          11 FISKE STREET
23                 SHREWSBURY, MASSACHUSETTS  01545
                          (508) 845-1096
24
```

1    Q.    I'm going to refer you back to your
2    Exhibit No. 1, those notes, your notes taken for the
3    Janice Lang interview; is that correct?
4         A.    Yes.
5         Q.    We are going to go through in some level
6    of detail each one of these questions.  I'm going to
7    ask you what is the answer that you were looking for
8    in number one, please?
9         A.    Article 17 as a starting point would be
10   the article and in circumstances where unions
11   would -- where an employee would be paid authorized
12   payment for their duties as a steward.  That's what
13   I'm looking for.
14        Q.    Do you know what answer you were
15   expecting to receive from the question being asked?
16        A.    Well, that they would be paid for
17   investigating grievances.  I think we were looking
18   for -- I was probably looking for circumstances where
19   they might not be paid, where it wouldn't be known.
20   To attend a medical evaluation, things like that.
21        Q.    Prior to your working on the details in
22   labor relations, had you known this information
23   before that?
24        A.    Yeah.

1       Q.      So prior to 1998, had you known the

2   answer to question number one?

3       A.      Yes.

4       Q.      Under what circumstances did you become

5   aware of the answer to question number one?

6       A.      My job as manager and supervisor, as

7   supervisor for seven odd years and manager for

8   another three to four years.

9       Q.      In your capacity as labor relations

10  specialist, did you have any responsibility in

11  supervision itself?  Did you supervise any employees?

12      A.      In labor?

13      Q.      Labor relations.

14      A.      No.

15      Q.      Just so the document is clear, there is

16  a 51 on the left-hand side of the first page of the

17  document.  Is that the total score that you assigned?

18      A.      Yes, that would have.  I didn't add them

19  up but I would imagine these are all those numbers

20  added up.

21      Q.      Where you have 11:05 to 11:50 or 56,

22  that is the time of the interview?

23      A.      Yes.

24      Q.      Where it indicates on the left side to

1    the numbers various initials, would that be the
2    initials of the person asking the question?
3          A.     Yes.
4          Q.     Can you tell me what the answer you were
5    expecting was to question number two, please?
6          A.     Well, there could be a number but the
7    two significant differences would be that they did
8    not -- expedited panel cases are not -- you can't
9    submit those in regional arbitration for precedential
10   value.  They are noncitable.
11          Also, regional you have the option of
12   doing a written or oral closing and expedited doesn't
13   have that.  Those would be the two that I would be
14   looking for.
15          Q.     Would that be -- would the answer to
16   your question have been learned prior to you becoming
17   a labor relations specialist?
18          MR. WILMOT:  Objection.  You can answer.
19          A.     I'm not sure.
20          Q.     Tell me what the answer was that you
21   were looking for to number three.
22          A.     For the likelihood of getting all, I
23   believe there is twelve items, hit as many as
24   possible out of those twelve.  If you're asking me

```
 1   what the twelve items are right now, I cannot give
 2   them to you, sir.
 3       Q.    And how are the Douglas Factors used in
 4   the responsibilities of the labor relations
 5   specialist?
 6       A.    If you're taking a disciplinary action
 7   against a veteran, MSPB eligible employee, you have
 8   to refer to Douglas Factors when you're making your
 9   decisions and if you don't refer to Douglas Factors
10   it could be fatal before an MSPB Judge.
11       Q.    Is that something that you learned after
12   you became a labor relations specialist?
13       A.    More than likely.  More than likely.
14       Q.    On the right-hand side of your notes for
15   number three, are you able to tell me what you wrote
16   there?  It begins with the word evaluated.
17       A.    Says discipline is fairly administered.
18   MSPB evaluating that discipline it looks like.  I
19   can't even tell you what that last word is.
20       Q.    Can you tell me what you perceived as
21   the answer to number four, please?
22       A.    Well, what I would be looking for, I
23   mean, there is no set answer to that.  I believe I'd
24   be looking for someone, how would they handle that
```

 1  situation without getting us into a liability,
 2  without making any assessments on their own that the
 3  person was drunk, having the person evaluated,
 4  getting them out of the situation immediately, if the
 5  person was staggering or reeking, look for someone
 6  who was going to remove that person from any danger
 7  to himself or herself, get them evaluated from a
 8  medical standpoint, letting them know whether they
 9  were, in fact, drunk or not.  Follow-up with more
10  than likely an emergency placement.  Follow-up with,
11  you know, discipline, EAP referrals, something along
12  that line.
13         Q.    Number five, tell me what Metz Factors
14  are?
15         A.    They are the factors that are used when
16  evaluating a threat, whether something was an actual
17  threat or not.
18         Q.    Are there specific --
19         A.    Yes, there are.
20         Q.    -- factors?
21         A.    Yes, there are.
22         Q.    And do you know what they are?
23         A.    Top of my head, I don't.  I know the
24  person's reaction, how the circumstances that the

```
 1    comments were made in, the person's reaction to them
 2    when they were made, something along that line.  I
 3    believe there is four.
 4         Q.    Are you able to read for me what your
 5    notes say?
 6         A.    I see MSPB and I can't read that line
 7    underneath that.  One looks like interpret --
 8    interpretation -- I don't know what it says.  It says
 9    reaction.  It must be listener.  The intent of the --
10    and I guess that reads -- actually, the intent of
11    threatener or the person that made the threat,
12    history of the employee.  You got me on the last two.
13    I don't know what that says.
14         Q.    Turn the page, please.  At the very top
15    of the page above where it says number six, is that
16    your, I'll call it scribbles?
17         A.    I have no idea.
18         Q.    ·Can you tell me what the answer was you
19    were looking for in number six, please?
20         A.    Looking for, you know, did they have the
21    appropriate documents?  Did they have the 3971s and
22    3972s?  Getting medical documentation that might have
23    been submitted, any FMLA issues that might be
24    present.  Was there a previous disciplinary interview
```

1    conducted?

2             What were the defenses raised by the

3    employee at the disciplinary, pre-disciplinary

4    interview?  Had they been -- depending how long they

5    were out of work, was there a medical availability

6    sent out to them?  Were they made aware?  Were there

7    prior elements?

8             What would the person go through the

9    progressive chain of discipline or was this something

10   along that line.

11       Q.      Is that something that you knew about

12   prior to working in labor relations?

13       A.      Yeah, I would say so, yeah.

14       Q.      How did you become aware of that?

15       A.      As a manager and supervisor.

16       Q.      I did not ask that question of number

17   five.  In terms of the Metz Factors, that is

18   something that you learned while were you in labor

19   relations?

20       A.      More than likely, yeah.

21       Q.      Alongside number six, there is a ranking

22   or grade of three?

23       A.      Uh-huh.

24       Q.      There appears to be some type of

1    asterisk alongside of that?

2        A.    Uh-huh.

3        Q.    Is there any significance to the

4    asterisk?

5        A.    Not that I can see.

6        Q.    Number seven, please.  Can you tell me

7    what you were expecting for an answer?

8        A.    Well, article -- I don't know right now.

9    I think it's article seven.  It could be cross-craft

10   would be the answer.  Actually, it might be article

11   one.  I'm not really sure what circumstances.  In

12   emergencies, for training purposes.

13       Q.    Are you all set with your answer?

14       A.    Yeah.

15       Q.    Is that something that you had known

16   prior to becoming working in labor relations?

17       A.    Yeah, I would say so.

18       Q.    Number eight, please, can you tell me

19   the answer that you were looking for?

20       A.    Looking for that the employee, they have

21   invoked their Weingarten Rights, that they have an

22   opportunity to have a steward present during any

23   discussions that they have.

24            Basically, that's what I'm looking for,

```
 1   not to continue until he has a steward present.  Let

 2   him know if he does, you know, chances are if he

 3   continues discussion without a steward present, it

 4   could harm the case later, any discipline that could

 5   come out of this because they were not given their

 6   representation.

 7        Q.      Does the entry on the left side of your

 8   notes under number eight, can you read that into the

 9   record, please?

10        A.      It looks like it says S M, which I'm

11   assuming was Steve Meier, had asked a follow-up

12   question.  What if the steward asked for time prior

13   to the meeting?

14        Q.      Is that to mean time prior to the

15   meeting to meet with the employee?

16        A.      Yes.

17        Q.      You wrote down in quotes the word yes?

18        A.      Yes.

19        Q.      Is that what Ms. Lang had given for an

20   answer?

21        A.      Janice said yes, he would be allowed

22   time prior to the meeting.

23        Q.      Is that a correct response?

24        A.      Yes.
```

1      Q.      Do you recall today whether or not there

2  were any additional follow-up questions that were

3  made during the interview besides the one that is

4  noted here?

5      A.      No, if there had been, I would have

6  written them down.

7      Q.      Were you aware of the Weingarten

8  principles prior to becoming working in labor

9  relations?

10     A.      Yes.

11     Q.      How did you learn of that?

12     A.      As manager and supervisor.

13     Q.      Number nine, tell me what you were

14 expecting for an answer, please?

15     A.      Abolishment and reversion, abolishment

16 is getting rid of a job while somebody is in the job.

17             You have a job you have determined you

18 don't need anymore.  You abolish it.  That

19 abolishment is the person is in it.

20             The reversion is when you get rid of a

21 job when it becomes vacant, you don't fill it.

22 Essentially, that's what we are looking for.

23     Q.      In the parenthesis you have under your

24 answer, what does that say?

1       A.      Looks like right to return to the
2  office.
3       Q.      Do you know how that is to be read in
4  context?
5       A.      Well, in reading this, it looks like
6  Janice said a reversion means that the position is
7  available to be filled and the employee would have a
8  right to return to the office if their job is
9  reverted.
10      Q.      Is that a correct response?
11      A.      No.
12      Q.      What is incorrect about it?
13      A.      Well, the abolishment, abolishment --
14  she said abolishment meant the job was totally
15  eliminated.  The reversion meant it was available to
16  be filled.
17              I guess the job was not totally
18  abolished.  It was still there in some capacity, that
19  it could be filled later.  And somebody was returning
20  to the office, they could fill it.
21              That's what I'm getting off these notes.
22  This was, again, several years ago.
23      Q.      The person who is having their job
24  abolished, what happens to that person?

```
 1          A.      Depends.
 2          Q.      That wasn't part of the question?
 3          A.      I'm sorry?
 4          Q.      That wasn't part of the question?
 5          A.      Not that I can see here, no.
 6          Q.      For a reversion, the position is already
 7     vacant and then that position is --
 8          A.      Right.
 9          Q.      -- eliminated?
10          A.      Reversion would be if somebody retired
11     or bid another position and this job, at that point
12     assessment is made whether the job is needed anymore
13     operationally.  You revert the job.  Notify the
14     union.
15               You have 28 days to do it and if you
16     don't do it within 28 days, you can't revert it.  You
17     have to repost and abolish it.  It's a headache.
18          Q.      Who makes the actual decision whether to
19     abolish or revert?
20          A.      Local management.
21          Q.      Have you done that?
22          A.      Have I abolished or reverted jobs?
23          Q.      Yes.
24          A.      I'm sure I have.
```

1          Q.     Tell me what the answer is to number

2     ten, please.

3          A.     What are the criteria that we're looking

4     for?  The 1250 work hours and the one year continuous

5     service.

6          Q.     Anything else?

7          A.     No, I think it was that simple, just

8     looking for the threshold.  If you didn't have those

9     two, then you weren't eligible.

10         Q.     Tell me the answer to number eleven,

11    please.

12         A.     Looking at FMLA.  FMLA is federal law.

13    Dependent care is a postal policy, postal contractual

14    entitlement.  It's not a law.

15               FMLA is a -- you get twelve -- you get

16    480 hours a year of protected leave.  Sick leave for

17    dependent care is strictly 80 hours, period.  Sick

18    leave dependent care can be at the same time as FMLA.

19    Can run concurrently with it, although not

20    necessarily.  So the family, the illness that the

21    family member needs care for doesn't necessarily have

22    to be an FMLA condition.  It does have to be covered

23    by postal sick leave dependent care but it can be, so

24    if you're caring for a family member that is an FMLA

1   covered condition, it would run as part of the twelve
2   weeks.
3       Q.    Is that something that you knew about
4   prior to becoming a member of the labor relations
5   department?
6       A.    I'd say most of it, yeah.
7       Q.    Tell me what the answer you were
8   expecting was for question number twelve, please.
9       A.    That answer would be in my mind, you
10  answer the grievance.  You still accept the
11  grievance.  You don't sit on it.  You answer the
12  merits of the grievance but you note it was untimely
13  appealed.
14          You don't just say untimely, I'm not
15  going to listen to you.  You sit, have the meeting,
16  take all their arguments, respond to their arguments.
17  You treat it as though it was a timely appeal, except
18  you just note that it was untimely appealed.
19      Q.    Number 13, please tell me what answer
20  you were expecting?
21      A.    Looking at 13, this is a hypothetical as
22  it says.  If a steward was yelling, swearing -- I
23  guess not to read the question then, I guess not to
24  accept that, not to join in, I guess, not to go down

1   to that person's level.

2              To reschedule the meeting if necessary

3   for it to stop.  Tell them the meeting is over and

4   reschedule it.  Explain to the steward, you know,

5   they don't have the right to do that, that type of

6   thing.

7        Q.    And question number 14, please tell me

8   what you're looking for in that response?

9        A.    Basically, what it says, EEO and safety

10  you can go right to step two.

11       Q.    Was that something that you knew prior

12  to --

13       A.    Yes.

14       Q.    -- working in labor relations?

15       A.    (The witness shook his head indicating

16  yes.)

17       Q.    That's a yes?

18       A.    Yes.

19       Q.    Number 15, please tell me what you are

20  looking for in terms of the response?

21       A.    I honestly don't know what I was looking

22  for, just trying to get an idea how their -- how they

23  propose to handle a hectic workload.

24              There was no set answers in mind, just

1  to see the thought process, you know, what they felt

2  was the best way to do it.

3      Q.    Is there any concern expressed by any

4  member of the interviewing panel regarding Ms. Lang's

5  age?

6      A.    No.

7      Q.    During the time that you have been in

8  labor relations, has there been ever a female labor

9  relations specialist?

10     A.    Yes.

11     Q.    Who is that?

12     A.    Harriett Linkowitz.

13     Q.    Say it again?

14     A.    Clarify.  The time I've been in labor

15  relations where?

16     Q.    Labor relations specialist in

17  Massachusetts.

18     A.    Massachusetts district or --

19     Q.    Well, in terms of the --

20     A.    In my time in labor relations, I have

21  worked with female labor relations specialists, yes.

22     Q.    Where was that person employed?

23     A.    In Boston.

24     Q.    What is the district that you're

```
 1   assigned to now?

 2         A.     Massachusetts district.

 3         Q.     Okay.

 4         A.     I have worked with females in the

 5   Massachusetts district also.

 6         Q.     In terms of the Middlesex central

 7   district --

 8         A.     Yes.

 9         Q.     -- have there been any females working

10   as labor relations specialists?

11         A.     Yes.

12         Q.     Who is that?

13         A.     Lisa Andreasson.

14         Q.     Is she on a detail?

15         A.     Yes.

16         Q.     How about on a permanent basis?

17         A.     Not in my time, not since 2003.

18         Q.     How about when you were working details?

19   Were there any women on a permanent basis of the

20   labor relations specialists to your knowledge in the

21   Middlesex central district?

22         A.     Yes.

23         Q.     Who is that?

24         A.     I believe Ann Marie Stoica, who is an
```

1    attorney.   I think she later became an attorney.

2          Q.      She was a labor relations specialist?

3          A.      I believe she was.  I may be mistaken.

4          Q.      When did she leave?

5          A.      I'm going to say, I'm guessing.   I'm

6    going to say probably around 2000, 2001.

7          Q.      Do you know who she reported to?

8          A.      I don't.  I don't know what the

9    structure was back then.

10          Q.      You believe she was in the Middlesex

11   central district?

12          A.      I'm pretty sure she was.  Because there

13   used to be just the Middlesex district and the

14   Central Mass. district and at some point, they

15   combined and became Middlesex Central.

16               I don't know at what point she was

17   there.  She may have been there when it was Central

18   Mass.  I think she was out in Central Mass.  I'm 99

19   percent sure she was.  It might have been during the

20   Central Mass. time.  It might not have been at the

21   time when the two districts merged.

22          Q.      Do you know why she's no longer

23   employed?

24          A.      I believe she went into private practice

```
 1   as an attorney.
 2        Q.    Are you currently going to law school?
 3        A.    Yes, I am.
 4        Q.    What year are you?
 5        A.    I just finished my first year.
 6        Q.    Have you found as of yet, in terms of
 7   your law school experience, any of your education
 8   assisting you in doing preparing for the labor
 9   relations specialist position?
10        A.    Yes.
11        Q.    In what way?
12        A.    Particularly, most recently, briefs,
13   writing briefs.  Where I'm doing appellate briefs and
14   research and writing class and doing -- well, we
15   refer to them as briefs.  They are oral closings more
16   than a brief.  I'm sorry, written closings more than
17   a brief but yeah, that has been almost a direct
18   relationship to my job.
19        Q.    Were you aware at the time of Janice's
20   interview that she had passed the bar?
21        A.    I'm not sure.
22        Q.    Are you aware that she had gone to law
23   school?
24        A.    I'm not sure I would at that point or
```

1    not.

2         Q.      You have down on the last page on

3    Exhibit No. 1, it says she studied law.  Do you see

4    that?

5         A.      Yeah, then I must have known she went to

6    school.  I believe you asked me if she passed the

7    bar.

8         Q.      Right.

9         A.      I don't think I knew she passed the bar

10   at that time.

11        Q.      Okay, and the follow-up question then

12   was did you know whether she had gone to law school

13   at the time?

14        A.      I must have, according to those notes.

15        Q.      And just so as a matter of practice when

16   you were on -- the best of your recollection when you

17   were on the interview panel, all of the application

18   forms and 991s and all the attachments to it, was

19   that something that was reviewed at all?

20        A.      I don't recall seeing it.  I don't.

21             MR. GOLDBERG:  Let's take a break for a

22   second.

23             (Recess held.)

24             MR. GOLDBERG:  Back on.

```
 1          Q.     Just as follow-up to Ann Marie Stoica,
 2    do you recall her being in the district on a
 3    permanent basis?
 4          A.     I don't know.  It was prior to my
 5    arrival in this district.
 6          Q.     I just want to make sure you remember
 7    her being on a detail or permanent assignment?
 8          A.     I had assumed it was a permanent
 9    assignment.  I could be wrong.
10          Q.     Now, when you had indicated to
11    Mr. Persson that you believed that Mr. DiVasta was a
12    good candidate for the labor relations position
13    following the interview, your opinion was based upon
14    the interview and your knowledge of his prior
15    experience; is that correct?
16          A.     Yes.
17          Q.     You had not, if I recall correctly, seen
18    his 991 or any of the attachments to it?
19          A.     I don't recall ever seeing it.
20          Q.     And you had not seen Ms. Lang's 991 or
21    any of the attachments to it?
22          A.     I don't believe I did.
23          Q.     And your knowledge of Ms. Lang's work
24    history at the postal service from your own personal
```

# EXHIBIT G

1

```
 1                              Volume I
                             Pages 1 - 87
 2

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
    JANICE E. LANG,                         )
 5                  Plaintiff              )
                                            )
 6      VS.                                 )  05-10052-WGY
                                            )
 7   JOHN E. POTTER, Postmaster General    )
     United States Postal Service,         )
 8              Agency                       )
                                            )
 9

10

11        DEPOSITION OF MELINDA LAVECCHIO, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   17, 2005, commencing at 1:07 p.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21
                        FOR THE RECORD
22                 COURT REPORTING SERVICES
                      11 FISKE STREET
23           SHREWSBURY, MASSACHUSETTS   01545
                       (508) 845-1096
24
```

**COPY**

1          Q.      Did you have involvement in the
2     recruiting and selection for the labor relations
3     specialist position that Ms. Lang had applied for in
4     2003?
5          A.      I posted the position.
6          Q.      And how did you go about posting the
7     job?
8          A.      When a position becomes vacant, the
9     selecting official normally would have notified me.
10    I will pull the job description and qualification
11    standards for the position.
12              If it was a position that I had posted
13    in the past, I would get a copy of the position, the
14    posted position, prior.  The vacancy announcements
15    are all typed.  Unfortunately, we don't have an
16    automated system at this point, like you type in occ
17    codes and it gives you everything.
18              So this is all typed in.  So I would
19    prepare the vacancy announcement and then have it
20    reviewed by the selecting official before it was
21    posted.
22         Q.      Is that what occurred in this matter?
23         A.      Yes.
24         Q.      I know that you have been touching

1    selection was made and the service center processed

2    it, it would be at the service center.

3        Q.    Wherever it is physically maintained

4    today, would the recommendation from the review board

5    as to who they wanted to have interviewed be a part

6    of that file?

7        A.    Should be.

8        Q.    When the decision is made to repost

9    which apparently was done in this particular case,

10   what is your responsibility in the reposting?

11       A.    When a position needs to be posted

12   service-wide, we have to notify our northeast area

13   office, the HR analyst at the northeast area, about

14   the position, vacancy, with all the pertinent

15   information and he forwards it to headquarters to

16   post in a service-wide booklet.

17       Q.    Who chooses the specific requirements

18   for level 17 and level 19?

19       A.    Headquarters has a vacancy automated

20   system so that when they put in an occ code, the

21   requirements come up automatically.

22       Q.    So if that occ code requirement were

23   different than what was used for the district

24   posting, does that difference get discussed with the

```
 1   identity of the review board confidential, why would

 2   he do that?

 3                MR. WILMOT:  Objection.  You can answer.

 4        A.      They keep it confidential until

 5   selections are made and non-selections are made.  So

 6   once the position is either filled or the position

 7   is -- it is determined who isn't going to get the

 8   position, then the applicants have the right to know

 9   who was on the review committee, so that way a person

10   like Mr. DiVasta could go back to the chairperson and

11   talk to him about the job and what his deficiencies

12   were.

13        Q.      So the level of confidentiality is only

14   up to a certain point in time?

15        A.      Yes, yes.

16        Q.      I just want to make sure my previous

17   question was in context.  The question of the undue

18   influence really is in the context of the fact that

19   the job was still currently being posted because it

20   wasn't filled the first time around.

21                Is that what your understanding was in

22   answering the question?

23        A.      Yes.

24        Q.      Have you been involved in any
```

 1        Q.    But we know at least for the local level
 2   there was several additional factors that were
 3   included that were not in the job description as
 4   well; isn't that true?
 5        A.    Yes.
 6        Q.    Couldn't the selecting official have
 7   directed that that posting include, for instance,
 8   operational experience for the district?
 9        A.    The requirements, the special
10   requirements that we are able to add locally,
11   normally have something to do with the specific job
12   or the ones we normally have, computer skills,
13   traveling skills, things that, you know, knowledge of
14   word processing or oral communications, if it's not
15   included, those are the ones that are really
16   applicable to every single job.
17              Those are the ones that we can add
18   locally.  For something like operations, putting that
19   requirement would really change the, you know, the
20   job.
21        Q.    But if the selecting official really
22   wanted someone who could walk right into the job and
23   they needed to have this operations experience
24   background, why couldn't they then include that as

```
 1          A.      No, I don't.

 2          Q.      You made a comment before during your

 3   earlier testimony about individuals who are deemed to

 4   be experts in 991s.  Who would they be?

 5          A.      In our district, there is certain people

 6   that have been designated to give the training.

 7   Right now, Dave Papa has been giving the training.

 8   I know that Janice has even spent time giving people

 9   training on 991s.

10          Q.      So besides Mr. Papa and Ms. Lang,

11   anybody else that when you were giving the answer

12   before about experts in 991s, anybody else that you

13   were thinking of?

14          A.      I know of several postmasters that if

15   people asked me, I try to steer them to those

16   postmasters.

17          Q.      For example?

18          A.      Donna Legro, postmaster of Wakefield.

19   She and Dave Papa are probably the only two that I

20   have recommended.

21          Q.      There was some testimony earlier today

22   that an employee by the name of Ann Marie Stoica was

23   offered a labor relations specialist position by

24   Mr. LoPreste.  Do you have any knowledge about that?
```

1      A.     Yes.

2      Q.     What is your knowledge?

3      A.     That she applied for a labor relations

4  specialist position.  She was postmaster of Sutton

5  and she was very interested in the job but when push

6  came to shove or when she was actually offered the

7  job, she didn't want to commute to the district

8  office every day.

9      Q.     So from wherever she lives to --

10     A.     Sutton to North Reading.  Sutton, I

11  think it's around here.  Isn't it part of Worcester

12  someplace?  I don't know.  I've never been there but

13  I know that she just didn't want to commute the whole

14  way every day.

15     Q.     Do you remember when this offer was

16  made?

17     A.     I don't have the date.

18     Q.     Is Ms. Stoica still employed with the

19  postal service?

20     A.     No, she isn't.

21     Q.     Do you know how long it's been since

22  she's been employed?

23     A.     I'm guessing three years.

24     Q.     What position did she hold before she

1  left, if you know?

2      A.    I can't be sure.  She's one of these

3  people that had all kinds of details but I believe

4  she had a position at the northeast area.

5      Q.    In labor relations?

6      A.    In labor relations.

7      Q.    And any idea as to how long she was in

8  that position for before she left?

9      A.    I'm guessing.  I know it was at least a

10  couple years.  When I was down there, she was down

11  there, too.  So at least a couple years.

12          MR. GOLDBERG:  Okay, I don't have any

13  further questions right now.

14          MR. WILMOT:  I just have a couple.

15  EXAMINATION BY MR. WILMOT:

16      Q.    You testified earlier that you never

17  applied for the labor relations specialist position.

18  Were you ever asked to?

19      A.    When positions came open, I was a

20  trained advocate so I used to help them out.  Every

21  month I'd get a listing and I used to do advocacy

22  work.

23          When positions became vacant, they

24  always said, Melinda, there's a position opening.

1    You should think about coming into labor relations.

2        Q.      Who would say that to you?

3        A.      Dave Couture and Bob LoPreste.

4        Q.      During the time that you were HR

5    specialist, are you aware how often a vacancy became

6    available for labor relations specialist positions?

7        A.      You know, I knew I was coming here

8    today.  I didn't do very much but I kept thinking

9    about it all night.  I got to thinking about the

10   staff in labor relations.  In 1993 there was Bob

11   LoPreste, Mark Persson, Dave Papa.  I posted at least

12   two or three prior to this one.

13       Q.      This one being what?

14       A.      The one that was posted 03-020 then

15   service-wide.

16       Q.      So prior to what's been marked as

17   Persson Exhibit No. 1 and then the reposting of that

18   position, and Persson No. 17, your memory is that you

19   posted maybe three?

20       A.      Yes.

21       Q.      Okay.  For those vacancies, other than

22   the two that we have been talking about today, which

23   is marked as Plaintiff's Exhibit No. 1 and

24   Plaintiff's Exhibit No. 17, other than Ms. Stoica,

1    are you aware of any other female applicants for

2    those vacant labor relations specialist positions?

3        A.      Not that I can remember.

4        Q.      You testified earlier that it is a

5    selecting official's responsibilities to choose the

6    members of a review board.  Although it is the

7    selecting official's responsibility to do that, were

8    there times where you had to choose the review board

9    members?

10        A.      I never was the actual chooser.  I have

11    had, as I said, my role is so different from job

12    vacancy to job vacancy.  I have had selecting

13    officials, postmasters, ask me who was trained and

14    who was on review boards and I would give them

15    recommendations, but I never made the sole selection.

16        Q.      Do you remember if you made any

17    recommendations for the two review boards that we

18    spoke about today?

19        A.      No, I didn't.

20        Q.      You did not make any recommendations?

21        A.      I did not make any recommendations.

22        Q.      It's my last question and it's a long

23    one.  I will try and make sense of it.  If it

24    doesn't, please ask me to repeat it.

# EXHIBIT H

1

1 - 207

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

JANICE LANG,                         )
                                     )
            Plaintiff,               )
-v-                                  )  CIVIL DOCKET NO.:
                                     )  05-10052-WGY
JOHN E. POTTER,                      )
Postmaster General,                  )
                                     )
            Defendant.               )


THE ORAL DEPOSITION OF JANICE LANG, held

pursuant to Notice, and the applicable provisions of the

Federal Rules of Civil Procedure, before Steven Kane, a

Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the office of the

United States Attorney, 1 Courthouse Way, Suite 9200,

Boston, Massachusetts, on Tuesday, August 4, 2005,

commencing at 11:00 a.m.

ORIGINAL

126

1       I believe there was going to be a class like
2  November 3rd, or something.

3       And I said I really don't know if I can take it.
4  I said I was counting on the position, the Labor Relations
5  position to pay off my tuition, and so forth, and now I'm
6  probably would be looking for a part-time job and I didn't
7  know if I would be available at that time to do it.

8       Q    Do you remember if you said anything else?

9       A    I probably made a comment in terms of maybe I
10 would have to talk to my lawyer or something or whatever.

11      I don't know.  All I know is I was stunned when he
12 said "Ralph."

13      Q    Do you think that in that conversation on the
14 14th, when he first told you that Mr. Divasta was selected,
15 that you mentioned to him that you were going to speak to a
16 lawyer about you not getting the position?

17      A    Possibly.

18      Q    Okay.

19      A    All I know is my face was getting beet red from
20 just the stress of the whole thing and then to be told Ralph
21 got the job.  I mean, that was the last blow.

22      Q    In October of 2003, were you aware of what the
23 procedures were for lodging an EEO Complaint?

24      A    In October, when?

25      Q    Of 2003.

APEX Reporting
(617) 426-3077

1          BY MR. WILMOT:

2      Q    Did you file any type of formal or informal

3   complaint with regard to the selection of Mr. Divasta for

4   the Labor Relations Specialist position?

5      A    I filed timely when I learned who was awarded the

6   position.

7           That was an ongoing, continuous process starting

8   May 1st with my first interview, applying in April, and

9   finally being resolved on October 17th -- October 14th, when

10  I was told Mr. Divasta was awarded the position.

11     Q    Did you file a formal or informal complaint?

12     A    Could you explain the difference between the two?

13     Q    Early on, when we first started this deposition,

14  Exhibit No. 2, you identified as your EEO Complaint, "a

15  discrimination in the Postal Service."

16          Do you remember that testimony?

17     A    Right.

18     Q    Was this document, Exhibit No. 2, your first

19  Complaint concerning your non-selection for this Labor

20  Relations Specialist position?

21     A    I filed the proper procedure as instructed by the

22  bulletin board, and so forth, in contacting the EEO

23  Department.

24          And I believe that was done at the end of October.

25  I believe I filed papers October 31st, and so forth.

| | | |
|---|---|---|
| 1 | | It was timely done. |
| 2 | Q | And you said you contacted the EEO Department? |
| 3 | A | That's correct. |
| 4 | Q | Do you remember when you did that? |
| 5 | A | October -- the end of October -- October 31st. |
| 6 | | I asked Dave Papa, who was the EEO Manager for the |
| 7 | paperwork. And that was filed in October of 2003. |
| 8 | Q | So you asked Dave Papa for paperwork and you |
| 9 | filled out that paperwork? |
| 10 | A | I made my Complaint and it was put into the works. |
| 11 | Right. |
| 12 | Q | Do you remember when you filed that paperwork that |
| 13 | you're describing? |
| 14 | A | I'm not too sure, no. All I know, is I met with |
| 15 | Mary Ann Keefe in December. |
| 16 | Q | And who is Mary Ann Keefe? |
| 17 | A | She was the US Postal Service and EEO |
| 18 | investigator. |
| 19 | Q | And that was December of '03? |
| 20 | A | That's correct. |
| 21 | Q | I'd like to bring your attention back to your |
| 22 | Complaint, Exhibit No. 1. |
| 23 | | I just want to bring your attention to paragraph 9 |
| 24 | of your Complaint. |
| 25 | | What did you understand to be the qualifications |

# EXHIBIT I

```
 1                          Volume I
                         Pages 1 - 117
 2

 3                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 4
     JANICE E. LANG,                          )
 5                    Plaintiff               )
                                              )
 6        VS.                                 )  05-10052-WGY
                                              )
 7   JOHN E. POTTER, Postmaster General       )
     United States Postal Service,            )
 8              Agency                         )
```

# COPY

```
11        DEPOSITION OF DAVID COUTURE, taken at the

12   request of the Plaintiff, pursuant to the applicable

13   provisions of the Federal Rules of Civil Procedure,

14   before Karen G. Farragher, RPR and Notary Public in

15   and for the Commonwealth of Massachusetts, on August

16   12, 2005, commencing at 1:53 p.m., having been

17   identified by the Notary Public through satisfactory

18   evidence of identity per Executive Order No. 455

19   (03-13) at the offices of Gary H. Goldberg, Esq., 120

20   Main Street, Worcester, Massachusetts.

21

22                    FOR THE RECORD
               COURT REPORTING SERVICES
23                   11 FISKE STREET
            SHREWSBURY, MASSACHUSETTS   01545
24                   (508) 845-1096
```

1  did not agree with the selecting official's selection

2  but concurred anyway?

3      A.      Little strongly worded there.  I

4  questioned -- all I can recall, one time I questioned

5  the selection by the manager but we acquiesced and

6  concurred with his selection.

7      Q.      Do you remember what that occasion was?

8      A.      Selection for safety position.

9      Q.      Have you ever had the occasion where you

10 have convinced a manager to change their selection?

11     A.      No.

12     Q.      In the period of time that you have

13 served as district manager for human resources, how

14 many times was there a vacancy in the labor relations

15 specialist position?

16     A.      Including these two times that we are

17 speaking about here, I think five times.

18     Q.      Five times, not including the two

19 postings that we have discussed here, the two

20 vacancies we have discussed here today and the other

21 three occasions that a position was vacant in labor

22 relations specialist position, how many times did a

23 woman apply for that position?

24     A.      While I can't recall a specific number,

1    I know for a fact one time there was one female

2    candidate from Boston.

3            Q.      Okay.

4            A.      But I can't recall any others.

5            Q.      You can only think of one?

6            A.      Yes.

7            Q.      I don't think we got this before, how

8    many EAS employees reported to you in 2003?

9            A.      Well, I mentioned the number before, 64,

10   65.  It's a little bit in flux but out of that 64,

11   65, probably 62, 63 of them are EAS employees,

12   supervisor employees.  We only had two craft

13   employees, bargaining unit employees that worked.

14           Q.      How many of those employees were female?

15           A.      Can't give you the exact number but I

16   know more than half.

17           Q.      Okay.  Do you remember who hired Pete

18   Attridge in 2003 for the labor relations specialist

19   position?

20           A.      My recollection would have been Bob

21   LoPreste.  I think he was prior to Mark.

22           Q.      Did you concur with that decision?

23           A.      I would have.

24           Q.      At any time after or before your

 1   interview of Ms. Lang with Mr. Persson in 2003, did
 2   you have any discussion with Mr. Persson about
 3   Ms. Lang's age?
 4        A.      Not that I can recall.
 5        Q.      After or before your interview of
 6   Ms. Lang with Mr. Persson 2003, did you have any
 7   discussion with Mr. Persson about Ms. Lang's sex or
 8   gender?
 9        A.      Well, obviously, she's a female.  We
10   would have had those types of discussions.
11        Q.      What do you mean by that?
12        A.      Just in speaking about the candidates.
13   I had mentioned earlier that one of my desires was to
14   try to have more females in human resources in
15   specific functional areas.
16             So I know at times we had conversation
17   about the fact of a lack of people that were in there
18   and the lack of qualified candidates applying for the
19   job.  So we would have had that type of conversations
20   about Janice's sex.
21        Q.      So fair to say your conversation about
22   Ms. Lang being a female candidate was positive for
23   Ms. Lang's candidacy?
24        A.      Yes, yes, my desire to have women in the

1  office.

2      Q.      Was Ms. Lang's age a factor in your

3  recommendation to repost the labor relations

4  specialist position in 2003?

5      A.      No.

6      Q.      Was Ms. Lang's sex or gender a factor in

7  your recommendation to repost the labor relations

8  specialist position in 2003?

9      A.      No.

10     Q.      Did you play any role in the second

11  review board's decision to recommend Ralph DiVasta by

12  the selecting official?

13     A.      No, not that I can recall.  In fact, as

14  I testified earlier, that whole process for the

15  second posting, the second position, I had minimal

16  involvement.

17          We were in the middle of this

18  restructuring with Springfield, assumption of all of

19  those employees, all those people and, in fact, in

20  retrospect, that's probably why I agreed to allow the

21  other labor relations specialists to sit in on the

22  interviews rather than do it myself as an example.  I

23  was just busy with other things.

24     Q.      Who made the decision to hire Ralph